**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 16-11626 (BLS)<br><br>(Joint Administration Requested) |

**DECLARATION OF SANJAY BHARTIA,
IN SUPPORT OF DEBTORS' FIRST DAY PLEADINGS**

I, Sanjay Bhartia, pursuant to 28 U.S.C. § 1726, hereby declare that the following is true and correct to the best of my knowledge:

1.     On July 8, 2016 (the "**Petition Date**"), Essar Steel Minnesota LLC ("**ESML**") and ESML Holdings Inc. ("**Holdings**," together with ESML, the "**Debtors**,") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), thereby commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  The Debtors continue to operate their business as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

2.     I have been employed by ESML as its Chief Financial Officer (the "**CFO**") since July 24, 2013.  In such capacity, I am generally familiar with the Debtors' business, day-to-day operations and financial affairs.  I have more than 12 years of international experience in the mining and resources industry and over twenty-five (25) years of senior executive experience. Before joining ESML, I was the chief financial officer of Crossland Resources Ltd. in Australia. I have held various leadership positions with companies such as Aditya Birla Minerals Limited

---

[1] The last four digits of Essar Steel Minnesota LLC's federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

in Perth, Australia, Indo Phil Cotton Mills, Inc. in the Philippines and Hindalco Industries Ltd. in India.  During my career, I have been involved with the development and financing of large greenfield resource-based projects.  I hold a bachelor's degree in commerce and am a member of the Australian Chapter of The Institute of Chartered Accountants Australia, The Institute of Chartered Accountants of India, and I am also a graduate member of Australian Institute of Company Directors.

3.      I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances that preceded the commencement of the Chapter 11 Cases and in support of the first day motions and applications filed by the Debtors (collectively, the "**First Day Motions**").  Except as otherwise indicated, all facts set forth in this Declaration are based upon by personal knowledge, information provided to me by certain of the Debtors' employees and professionals, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtors.  If I were called to testify, I would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      This Declaration is divided into two sections.  **Section I** provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the events giving rise to the Chapter 11 Cases.  **Section II** summarizes the relief requested in, and the facts supporting, the First Day Motions.  This Declaration is intended to supplement any other declarations submitted in support of the First Day Motions.

### Section I – The Debtors' Organizational Structure, History and Development of the Project, and Events Giving Rise to the Chapter 11 Cases

**A.  History and Conception of the Project**

5.      The Debtors are two separate entities: (a) ESML, a Minnesota limited liability company, and (b) Holdings, ESML's direct parent company, a Delaware corporation.   In addition to the Project (as defined below) the Debtors maintain office space in Hibbing, Minnesota and New York, New York.

6.      ESML was formed to develop and operate a fully-integrated, seven (7) million tonnes per annum (mtpa) capacity pellet production facility (the "**Project**") in the western Mesabi Range in northern Minnesota.  The Project is one of the largest "greenfield" mining projects being constructed in the United States and will consist of an open-pit iron ore mine, crushing, concentrating and pelletizing facilities, and a rail line and train-loading system. Among the Project's potential core competitive strengths is its ability to supply multiple types of pellets on a competitive basis to both national blast furnace and the electric furnace steel manufacturers due to lower costs and higher overall pellet quality.

7.      At the Project Site (defined below), there are an aggregate of approximately 1.8 billion tonnes of measured and indicated magnetite iron resources, of which approximately 1.7 billion tonnes are classified as proven or probable reserves, and an additional 0.2 billion tonnes of inferred magnetite iron resources.  Stated in operational terms, if the Project were consistently operating at its highest potential capacity, proven and probable reserves are likely sufficient to support a mine life of approximately seventy (70) years.

8.      In addition to the benefits of the Project's top-to-bottom vertical integration and the resources in the land on which it sits, its geographic location in the Mesabi Range—with its long and established history of iron ore mining—will enable the Debtors to leverage the

established local infrastructure, and the area's skilled labor force to successfully complete and operate the facility.  The Project is located approximately 120 miles by rail from the point of sale at the Port of Duluth, with full transportation infrastructure in place, including two Class I rail carriers and sufficient port capacity to swiftly transport all expected production to customers. Upon completion of the Project, ESML will be well-positioned to access the broader North American market.

**B.  Plant Facilities and the Production Process**

9.      The main steps involved in the production of iron ore pellets, all of which will be conducted at the Project, in sequence, are: the mining of iron ore; the crushing of the mined ore; the concentration of the crushed ore; and the pelletization of the concentrate.



- <u>Mining</u>:  The mine at the Project is designed to be a conventional open-pit mine, which will consist of drilling and blasting of ore.

- <u>Crushing</u>:  Ore from the mine will be processed through a crusher or multiple crushers, before being separated into magnetic crushed iron ore and non-magnetic material. Magnetic crushed iron ore will be conveyed to the fine and course ore storage stockpile; and non-magnetic material will be stockpiled and used for site road construction and maintenance.

- <u>Concentration</u>: The concentration process will involve the grinding of crushed ore and magnetic separation to remove non-magnetic or non-iron elements. The Project's concentration process will be capable of producing DR-grade concentrate containing approximately 65% iron with silica content of less than 2%.

- <u>Pelletization</u>: Pellets are heat-hardened balls produced from concentrates. The pellets are conveyed to bunker house storage bins or stockpiles, until they are loaded for shipment.

**C.  The Project Site and Access to Minerals and Ground Leases**

10.     The land area ESML expects to utilize to operate the Project is approximately 20,837 acres, comprised of: 6,154 acres for mining, 575 acres for the site on which the operating plant (the "**Plant**") sits, 1,940 acres for the tailings basin, 823.0 acres for the stockpile and

16,695 acres for environmental buffer land. The Debtors own the surface rights to approximately 13,861 contiguous acres of the 20,837, and hold another approximately 6,167 acres under long-term leasing arrangements, and has 800 acres that remain unleased (collectively, the "**Project Site**").

11.    As stated above, the construction of the mine, crushing, concentrating and pelletizing facilities, as well as the use of the associated tailings basin in connection with processing the ore mined at the Project, will all be conducted at the Project Site. This estimated area is the extent of the land area on which the Minnesota Department of Natural Resources ("**DNR**") has issued a "Permit to Mine." Due to environmental protection in the region, the actual lands that may be disturbed by mining operations in the Mesabi Range will continue to be reduced in the foreseeable future, rendering the Project Site, in and of itself, a competitive advantage of the Debtors and a valuable asset.

12.    The majority of the mineral rights in the Project area are controlled by the State of Minnesota ("**Minnesota**"), Great Northern Iron Ore Properties ("**GNIOP**"), Superior Mineral Resources LLC, and the Langdon/Warren families. The Debtors hold leases to mineral rights for 5,805 acres in connection with the Project.

13.    The Debtors mainly lease their mineral rights, with a relatively small share of their mineral rights owned by ESML. The Debtors' largest percentage of mineral rights is leased from the Minnesota DNR, representing approximately 41.6% of the Debtors' total mineral rights (under approximately 2,500 acres), followed by GNIOP, representing approximately 33.4%, Superior Mineral Resources LLC representing approximately 17.2%, and the Langdon/Warren families representing approximately 4.4%. As discussed below, the potential termination of

these mineral leases—the core source of supply of raw material for operation of the Facility—provided an impetus for the Debtors' filing of the Chapter 11 Cases.

### D.  Prepetition Project Financing and Equity Capital Structure

14.    As of the Petition Date, the Debtors had over one billion dollars of secured obligations, which are secured by a lien, subject to certain exceptions, on substantially all the assets of the Debtors—namely those assets constituting the Project—consisting of:

- o  a multi-tranche term loan (the "**Project Finance Debt**") issued pursuant to that certain Senior Secured Credit Agreement, dated as of December 29, 2010 (as amended from time to time, the "**2010 Senior Secured Credit Agreement**") by and among ESML, as borrower, Holdings and certain other affiliates of ESML, as guarantors, ICICI Bank Limited, Singapore Branch, as Facility Agent, Wilmington Trust, National Association, as Security Agent, ICICI Bank Limited, New York Branch, as a Lender and Issuing Bank, Escrow Agent and Account Bank, and Mandated Lead Arranger, through which approximately $530,000,000 was funded as of the Petition Date;

- o  term loan facility (the "**Term Loan**") issued pursuant to that certain Credit and Security Agreement, dated as of September 30, 2014 (as amended from time to time, the "**2014 Credit and Security Agreement**") by and among ESML, as borrower, Holdings, as guarantor, the lenders signatory thereto, and U.S. Bank National Association (the "**Term Loan Agent**"), a national banking association, as agent, through which approximately $349,000,000 was funded as of the Petition Date; and

- o  certain reimbursement obligations under that certain Letter Agreement, dated March 3, 2014 by and between ESML and EPIL, and that certain Facility Agreement, dated June 1, 2012 (the "**EPIL Supplier Credit Facility**," and collectively with the Term Loan and the Project Finance Debt, the "**Secured Debt**"), by and among EPIL, as borrower, Central Bank of India, as Lender, Lead Bank and Facility Agent, and Export Import Bank of India, as Lender, through which approximately $139,000,000 was funded for the indirect benefit of the ESML.

- o  Holdings is a guarantor of ESML's Project Finance Debt and Term Loan obligations.  In support of its guarantee, Holdings pledged its only asset, its membership interests in ESML.

15.    Essar Global Fund Limited (ESML's ultimate parent company, "**EGFL**") and its subsidiaries have contributed over $800 million in equity to ESML to date.

16.     ESML is also a party to that certain Equity Contribution Agreement among Essar Global Fund Limited (ESML's ultimate parent company, "**EGFL**") and U.S. Bank, National Association dated as of September 30, 2014 (the "**ECA**").  Pursuant to the terms of the ECA, EGFL agreed to provide equity contributions to ESML to fully satisfy obligations of ESML in respect of Secured Debt obligations or those obligations otherwise required to be satisfied to complete the construction of the Project, including build costs in excess of $1.802 billion and government grant reimbursement obligations (discussed below).

17.     The Secured Debt is subject to the terms of that certain Collateral Agency and Intercreditor Agreement, dated as of September 30, 2014, by and among, ESML, Holdings, as Pledgor, ICICI Bank Limited, Singapore Branch as the ICICI Facility Agent, Central Bank of India as the SC Facility Agent, U.S. Bank National Association, as the Term Loan Agent, Wilmington Trust, National Association, as the Security Agent, and other parties thereto from time to time (the "**Intercreditor Agreement**"). The Intercreditor Agreement governs the enforcement of rights and remedies of the Debtors' secured lenders.

**E.  Construction of the Project**

18.     On March 22 and May 5, 2010, ESML entered into engineering, procurement, construction and project management contracts with affiliates to build the Project. Subsequently, in 2012, certain of those agreements were modified, and portions were consolidated into an additional Lump Sum Turn Key Agreement (the "**LSTK**" and collectively the "**Construction Agreements**") with another affiliate, Essar Projects Limited ("**EPL**"). Under the LSTK, as amended, ESML appointed EPL as Contractor for work necessary to complete the Project by May 31, 2015, in exchange for payment of the Contract Price, *i.e.*, a sum-certain in the amount, with ESML entitled to retain 10% of the Contract Price until the Project is completed.

19.     As of the date hereof, ESML has paid substantially all amounts due under the Construction Agreements with the exception of a 10% holdback under the LSTK which is not due until completion of the Project. Nevertheless, the Project remains significantly incomplete. In October 2015, the Contractor fell behind on payments to a significant number of subcontractors, many of whom have since filed liens on ESML's assets, and work substantially ceased on the Project in November 2015.

20.     Since construction ceased in November 2015, ESML has worked tirelessly to find a path forward to complete the Project. These efforts have included negotiations and discussions with ESML's Secured Debt lenders, mineral lessors, customers, shareholders and affiliates, with the Contractor's subcontractors, and with numerous political leaders and agency commissioners in the State of Minnesota.  ESML spent several months working with the Contractor to determine and validate the cost to complete the project, and with other potential project managers to attempt to obtain third-party validation of the cost to complete the project and to determine whether it would be more cost effective, efficient or otherwise prudent to engage a new contractor to complete construction.

21.     ESML's efforts also have included substantial efforts to raise the additional equity or debt financing necessary to fund project completion.  ESML worked with several potential investors in multiple locations around the world to attempt to obtain the requisite financing.  On March 7, 2016, ESML retained Guggenheim Securities, LLC, to assist in this process.  ESML also engaged SBI Capital Markets to prepare an information memorandum and assist in the financing process in India.  Immediately prior to the filing of these Chapter 11 Cases, ESML was finalizing the terms for interim financing that ESML expected to provide the liquidity necessary for ESML to complete its financing process, which was expected to include a significant equity

investment by the interim financing lender, but which was contingent upon the State of Minnesota agreeing not to terminate ESML's State mineral leases during that financing process. Ultimately, given the onslaught of issues that have arisen from the Project's halted construction, particularly due to uncertainty of ESML's State mineral lease situation and the termination of its ArcelorMittal contract (each as described in more detail below), ESML simply was not able to complete the process to obtain the necessary funds to resume construction prior to its need to file these Chapter 11 Cases to protect its mineral leases.[2]

22.      ESML (as described further below) currently employs 32 individuals.

**F.  Events Leading to the Chapter 11 Cases**

23.      The Project's stalled development resulted from a series of material events that threatened the Project and resulted in a chain of events that, if not stymied now, would result in a devastating blow for the Debtors.

24.      *First*, the State of Minnesota has recently taken the position that ESML's mineral lease agreements with the Minnesota DNR, which account for approximately 41.6% of ESML's access to iron ore—the raw material, around which the Project is being developed and which is essential for the plant's production— may be terminated after noon on July 8, 2016.  A loss of access to the natural resources provided under these leases would be devastating to ESML and its stakeholders, and would nullify many years of effort and hundreds of millions of dollars invested to date.  In addition to the catalysts described below, this threat of loss of ESML's largest group of mineral leases was the proverbial straw that broke the camel's back, requiring that the Debtors commence these Chapter 11 Cases without delay.

---

[2] The interim financing also would have provided funding for the payment of a significant portion of the outstanding subcontractor payables that had resulted in mechanics' liens being filed against ESML's real property.

25.     *Second*, the Project's anticipated output of seven (7) mtpa of iron ore pellets was supported by offtake agreements (output sale contracts) with an affiliate of the Debtors, Essar Steel Algoma Inc. for 2.5 mtpa and ArcelorMittal USA LLC ("**ArcelorMittal**") for 4.5 mtpa. On May 27, 2016, ArcelorMittal informed ESML that it was terminating its 4.5 mtpa offtake agreement, leaving ESML with uncertainty in respect of a significant percent of its expected revenue upon completion of the Project and an obstacle to obtaining financing.

26.     *Third*, beginning in September 2015, EGFL did not provide a contribution to a cost-overrun escrow account in favor of the Term Loan lenders required pursuant to the ECA and did not meet certain other obligations to provide equity contributions to fund extraordinary Project expenses required by the ECA.  While EGFL has contributed over $800 million into ESML, its inability to contribute to the cost overrun account as required under ECA resulted in defaults under ESML's Secured Debt agreements and unavailability of Term Loan funds, cutting off the critical financial lifeline to ESML and initiating the subsequent chain of events.

27.     *Fourth*, certain of the Debtors' Secured Debt facilities were accelerated, and the Debtors determined that they must act promptly to ensure that involuntary foreclosure on certain of the Debtors' assets could not occur.  Specifically, on February 23, 2016, the Term Loan Agent accelerated the obligations under the 2014 Credit and Security Agreement.  In connection with this acceleration notice, the Term Loan Agent seized approximately $120 million that would otherwise have been distributed to ESML for the continued development of the Project, and applied the funds to payment of their fees, interest, a prepayment penalty and an involuntary paydown under the Term Loan.  Approximately two months later, on April 25, 2016, ICICI Bank, in its capacity as Facility Agent acting on behalf of the required lenders thereunder, accelerated ESML's obligations under the 2010 Senior Secured Credit Agreement.

28.    *Fifth*, the Project has benefitted from a regional infrastructure build-out, which has been funded through a grant of approximately $65.9 million from the State of Minnesota to Itasca County.  Pursuant to the terms of the agreements governing the grant, EGFL and ESML were required to reimburse Itasca County, due to, among other things, construction of the Project not being completed by October 1, 2015.  Despite negotiations that extended over a three-year period, ESML was not able to obtain an extension of the construction completion deadline from the State of Minnesota.  EGFL and ESML reached an agreement in principle in December 2015 with the State of Minnesota for deferred repayment terms, but ESML could not honor that commitment because it was not able to obtain the consent of its Secured Debt lenders to make payments on account of the grant.

29.    *Sixth*, ESML is party to litigation that was commenced by Great Lakes Gas Transmission Limited Partnership, in which a judgment was entered against ESML in excess of $32 million.  The matter is on appeal, but could not have gone forward without ESML's provision of a bond in excess of $37 million, which was provided by a surety company.  Approximately $23 million of ESML's cash collateralizes the bond, and the surety company has demanded that an additional $15.3 million in cash collateral be provided.  ESML has not had the funds to provide the additional cash collateral and on April 25, 2016 the surety company commenced a lawsuit against ESML seeking the funds.

30.    *Finally*, a number of the Contractors' subcontractors have filed mechanics' liens against the Project that have put certain of ESML's material agreements at risk of default and/or termination.

31.    In short, the Debtors filed the Chapter 11 Cases seeking the necessary breathing space from growingly aggressive creditors and contract counterparties alike, so that a proper

restructuring of the Debtors' financial obligations can occur, while preserving the Debtors' critical assets, and in turn, maximizing value for all stakeholders.

32.     ESML is not currently operating and has had no source of funds other than equity contributions since February 2016.  All proceeds of Term Loan were expended by approximately September 2015.  Since that time, the Debtors' affiliates have contributed $49 million in new equity to allow ESML to continue to maintain its assets.   As of the Petition Date ESML expects to have sufficient cash remaining from these equity contributions to continue to operate in the ordinary course of business postpetition for approximately three weeks.  ESML is optimistic it will procure financing in the form of debtor-in-possession financing during this time.

### Section II – The Relief Requested In, and the Facts Supporting, the First Day Motions

33.     It is critically important for ESML to maintain the loyalty and goodwill of, among their other constituencies, their vendors and employees, to ensure that the Project may be properly preserved, particularly while the Debtors are working to obtain new financing so that construction of the Project may resume and working to resolve outstanding issues that continue to hamper progress.  The Debtors have therefore filed the First Day Motions seeking relief intended to enable the Debtors to effectively transition into the Chapter 11 Cases with minimum disruption to their limited business operations, thereby preserving and maximizing value of the Debtors' estates and ultimately affording a smooth transition as Project development resumes. Unless the "first day" relief is granted, I believe ESML's operations will suffer adverse immediate and irreparable consequences.

34.     Some of the First Day Motions request authority to pay certain prepetition claims. I am told by my advisors that rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the

first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. As part of this, certain requests for relief will be deferred for consideration at a later hearing.

35.    I have reviewed each of the First Day Motions and/or had their contents explained to me. The facts stated therein and described below are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable ESML to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully rehabilitating the Debtors' Project.[3]

---

[3] Capitalized terms used but not otherwise defined in Section II of this Declaration shall have the meanings ascribed to such terms in the relevant First Day Motion.

### A.  Administrative Motions

**i.    Debtors' Motion for Entry of An Order Pursuant to
11 U.S.C. §§ 105, 342(C)(1) for Joint Administration of Cases**

36.    The Debtors commenced two (2) chapter 11 cases by filing the appropriate petitions with this Court for ESML and Holdings.  The Debtors seek joint administration of the chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b), and request that this Court utilize a single general docket for the chapter 11 cases under the lead case, Essar Steel Minnesota LLC.

37.    I believe that joint administration is in the best interest of the Debtors' estates, their creditors and all parties in interest and will serve to expedite the administration of these cases and reduce administrative expenses without prejudicing any creditor's substantive rights.

**ii.    Debtors' Motion for an Order Authorizing the Debtors to File a
Consolidated Master List of Creditors**

38.    The Debtors seek an order permitting them to file a consolidated list of creditors, rather than filing a separate creditor matrix for each Debtor.  The Debtors do not presently maintain lists of the names and addresses of their creditors on a Debtor-specific basis.  Requiring the Debtors to segregate their creditor records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings.  I believe that requiring the Debtors to segregate their creditor records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings, particularly given the posture of Holdings merely as a holding company and guarantor.  I also understand the filing of a consolidated master list of creditors will enable the Debtors to provide notice most efficiently to all parties in interest entitled to notice of happenings in the Chapter 11 Cases.

### iii. Debtors' Motion for Entry of Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs

39.     The Debtors request an order granting an extension of forty-five (45) additional days to complete their schedules of assets and liabilities, schedules of executory contracts and unexpired leases (collectively, the "**Schedules**") and their statements of financial affairs (collectively, the "**Statements**"), resulting in a 59-day deadline from the date hereof.  Collecting such information will require a significant expenditure of time and effort on the part of ESML's employees, including management, particularly now, while the Debtors' personnel resources are limited.  Given the amount of work entailed in completing the Schedules and Statements, as well as the competing demands on the Debtors' management team, the Debtors will likely not be able to properly and accurately complete the Schedules and Statements within the required fourteen (14) day period.  The Debtors anticipate that they will be able to properly file their Schedules and Statements before the proposed 59-day deadline.

### B.  Operational Motions

> **i.**  **Debtors' Motion for Entry of Order Granting Authority To Pay Prepetition Wages, Compensation, Employee Benefits, And Related Obligations (the "Wages Motion")**

> **a.  Employees**

40.     ESML currently employs thirty-two (32) employees, of which eight (8) are paid on an hourly basis (the "**Hourly Employees**") and twenty-four (24) are paid a salary (the "**Salary Employees**").   ESML also use the services of one (1) independent contractor (the "**Contract Employee**,"[4] collectively with the Hourly Employees and Salary Employees, the "**Employees**").  The Employees are employed centrally by ESML.  None of the Employees are covered by collective bargaining agreements.

41.     The Employees consist of: (i) senior management, which includes the chief executive officer and president, the chief financial officer, the general counsel, and the vice president of finance and treasurer; (ii) middle management, which includes certain of the Debtors' managers and directors; and (iii) other Employees, made up of administrative staff, technology support staff, and technical employees.

42.     The Debtors ultimately seek to complete construction of the Project, with an estimated total cost of over $2 billion, to maximize value for all stakeholders.  In balancing completion of the Project with ESML's precarious financial situation, in January 2016, ESML made the difficult decision to temporarily reduce their workforce to a skeleton crew, who performs the core and essential functions to preserve the Project, which is ESML's principal asset.  Among other things, the Employees maintain a safe working environment for construction

---

[4] Nothing contained herein shall constitute an admission by the Debtors that the Contract Employee is an "employee" of the Debtors, and the Debtors expressly reserve their rights with respect to the proper designation of the Contract Employee in any context or circumstance.

workers and contractors who are on site for continued maintenance and environmental requirements; ensure that ESML is compliant with local, state, and federal safety and environmental regulations; maintain necessary permits for Project completion; perform essential administrative and managerial tasks to ensure the protection and maintenance of the existing infrastructure and that the Project can restart upon receipt of sufficient funding; and provide key information and support in the efforts to raise the funds necessary to complete the Project.

43.     These Employees have specialized skills, knowledge, and understanding of the Project that are essential to preserving and protecting the work done to date and the viability of the Project going forward.  It would be difficult to find comparable and competent replacement hires on short notice, especially while the ESML is in chapter 11.  ESML believes that any disruption in Employee obligations or benefits would have adverse consequences to ESML, including, without limitation, Employee attrition and loss of Employee morale during this critical period.  If ESML fails to pay the Employees in the ordinary course, many Employees would suffer extreme personal hardship and, in some cases, would be unable to pay their basic living expenses.  This would have a highly negative impact on the Employees' morale and likely would result in unmanageable performance issues or turnover.

### b.  Payroll Obligations, Paid Time Off, and Other Compensation

#### i.  Payroll Obligations

##### (a) Salaries and Wages

44.     ESML pays the Employees bi-weekly in arrears with a Friday pay date.  On a bi-weekly basis, ESML's payroll averages approximately $190,000 in the aggregate (the "**Employee Payroll Obligations**").  ESML uses Automatic Data Processing Inc. ("**ADP**") to assist them with payroll.  All Employees are paid through direct deposit by ADP.

45.    To the extent the Employee Payroll Obligations may be construed as obligations arising prior to the Petition Date, ESML requests authority to pay the accrued but unpaid Employee Payroll Obligations in the ordinary course of business, without regard to the date that such obligations arose.  The request to pay Employee Payroll Obligations relates solely to Employees who are employed as of the Petition Date.  As of the Petition Date, ESML estimates that no Employee is owed in excess of $12,850 on account of the Employee Payroll Obligations. ESML estimates that the Employee Payroll Obligations will not exceed $6,500.

### (b) Administrative Fees

46.    ESML uses third party administrators to assist with processing and administering payroll.  Specifically, ESML's payroll is processed by ADP.  All Employees are paid through direct deposit by ADP.  ADP charges the Debtors $1,976 per month to process and administer payroll (the "**ADP Fees**").

47.    Additionally, ESML pays a monthly fee (paid quarterly) to Benefit Administration, Inc. ("**BAI**") for the design of the Debtors' 401(k) plan (the "**BAI Fee**," and together with the ADP Fees, the "**Administrative Fees**").  BAI also continually assists the Debtors in verifying that the Debtors 401(k) plan is in compliance with IRS guidelines.

48.    Failure to pay the Administrative Fees could result in a costly disruption to ESML's fulfillment of their payroll obligations.  ESML estimates that, as of the Petition Date, the Administrative Fees will not exceed $2,500.

**(c) Paid Time Off**

49.     In addition to salary and wages, all Employees are given paid time off ("**PTO**") in the form of (i) paid time off and (ii) holidays[5] pursuant to the ESML's paid time off policy or in accordance with contractual obligations with an individual employee.  Other than Employees located in New York, who are eligible for forty (40) hours of accrued sick leave pursuant to New York City's Earned Sick Time Act, ESML does not have separate paid vacation, paid sick leave, and paid personal leave benefits.  Instead, all of those typical forms of paid leave have been combined into a comprehensive PTO system.  The purpose of PTO is to provide Employees with paid time off for such things as: (i) rest, relaxation, and personal travel; (ii) family time and attending to family matters; (iii) absence arising out of an Employee's own illness or injury or the illness or injury of a close family member; (iv) medical or other personal appointments; and (v) any other personal or family matters necessitating the Employee's absence from work.

50.     As of March 25, 2015, if an Employee had a certain amount of paid leave benefits in the form of paid vacation days and paid personal days confirmed in an offer letter to the Employee at the time of the Employee's formal job offer, then any such paid vacation and paid personal days were converted over to PTO pursuant to a formula delineated in the paid time off policy.  For any Employee whose paid leave benefits were never dictated or covered by the terms of an offer letter or are no longer dictated or covered by the terms of an offer letter, the PTO schedule depends on the Employee's years of service with the Debtors.  PTO is credited to each Employee's PTO account on January 1st of each year.  PTO eligibility and use of PTO are determined and tracked on the basis of the calendar year (January 1 to December 31).  As of the

---

[5] For all full-time Employees, holidays are paid unless the Employee, unapproved, takes the day preceding or following the holiday off, in which case the holiday is not paid.

Petition Date, the average employee has accrued approximately 92 hours of PTO and the maximum amount of PTO any single Employee has accrued is 172 hours.[6]

51.     Unless an Employee fails to provide ESML with two weeks of advance notice of intent to retire or resign or is terminated for an incident or acts of serious or gross misconduct, unused PTO is payable upon the termination of an Employee's employment relationship with the Debtors (the "**PTO Payouts**").[7]   As of the Petition Date, ESML estimates that the aggregate amount of accrued but unpaid PTO Payouts is approximately $110,000.  This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused PTO in the event the Employee leaves the ESML's employment. Accordingly, ESML does not anticipate paying any prepetition amounts for unused PTO unless an Employee is terminated during the Chapter 11 Cases.

52.     I believe that the continuation of the PTO policies in accordance with prior practice is essential to maintaining Employee morale during the Chapter 11 Cases.  Further, the PTO policies are broad-based policies upon which all Employees have come to depend.

### (d) 401(k) Contribution

53.     All Employees are automatically enrolled in ESML's 401(k) plan (the "**401(k) Plan**") at a 6% contribution rate after one (1) month of service, unless such Employee opts out of automatic enrollment.  Under the 401(k) Plan, Employees, subject to certain limitations, may contribute up to 100% of their pre-tax earnings annually, up to $18,000.

---

[6]Not including four (4) executives, Madhu Vuppuluri, Susan Fennessey, Sanjay Bhartia, and Samir Kalra who have accrued 732, 336, 772, and 72 hours of PTO respectively (the "**Executive PTO**").

[7]PTO Payouts, as defined herein, does not include payments for the Executive PTO.  If payment of Executive PTO becomes necessary it shall be the subject of a separate motion.

54.     ESML's 401(k) Plan is administered by Voya Financial ("**Voya**").  ESML matches the first 1% of an Employee's salary contributed dollar for dollar and fifty cents on the dollar for the next 5% for a total of 3.5% match (the "**401(k) Contributions**").  Per pay period, ESML pays approximately $5,000 in 401(k) Contributions.  ESML estimates that, as of the Petition Date, approximately $300 in 401(k) Contributions have accrued but have not yet been contributed to the 401(k) Plan.

55.     It is essential for the morale and maintenance of trust of the Employees that necessary steps are taken to protect the Employees' 401(k) Plan.

### (e)  Reimbursable Business Expenses

56.     In the ordinary course of business, for the convenience of the Employees and ESML alike, ESML reimburses Employees for certain expenses incurred in the scope of employment   (collectively, the "**Reimbursable Expenses**").  The Reimbursable Expenses typically include, among other things, business related travel expenses, business meals, car rentals, safety gear, and a variety of miscellaneous expenses.

57.     At any given time, one or more Employees may (i) be holding a reimbursable receipt for a Reimbursable Expense that it has not yet submitted for reimbursement; or (ii) have submitted a reimbursement request to ESML but not yet received payment on account of such request.   Employees that make purchases on behalf of ESML in furtherance of ESML's businesses do so with the reasonable expectation of receiving prompt reimbursement on account of such purchases.  Based upon historical averages, ESML estimate that, as of the Petition Date, the total amount of Reimbursable Expenses owed is no more than $25,000.

58.     I believe that the failure to promptly process and pay in full each valid Reimbursable Expense would be detrimental to Employee morale.

## ii.  Employee Benefits

59.      In the ordinary course of business, and as is customary for most large companies, ESML has established various employee benefit plans and policies that provide Employees with medical, dental, prescription, disability and life insurance, employee savings, and other similar benefits (collectively, the "**Employee Benefits**"), which are generally described below.  Over the past eighteen (18) months, ESML spent significant time reviewing and analyzing its Employee Benefits to ensure that such benefits are competitive in the region and in the industry in order to attract the most qualified candidates and employees.

### (a) Employee Insurance Benefits

60.      ESML pays certain amounts to third-party insurance providers that, in turn, provide insurance benefits to the Employees (the "**Insurance Benefits**").   The Insurance Benefits are provided to regular, full-time Employees by the providers of such benefits (collectively, the "**Insurance Benefits Providers**"), which bill ESML monthly or annually as follows: (i) health insurance is provided by HealthPartners  (covered completely by ESML at a cost of approximately $36,000 per month); (ii) dental insurance is provided by Delta Dental of Minnesota (covered completely by ESML at a cost of approximately $3,500 per month); (iii) life, short-term disability, and long-term disability insurance is provided by Lincoln Financial Group (covered completely by ESML at a cost of approximately $3,000 per month); (iv) administration of the Employees' Health Savings Account, as may be elected by an Employee, is provided by MII Life Inc. d/b/a SelectAccount (covered completely by ESML at a cost of approximately $650 annually (calculated per participant plus an administrative fee); (v) the Employee Assistance Program is provided by Fairview Range Employee Assistance Group and Lincoln Financial Group; (covered completely by ESML at a cost of approximately $70 per month, paid annually) and (vi) Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**")

benefits are provided by Discovery Benefits Inc. ("**Discovery**") (at a cost of $33 per month to ESML).[8]

61.     The Insurance Benefits Providers may be entitled to discontinue providing Insurance Benefits to the Employees if the Debtors fail to pay their obligations to such providers on account of the Insurance Benefits in the ordinary course of business.  The Debtors believe that the Insurance Benefits constitute a valuable and important component of the compensation payable to the Employees, and that any disruption in the provision of such benefits would adversely affect Employee morale.  ESML believes that it is current on all payments to the Insurance Benefits Providers.   Nevertheless, to the extent that payment of the Employee Benefits, or claims related thereto, may be construed as an obligation arising prior to the Petition Date, ESML requests authorization to pay such amounts, in the ordinary course of business, without regard to when such obligations were incurred.   ESML believes that no Insurance Benefits will cause an Employee to be owed more than $12,850 when combined with the other Priority Amounts (as hereinafter defined).

### (a) Workers' Compensation

62.     ESML maintains workers' compensation coverage through Zurich American Insurance Company (the "**Workers' Compensation Policy**").[9]  The annual premium of the Workers' Compensation Policy is $48,042, with a $0 deductible.  ESML puts down a deposit in

---

[8] One severed employee has elected COBRA for life insurance.  COBRA bills ESML $60.50 per month for this benefit and Discovery reimburses ESML for the full amount once the severed employee pays Discovery resulting in no cost to ESML.

[9] Filed concurrently herewith is the *Debtors' Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105, 361, 363, and 364 Authorizing Debtors to (I) Maintain Insurance Program, (II) Maintain Insurance Premium Financing Program, (III) Pay Insurance Premiums in the Ordinary Course, and (IV) Pay all Obligations Associated Therewith*, which seeks approval to (i) maintain the Workers' Compensation Policy, and (ii) pay any premium in the ordinary course related thereto, among other relief.

the amount of $12,245.00 for the first month.  Thereafter, ESML is required to make eleven monthly installments of $4,195.00 due on the 7th of each month (collectively, the "**Workers' Compensation Obligations**").  ESML believes that it is current on all Workers' Compensation Obligations.  Nevertheless, ESML requests authorization to pay the Workers' Compensation Obligations in the ordinary course of business, without regard to when such obligations were incurred.

### iii.  Withholdings from Employee Paychecks

63.     ESML deducts certain amounts from their Employees' paychecks for the payment of flexible benefit plans that provide for pre-tax deductions of certain dependent care and certain reimbursable medical expenses, 401(k) deductions, and other miscellaneous amounts (collectively, the "**Employee Deductions**").  The Employee Deductions comprise property of the Debtors' Employees and are forwarded by ESML to appropriate third-party recipients at varying times.

64.     ESML may also be in possession of various withholdings that comprise property of third parties, including, among other things, federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Third Party Deductions**").  It is likely that funds have been deducted from Employees' wages but have not yet been forwarded to the appropriate third-party recipients.  Without authority to forward the Third Party Deductions to the appropriate parties, ESML exposes its officers and directors to personal liability.[10]

65.     Finally, Employees are permitted to take loans out against their respective 401(k) accounts.  Repayment of these loans are withheld from the Employee's wages and repaid to the

---

[10] Filed concurrently herewith is the *Debtors' Motion for Order Authorizing Payment of Prepetition Trust Fund and Use Taxes*, which seeks, among other things, authority to pay prepetition obligations owing on account of trust fund taxes.

Employee's 401(k) account through Voya (collectively, with the Employee Deductions and the Third Party Deductions, the "**Deductions**").  To the extent these obligations may be construed as obligations arising prior to the Petition Date, ESML requests authority to pay or remit the Deductions in the ordinary course of business, without regard to the date that such obligation arose.

### iv.   Limitations on Payments

66.    For the avoidance of doubt, the aggregate amount paid to any individual employee of ESML on account of Employee Payroll Obligations, including PTO Payouts,  the Incentive Programs, and Insurance Benefits (collectively, the "**Priority Amounts**") shall not exceed $12,850.

### ii.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtors' Cash Management System, Bank Accounts, and Existing Checks and Business Forms and (II) Waiving Investment and Deposit Requirements (the "Cash Management Motion")

### a.   The Debtors' Cash Management System

67.    Holdings maintains no bank accounts.

68.    ESML maintains an active cash management system (the "**Cash Management System**"), consisting of four (4) bank accounts at TD Bank N.A., account -4295 as the main operating account, utilized for issuing checks and wires for day to day expenses (the "**Operating Account**"); account -8135 as the payroll account (the  "**Payroll Account**"); -1302 as a secondary wire account for specific wires and payments (the "**Wire Account**"); and -8143, a money market account, which is currently inactive, but available to be utilized for investing idle funds in money market instruments (the "**Money Market Account**" and collectively the "**Bank Accounts**").

69.    ESML uses the Cash Management System in the ordinary course of business to transfer and disburse funds as necessary and to facilitate cash monitoring, forecasting, and

reporting.  ESML's Chief Financial Officer, Sanjay Bhartia along with Vice President of Finance and Treasurer, Samir Kalra and Financial Controller and Assistant Vice President, J K Dhoot, together maintain, maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, ESML's corporate accounting department regularly reconciles the Debtors' books and records to ensure there are adequate checks and balances and that all transfers are accounted for properly.

### b.  Lender-Required and Collateral Accounts

70.      In addition to ESML's active Cash Management System it maintains thirteen (13) inactive lender-required accounts and two (2) collateral accounts.[11]

71.      ESML's prior cash management system consisted of four (4) accounts subject to lender control agreements, one (1) account at Wells Fargo Bank, N.A. ("**Wells Fargo**"), account -3970 which was used for Term Loan distributions and three (3) operating, payroll and investment accounts at American Bank of the North ("**ABN**"), account -0925, account -0693 and account -0354.  Each of these accounts currently maintains a zero balance and is not used by the Debtors.

72.      In addition to the ESML's four (4) inactive prior cash management accounts, described in paragraph 8 above, ESML maintains nine (9) other lender-required accounts.  Three (3) of the accounts, -3988, -3996, and -7879 reside at Wells Fargo, three (3) accounts, -0700, -0701, and -0702 reside at U.S. Bancorp ("**U.S. Bank**"), one (1) account -1106, resides at ICICI Bank, NY, one (1) account -1160 resides at Union Bank, Hong Kong, and one (1) account -6002, resides at Canara Bank, London (collectively, with Wells Fargo and ABN, the "**Banks**").

---

[11] ESML also maintains an inactive securities account, Wells Fargo account -2090, which was active when ESML had excess liquidity to invest.  ESML does not currently have excess liquidity to invest so the securities account has a $0 balance, as well.

73.     These 13 accounts are required by the Debtors' Prepetition Loan Documents in order to distribute funds and interest payments to Prepetition Lenders, as control agreement accounts, or for operational purposes once the Plant is complete and operational (the "**Lender-Required Accounts**").   The Lender-Required Accounts are not currently active as the Prepetition Lenders are no longer making distributions under the Prepetition Loan Documents and the Plant is not yet operational.

74.     ESML also maintains two restricted cash collateral accounts, ABN account -0129 and ABN account -0072, which hold cash collateral supporting letters of credit issued to the U.S. Army Corps of Engineers and the Minnesota Department of Natural Resources and Pollution, Control Agency, respectively.

### c.   The Bank Fees

75.     The Debtors pay the Banks approximately $300 per month on account of fees incurred in connection with the Bank Accounts (the "**Bank Fees**").   The Debtors estimate that they owe the Banks approximately $0 as of the Petition Date.

### d.   Compliance with the U.S. Trustee Guidelines

76.     The Debtors' Prepetition Loans are in default and have been accelerated.   As a result of the asserted defaults, the Term Loan Agent ceased making distributions under the Term Loan on about October 31, 2015 and, in February 2016, withdrew all funds from the Term Loan account.

77.     The Debtors are not currently operating and have had no source of funds other than equity contributions since May 2015.   Accordingly, although the Debtors seek to keep all of the Bank Accounts open at this time, the Debtors currently use just six (6) accounts, two (2) of which are restricted cash collateral accounts.   The four Cash Management Accounts are

maintained at TD Bank, which is designated as authorized depositories by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), pursuant to the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**U.S. Trustee Guidelines**").

78.    While the Debtors have no immediate need for the Lender-Required Accounts, they must maintain such accounts to remain in compliance with their Prepetition Loans.  The Lender-Required Accounts may be maintained at Banks that are not authorized depositories under the U.S. Trustee Guidelines.  The Debtors seek relief, however, from the U.S. Trustee Guidelines and request authority to maintain these accounts as they are required by the Debtors' Prepetition Loan Documents and either maintain a $0 balance or are not controlled by the Debtors.  The Debtors will not, without further order of the Court, deposit or withdraw funds from any of the Lender-Required Accounts.

79.    The ABN operating account has a balance of less than $50,000 which will be utilized to honor certain pre-petition checks that are authorized by other orders of this Court.

### e.    Business Forms

80.    As part of the Cash Management System, ESML[12] utilizes numerous preprinted checks and business forms (the "**Business Forms**") in the ordinary course of their business. ESML also maintains certain forms, books and records to document, among other things, their expenses.  To minimize expenses to their estates and avoid confusion on the part of employees, vendors, and suppliers during the pendency of the Chapter 11 Cases, ESML requests that the Court authorize their continued use of all checks, correspondence, and business forms (including, without limitation, letterhead, purchase orders, and preprinted and future checks) as such forms

---

[12] Holdings conducts no business and has no checks or business forms.

were in existence immediately before the Petition Date, without reference to ESML's status as debtors in possession, rather than requiring ESML to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

### iii.  Debtors' Motion For Order Authorizing Payment Of Prepetition Trust Fund And Use Taxes (the "Tax Motion")

81.      In the ordinary course of business, ESML collects use and trust fund taxes (however denominated) (the "**Trust Fund Taxes**") from certain parties, and subsequently remit such taxes to the appropriate federal, state, and local taxing authorities (each, a "**Taxing Authority**"). A list of the Taxing Authorities is annexed hereto as **Exhibit B** to the Tax Motion.

82.      There is often a lag time between when ESML incurs an obligation to pay the Trust Fund Taxes and the date on which payment of such taxes is due.  Various governmental units may therefore have claims against ESML for Trust Fund Taxes that have accrued, but are unpaid and not yet due, as of the Petition Date.  The relevant Taxing Authority may also make retrospective adjustments to determine any payment deficiency or surplus for a particular period resulting in a demand for further payment from or refund to the taxpayer.  ESML estimates that the total amount of prepetition Trust Fund Taxes owing to the various Taxing Authorities is not more than $6.75 million exclusive of any interest and penalties that may be levied.  This amount represents the consolidated amount owed based on amended tax returns submitted to the Internal Revenue Service by ESML for ESML's withholding requirements for tax on payments or distributions made to nonresident alien individuals, foreign partnerships, or foreign corporations for the years 2010-2015.

### iv.  Debtors' Motion for Entry of Interim and Final Orders (I) Approving ESML's Proposed Adequate Assurance Payments for Future Utility Services; (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services; (III) Deeming Utility Companies Adequately Assured of Future Payment; and (IV) Approving ESML's Proposed

**Procedures for Resolving Additional Adequate Assurance Requests**
**(the  "Utilities Motion")**

83.     In connection with their business and the maintenance of the Project, ESML

obtains electricity, gas, water, steam, and sewage/trash services (collectively, the "**Utility**

**Services**") from various utility companies (each, a "**Utility Company**," and collectively, the

"**Utility Companies**").[13]   A nonexclusive list of substantially all of the Utility Companies

providing Utility Services to ESML as of the Petition Date is annexed hereto as **Exhibit C** (the

"**Utility Service List**").[14]

84.     ESML maintains corporate office space in New York. In Minnesota, ESML

maintains an office, the Project worksite, warehouse and corporate guest house.  ESML has

typical utility service needs for its office space and guest house.  To secure power for the Project,

however, ESML entered to that certain Large Industrial Service Agreement (the "**LISA**"),

pursuant to which Minnesota Power via, the Nashwauk Public Utilities Commission agreed to

provide the power necessary to service and maintain the Project on a "take or pay" basis.  More

specifically, under the LISA, as amended, ESML is obligated to pay for monthly minimums

irrespective of ESML's actual electricity usage.  Because the Project is not currently operational,

ESML does not utilize the monthly minimum amount of electricity and, accordingly, the "take or

---

[13] The Utility Companies referred to herein are paid directly by the Debtors and not through any third parties.

[14] The Utility Companies listed on **Exhibit C** include Utility Companies for ESML's offices, worksite, warehouse and corporate guest house.  The listings of any entity on **Exhibit C**, as well as any omission of any entity from **Exhibit C**, is not an admission by ESML that such entity is or is not a utility within the meaning of section 366 of the Bankruptcy Code.  ESML reserves the right to assert, at any time, that any entity listed on **Exhibit C** is not entitled to adequate assurance pursuant to section 366 of the Bankruptcy Code.  ESML further reserves the right to terminate the services of any Utility Company at any time and to seek an immediate refund of any Utility Deposit (as defined below) without effect to any right of setoff or claim asserted by a Utility Company against ESML.  In addition, ESML is requesting that this Motion apply to all of the Debtors' Utility Companies, whether or not any given Utility Company is included on the Utility Service List.  ESML has proposed a procedure for supplementing the Utility Service List.

pay" obligation under the LISA is not an actual or necessary expense of preserving the Debtors' estates.  Accordingly, this Motion only seeks authority to pay for the power that is actually utilized at the Project at customary non-contract rates. [15]  ESML estimates that the average monthly cost for power at the Project should be approximately $7,500.

85.    If any Utility Company were to refuse or discontinue service, even for a brief period, ESML could be forced to close its offices and plant worksite due to safety concerns for ESML's employees, resulting in a substantial disruption to ESML's business, ultimately causing irreparable harm to the Debtors' estates and jeopardizing their ability to reorganize. Accordingly, to avert an economically harmful situation that could negatively impact ESML's ability to maintain its assets and the Debtors' ability to successfully reorganize, the Debtors have sought the relief requested herein.

86.    ESML estimates that the average aggregate monthly cost of actual Utility Services utilized for all of ESML will be approximately $24,000.

87.    To provide adequate assurance of payment for future services to the Utility Companies, ESML proposes to deposit (the "**Utility Deposit**") with certain Utility Companies an amount equal to 50% of ESML's estimated cost of monthly utility consumption for each such Utility Company.  Additionally, ESML has previously provided one Utility Company with, and such Utility Company currently holds, a deposit in the amounts listed on **Exhibit C** (the "**Existing Deposit**") to the Utilities Motion.  To the extent the Existing Deposit exceeds the Utility Deposit, such Existing Deposit shall serve as the Utility Deposit.  To the extent the Existing Deposit is less than the Utility Deposit, ESML will provide a Utility Deposit in an amount equal to 50% of ESML's estimated monthly cost for such Utility Company less the

---

[15] This Motion does not constitute a motion to assume or reject the LISA and rights relating to the LISA are hereby reserved.

Existing Deposit.  The total amount of the Utility Deposits ESML proposes to provide to the Utility Companies is provided in **Exhibit C** to the Utilities Motion.

88.    ESML intends to pay its postpetition obligations to the Utility Companies in a timely fashion and in the ordinary course of business.  The Debtors submit that the Utility Deposits and/or the Existing Deposit (or some combination thereof), in conjunction with ESML's ability to pay for the Utility Services in the ordinary course of business, constitutes adequate assurance of payment for each of the Utility Companies.  Nonetheless, ESML anticipates that certain Utility Companies may request additional adequate assurance.  Therefore, ESML seeks to establish reasonable procedures by which a Utility Company may proceed if it believes that its Utility Deposit is insufficient.

> **v.    Debtors' Motion for Entry of an Interim Order (I) Authorizing the Use of Available Cash and (II) Scheduling a Final Hearing (the "Motion to Use Available Cash")**

89.    As of the Petition Date, the Debtors have over $1 billion of secured obligations, which are secured by a lien, subject to certain exceptions, on substantially all of the assets of the Debtors—namely those assets constituting the Project and certain controlled cash accounts (collectively, the "**Prepetition Collateral**")—which constitute the following:  (a) a multi-tranche term loan, through which approximately $530 million was funded as of the Petition Date (the "**Project Finance Debt**"); (b) a term loan facility, through which approximately $349 million was funded as of the Petition Date (the "**Term Loan**"); and (c) certain reimbursement obligations under the EPIL Supplier Credit Facility (collectively with the Project Finance Debt and the Term Loan, the "**Secured Debt**").

90.    The Debtors maintain a basic cash management system (the "**Cash Management System**"), which is described in the Cash Management Motion, filed contemporaneously herewith.  As described in the First Day Declaration, the Debtors are not operating and have had

no source of funds other than the equity contributions received by the Debtors since May 2015. The Debtors currently have on hand approximately $750,000 in cash ("**Available Cash**"), which was funded from an affiliate of the Debtors.[16]   Of this equity contribution, approximately $700,000 is held in a non-blocked account at TD Bank N.A.  Such bank account is not subject to a control agreement nor is it otherwise a restricted or Lender-Required Account, nor do the Debtors believe such funds constitute collateral.[17]   The Debtors also believe the funds held in such account are not otherwise subject to any lien held by any of the Debtors' secured creditors, including any of the Secured Debt lenders (the "**Prepetition Lenders**").[18]   However, out of an abundance of caution, the Debtors seek entry of the Interim Order to assure parties in interest that a smooth transition into the Chapter 11 Cases is possible and that the Debtors may preserve their assets and continue their minimal operations so as to continue to maximize value for the benefit of all stakeholders.

91.    The inability of the Debtors to use the Available Cash to fund working capital needs, including for the preservation of the Project and other general corporate purposes would

---

[16] ESML has a balance of less than $50,000 in a blocked account at ABN.  Except for the request in the Cash Management Motion to allow certain pending checks to clear, the Debtors are not seeking authorization to use the ABN funds.

[17] To the extent parties in interest with requisite standing posit that the funds sought to be used through the relief sought in this Motion constitute Prepetition Collateral, the Debtors reserve any and all rights to modify the relief sought herein.

[18] To have a perfected interest in the cash on hand, (i.e., a deposit account), a putative secured creditor must have "control" of the deposit account by (A) having a three-party control agreement among the debtor, the secured party and the depositary bank pursuant to which the depositary bank agrees to follow the secured party's directions regarding distribution of funds in the account without the further consent of the debtor or (B) being the "customer" of the depositary bank with respect to the deposit account (i.e., the deposit account is the secured party's account rather than the debtor's account). Alternatively, to the extent the funds credited to deposit account represent identifiable proceeds of the secured party's "primary" collateral (e.g., collections of accounts receivable), a putative secured lender could claim a security interest in such funds.

be nothing short of devastating for the Project, the capital and time intensive investments made to date, and the potential recovery for the Debtors' creditors and other stakeholders.

> **vi.    Debtors' Motion for Entry of an Order Authorizing Certain Ordinary Course Payments Relating to the Lease of Debtors' New York Offices (the "Motion to Pay Rent")**

92.    The Debtors' executives maintain offices at 277 Park Avenue, New York, NY 10017 (the "**New York Offices**").  The Debtors have occupied the New York Offices since April 2010.  Initially, the Debtors shared the New York Offices with their affiliate Essar Steel Algoma Inc. USA ("**Algoma**").  Algoma, however, has not used the New York Offices since April 2015, and since that time the Debtors have fully utilized the New York Offices.

93.    The New York Offices are subleased from JP Morgan Chase Bank ("**JPMorgan**") pursuant to that certain sublease, dated April 27, 2010, between JPMorgan, as Sublandlord, and Algoma, as Subtenant (the "**Sublease**"), which expires at midnight on January 31, 2021.  A true and correct copy of the Sublease is annexed to the Motion to Pay Rent as **Exhibit B**.  Under the Sublease, Algoma subleased approximately 10,800 rentable square feet for $702,000.00 per year or $58,500.00 per month (the "**Base Rent**").  Sublease, § 3(a).  In addition to the Base Rent, Algoma was also obligated to pay additional rent amounts, including, but not limited to, any and all rent inclusion charges, obligations, taxes, interest, costs, expenses, attorney's fees, and other charges under the Sublease (the "**Additional Rent**," together with the Base Rent, the "**Rent**").  *Id.* at § 3(c) - (i).

94.    As set forth in Exhibit F to the Sublease (the "**Sublease Guaranty**"), ESML is the Guarantor under the Sublease, thereby guaranteeing to JPMorgan, among other things, the full and prompt payment and performance by Algoma of all obligations under the Sublease, as well as payment of all damages, costs, and expenses that result from any default by Algoma.

95.     On November 9, 2015, Algoma and four of its affiliates (none of which are the Debtors) commenced the Canadian Companies Creditors Arrangement Act: In the Matter of the Companies Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended and in the Matter of a Plan of Compromise or Arrangement of Essar Steel Algoma Inc., Essar Tech Algoma Inc., Essar Steel Algoma (Alberta) ULC, Cannelton Iron Ore Company and Essar Steel Algoma Inc. USA, Court File No. CV-15-000011169-00CL, filed in the Ontario Superior Court of Justice (Commercial List).   On the same day, Algoma and its four affiliates commenced ancillary chapter 15 cases in the United States Bankruptcy Court for the District of Delaware, which are jointly administered under Case No. 15-12271.

96.     Algoma has not paid the Rent or other amounts due under the Sublease since April 2015, nor has Algoma occupied the New York Offices since April 2015.  Accordingly, in June 2015, because the Debtors wished to continue to occupy the New York Offices and because it was obligated pursuant to the Sublease Guaranty, ESML began making the Rent payments directly to JPMorgan.[19]  Since June 2015, the Debtors have occupied the New York Offices and ESML has paid approximately $63,000.00 per month in Rent. As of the Petition Date, there are no prepetition amounts owed under the Sublease Guaranty.

97.     Although ESML is not a party to the Sublease, ESML currently occupies and uses the New York Offices for its business operations and intends to continue to occupy and use the New York Offices during the Chapter 11 Cases and thereafter.

98.     The Debtors do not believe that they could find comparable office space for the same rate paid for the New York Offices and relocating during the chapter 11 proceedings would be costly and distracting.

---

[19] ESML has filed two claims in the Canadian proceeding related to the Sublease Guaranty.

99.     As of the Petition Date, there are no outstanding amounts due under the Sublease to JPMorgan as ESML has remained current on the Rent under the Sublease as required under the Sublease Guaranty.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 8, 2016

_____
Sanjay Bhartia
Chief Financial Officer
Essar Steel Minnesota LLC