# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS) (Jointly Administered) |
| Debtors. | **Hearing Date:  July 26, 2016 @ 10:00 A.M.** **Objections Due:  July 25, 2016 @ 12:00 P.M.** |

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 362 AND 364 AND (II) SCHEDULING FINAL HEARING

Essar Steel Minnesota LLC ("**ESML**") and ESML Holdings Inc. ("**Holdings**" and, together with ESML, the "**Debtors**" or the "**Company**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), file this motion (the "**Motion**") pursuant to sections 362 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") seeking (a) authority to obtain debtor-in-possession financing for the Debtors, and (b) approval of the agreements related to the foregoing.  In support of the Motion, the Debtors rely upon and refer this Court to the *Declaration of Stuart Erickson in Support of Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 362 and 364 and (II) Scheduling Final Hearing*

---

[1] The last four digits of Essar Steel Minnesota LLC's federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

(the **"Erickson Declaration"**) and the *Declaration of Sanjay Bhartia in Support of Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 362 and 364 and (II) Scheduling a Final Hearing* (the **"Bhartia Declaration"**), filed concurrently herewith, and in further support of the Motion respectfully represent:

## I.    BACKGROUND

1.    On July 8, 2016 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11 Cases.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    To date, no trustee or examiner has been appointed in the Chapter 11 Cases.  On July 19, 2016, an official committee of unsecured creditors (the "**Committee**") was appointed in the Chapter 11 Cases.

3.    Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Sanjay Bhartia in Support of First Day Motions and Applications* [Dkt. No. 14] (the "**First Day Declaration**").

4.    As described in the First Day Declaration, in the ordinary course of business, the Debtors utilize cash on hand to fund ordinary course, working capital needs, primarily to preserve the Debtors' primary asset: a partially built, fully-integrated, seven (7) million tonnes per annum (mtpa) capacity pellet production facility in the western Mesabi Range in the northern Minnesota.  The Debtors employ thirty-two (32) employees and use the services of one (1)

2

independent contractor (collectively, the "**Employees**").   The Employees are responsible for maintaining and preserving the Project until construction resumes, and also for maintaining the Debtors' books and records and addressing the Debtors' operations other than Project maintenance and physical oversight.

5.      The Project, when completed, is slated to be the largest "greenfield" project constructed in the United States and will consist of an open-pit iron ore mine, crushing, concentrating and pelletizing facilities, and a rail line and train-loading system.   Among the Project's potential core competitive strengths is its ability to supply multiple types of pellets on an economic basis to both national blast furnace and electric furnace steel manufacturers due to lower costs and higher overall pellet quality.

6.      Prior to the Debtors' filing of the Chapter 11 Cases, the Company entered into a non-binding letter of intent with SPL Advisors LLC ("**SPL**"), an investment firm with offices in California and New York, setting forth the terms on which SPL would invest or arrange as much as $250 million of new equity capital in exchange for an ownership stake in the Company of at least 80%. The investment would be conditioned upon a successful restructuring of the Company's existing high-cost debt and obtaining new debt financing in an estimated amount of $650 million, which the Company is currently working to raise. The new debt and equity capital would be used to pay-off the Company's remaining outstanding construction-related obligations, to pay-down existing funded debt and to fund completion of the Facility.

7.      The interim funding was to be conditioned upon, among other things, the State of Minnesota Department of Natural Resources (the "**State**") agreeing to forbear from taking any adverse action with respect to the Company's iron ore leases with the State until March 31, 2017. On June 30, 2016, the State agreed to standstill until Friday, July 8, 2016 at 12:00 noon CT so

3

that discussions could continue. When it became apparent that the parties would not reach agreement on a further extension, the Company concluded that the best way to move forward with its restructuring, to realize value from the nearly $2 billion that has already been invested in the Project and to optimize value for all stakeholders, including the State and the Project's local contractors, was to seek chapter 11 protection before the expiration of the agreed standstill.

8.      Pursuant to the *Interim Order Granting Debtors' Motion for Entry of an Interim Order (I) Authorizing the Use of Available Cash and (II) Scheduling a Final Hearing* [Dkt. No. 36], the Debtors have been authorized, on an interim basis, to use approximately $700,000 of their remaining cash on hand to fund working capital needs.  This cash is only enough to fund these Chapter 11 Cases through July 28, 2016.

9.      To support the Debtors' working capital needs, including the preservation of the Project and other general corporate purposes, in order to sustain these Chapter 11 Cases and maximize the value of the Debtors' assets, the Debtors have actively sought financing from numerous sources of liquidity.  To assist them in their marketing efforts, the Debtors retained Guggenheim Securities, LLC, which contacted a broad array of potential investors at the request and on behalf of the Debtors.  The Debtors sought financing from its existing secured lenders (the "**Prepetition Lenders**"), which resulted in some interest and negotiation, but ultimately the Debtors determined that the terms proposed by such lenders were substantially inferior to the terms of the facility described herein (the "**DIP Facility**").  Only SPL, through its affiliate, Strategic Partners Holdings Limited or its designee (the "**DIP Lender**"), agreed to extend financing to the Debtors on a junior secured and superpriority basis.

10.     The DIP Facility is the most favorable debtor-in-possession financing that the Debtors could obtain under the circumstances.

4

## II.    JURISDICTION

11.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    RELIEF REQUESTED

13.    By this Motion, the Debtors respectfully request entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as <u>Exhibit A</u>, and final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"), pursuant to sections 362 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rules 4001-2 and 9013-1 (a) granting authority for the Debtors to obtain debtor-in-possession financing and (b) approving the DIP Facility and all documents related thereto.

## IV.    BASIS FOR RELIEF

### A.  Summary of the DIP Facility

14.    Under the DIP Facility, (i) the DIP Lender will provide up to $35 million of multiple-draw term loans to Debtor Essar Steel Minnesota LLC (the "**Borrower**") substantially on the terms set forth in the Debtor-in-Possession Promissory Note attached hereto as <u>Exhibit B</u> (as amended, supplemented, or otherwise modified and in effect from time to time, the "**DIP**

Note")[2] and (ii) Debtor ESML Holdings Inc. will guaranty the Borrower's obligations under the DIP Facility on the terms set forth in a guaranty in form and substance acceptable to the DIP Lender (as amended, supplemented, or otherwise modified and in effect from time to time, the "**DIP Guaranty**" and, collectively with the DIP Note and the DIP Orders, the "**DIP Documents**").

15.     As set forth below and in the Bhartia Declaration, the Debtors require the use of the proceeds of the proposed DIP Facility in order (i) to provide working capital and for other general corporate purposes of the Debtors, (ii) to pay administration costs of these Chapter 11 Cases and claims or amounts authorized by order of this Court and (iii) to pay reasonable costs and expenses of the DIP Lender to the extent provided under the DIP Documents (subject to the notice and objection provisions set forth in the DIP Orders).  Debtors' use of the proceeds of the proposed DIP Facility will maintain and preserve the value of the Debtors' businesses, in all cases for the benefit of the Debtors' estates and creditors.

16.     As discussed more fully below, the Debtors propose to secure their obligations under the DIP Facility by, among other things, granting to the DIP Lender (i) first priority liens on, and security interests in, substantially all of the Borrower's unencumbered assets and (ii) junior liens on, and security interests in, substantially all of the Borrower's encumbered assets (collectively, the "**DIP Liens**"), in each case, subject to the Carve-Out, as defined and described more fully below.   The DIP Documents also provide the DIP Lender with an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**").

---

[2] Unless otherwise set forth in this Motion, capitalized terms used within this Motion shall have the meanings ascribed to them in the DIP Note.

17.    The DIP Documents provide for, among other things, budgetary constraints, as set forth in the DIP Budget (defined below) on the use of the proceeds of the DIP Facility.  The proceeds of the DIP Facility will provide credit for up to approximately nine months to fund the Chapter 11 Case.

18.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the following sets forth a concise summary of material terms of the proposed DIP Facility and the DIP Orders:[3]

| Summary and Material Terms | |
|---|---|
| **Borrower:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Essar Steel Minnesota LLC |
| **DIP Lender:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Strategic Partners Holdings Limited, an affiliate of SPL Advisors LLC, or its designee |
| **Guarantor:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | ESML Holdings Inc. |
| **DIP Facility:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | Debtor-in-possession financing providing for a multiple-draw term loan |
| **DIP Availability:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | $35,000,000, of which (i) $7,000,000 shall be made available on an interim basis, (ii) $7,000,000 shall be made available upon entry of the Final Order; and (iii) the remainder of the DIP Facility shall be made available in multiple draws thereafter.<br><br>*See* DIP Note ¶ 1. |
| **Maturity Date:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | March 31, 2017<br><br>*See* DIP Note § 11. |
| **Use of DIP Financing Facility:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | The proceeds of the DIP Facility shall be used and/or applied in accordance with the terms and conditions of the DIP Documents: (i) to provide working capital and for other general corporate purposes of the Debtors, (ii) to pay administration costs of these Chapter 11 Cases and claims or amounts authorized by order of this Court, and (iii) to pay reasonable costs and expenses of the DIP Lender to the extent provided under the DIP Documents (and subject to the notice and objection provisions of the DIP Orders).<br><br>*See* Interim Order ¶ 3(b). |

---

[3] This summary is qualified, in its entirety by the provisions of the DIP Note and the Interim Order.

| **Summary and Material Terms** | |
|---|---|
| **Conditions of Borrowing:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | The DIP Lender's obligation to make its Initial Advance is subject to the following conditions:<br><br>    (i)    Delivery of the DIP Note and the DIP Guaranty.<br><br>    (ii)    Delivery by the Borrower of an officer's certificate.<br><br>    (iii)    Delivery by the Borrower and the Guarantor of (A) the corporate organizational and governing documents of the Borrower and Guarantor, (B) resolutions approving the DIP Note, and (C) signature and incumbency certificates of the officers of Borrower and Guarantor.<br><br>    (iv)    (A) The representations and warranties made by the Borrower shall be true, correct and complete in all material respects and (B) Borrower shall have performed and complied with all agreements, obligations and covenants.<br><br>    (v)    No Event of Default shall have occurred and be continuing or would immediately result from the consummation of the borrowing.<br><br>    (vi)    Borrower shall have delivered to DIP Lender the DIP Budget (in form and substance reasonably acceptable to DIP Lender).<br><br>    (vii)    The Interim Order shall have been entered by the Bankruptcy Court and shall not have been reversed, modified, amended, stayed or vacated.<br><br>The DIP Lender's obligation to make each subsequent Advance is subject to the following conditions:<br><br>    (i)    The representations and warranties made by the Borrower shall be true, correct and complete in all material respects and (B) Borrower shall have performed and complied with all agreements, obligations and covenants.<br><br>    (ii)    Delivery by the Borrower of an officer's certificate.<br><br>    (iii)    No Event of Default shall have occurred and be continuing or would immediately result from the consummation of the borrowing.<br><br>    (iv)    The Final Order shall have been entered by the Bankruptcy Court and shall not have been reversed, modified, amended, stayed or vacated.<br><br>*See* DIP Note ¶ 3. |
| **Interest Rates:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | Interest on the unpaid outstanding principal amount (including PIK Interest) from the Effective Date until paid in full shall accrue at an interest rate of 15.00% per annum (the "**Interest Rate**").<br><br>During an Event of Default, interest shall accrue at the Interest Rate, plus 2.00% per annum. |
| **Fees:** | <u>Facility Fee</u>: Maker shall pay in cash to Payee (or an affiliate of Payee |

| Summary and Material Terms | |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)* | designated by Payee), upon Maker's receipt of (i) the Initial Advance, a fee equal to 3.00% of $30,000,000, and (ii) each Advance, if any, made pursuant to clause (f) of Section 1 of the DIP Note, 3.00% of the amount of such Advance. <br><br> Exit Fee: On the earliest of (i) the Maturity Date, (ii) the Termination Date (as defined in the DIP Order), and (iii) the date principal and interest under the DIP Note become due and payable in full, whether at maturity, by acceleration or otherwise, Maker shall pay in cash to Payee (or an affiliate of Payee designated by Payee) a fee equal to (A) 3.00% of $30,000,000, plus (B) 3.00% of the total Advances, if any, made pursuant to clause (f) of Section 1 of the DIP Note on or prior to such date. <br><br> *See* DIP Note. |
| **Budget:** <br><br> *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | The use of proceeds of the DIP Facility is subject to a customary budget (with a monthly variance for total expenditures in the Budget for such month not to exceed 10% in the aggregate) (the "**DIP Budget**"), attached as <u>Exhibit C</u> hereto. <br><br> *See* Interim Order ¶ 6(a); DIP Note ¶ 6(a). |
| **DIP Liens and Priorities:** <br><br> *Bankruptcy Rule 4001(c)(i)* | Subject and subordinate to the Carve-Out, the DIP Lender is granted the following security interests and liens: <br><br>     (i)      pursuant to Section 364(c)(2) of the Bankruptcy Code, first priority liens on and security interests in all DIP Collateral that was unencumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date (the "**Prepetition Liens**"); and <br><br>     (ii)      pursuant to Section 364(c)(3) of the Bankruptcy Code, liens on and security interests in all DIP Collateral which is encumbered by Prepetition Liens immediately junior only to any such Prepetition Liens. <br><br> *See* Interim Order ¶ 3(d). <br><br> Subject and subordinate to the Carve-Out, the DIP Lender is granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim. <br><br> *See* Interim Order ¶ 6. |
| **Carve Out:** <br><br> *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | The DIP Liens and the DIP Superpriority Claim shall, in all cases, be subject and subordinate to a carve-out (the "**Carve-Out**"), which shall be comprised of the following: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), (ii) all fees required to be paid to any chapter 7 trustee appointed upon the conversion of any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code up to $50,000; (iii) allowed (whether allowed prior to or after the Carve-Out Trigger Notice (as defined below)) and unpaid fees and expenses (collectively, the "**Allowed Professional Fees**") of the Debtors' professionals and the professionals of the Committee (collectively, the "**Carve-Out** |

| Summary and Material Terms | |
|---|---|
| | **Professionals**") incurred from the Petition Date to the date of notice (a "**Carve-Out Trigger Notice**") from the DIP Lender that an Event of Default (as defined in the DIP Note) has occurred; and (iv) $1,000,000, which amount may be used to pay any Allowed Professional Fees after the date of receipt by the Debtors of a Carve-Out Trigger Notice.<br><br>*See* Interim Order ¶ 4(a). |
| **Events of Default:**<br><br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(ii)* | Each "**Event of Default**" is as follows:<br><br>(a)      the failure of Borrower or Guarantor to pay any principal under the DIP Note when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, or failure of Borrower to pay any interest or other amount due under the DIP Note within three Business Days after the date due;<br><br>(b)      the failure of Borrower to perform or observe any other term, covenant or agreement to be performed or observed by it pursuant to the DIP Note or the DIP Order, and, with respect to any provision of the DIP Note other than the milestones set forth in Section 6(i), such failure remains unremedied for a period of thirty (30) calendar days after written notice of such failure is given by DIP Lender to Borrower;<br><br>(c)      any representation or warranty made by Borrower to DIP Lender in connection with the DIP Note shall have been false in any material respect (or, if such representations and warranties are qualified by materiality, shall have been false in any respect) when made;<br><br>(d)      except with respect to defaults existing on the Effective Date, a default under any other agreement to which Borrower is a party that would have a Material Adverse Effect;<br><br>(e)      a Material Adverse Effect (other than in respect of defaults existing on the Effective Date) shall have occurred;<br><br>(f)      Borrower ceases or publicly announces its intent to cease operating and carrying on its business as it is now conducted;<br><br>(g)      (A) the failure of Guarantor to perform or observe any term, covenant or agreement to be performed or observed by it pursuant to the Guaranty, or (B) any representation or warranty made by Guarantor to DIP Lender in connection with the Guaranty shall have been false in any material respect (or, if such representations and warranties are qualified by materiality, shall have been false in any respect) when made;<br><br>(h)      Borrower shall file a plan or disclosure statement that fails to provide for the indefeasible repayment in full of the Obligations;<br><br>(i)      (A) the rights of Borrower under the Lease Agreements are, in any way, impaired other than with respect to circumstances existing on the Effective Date, (B) the Lease |

| Summary and Material Terms | |
|---|---|
| | Agreements are terminated, amended or otherwise modified in any way without the express written consent of DIP Lender, or (C) the Lease Agreements are assumed and assigned or rejected without the express written consent of DIP Lender; |
| | (j)      the reversal, vacatur, stay, amendment, supplementation or other modification of the DIP Order in any way without DIP Lender's consent (which consent for non-material matters shall not be unreasonably withheld), or Borrower shall apply for authority to do so or shall take any action to support any third party's application for authority to do so without DIP Lender's consent having been obtained; |
| | (k)      the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Holdings or Borrower shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise without the consent of DIP Lender; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Cases; or any manager or member of Guarantor or Borrower shall authorize a liquidation of Borrower's business; |
| | (l)      the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrower in an amount exceeding $5,000,000, individually or in the aggregate; or |
| | (m)      the Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets or properties of Borrower or any equity interest in Borrower pursuant to section 363 of the Bankruptcy Code other than as approved by DIP Lender unless such order or orders contemplate the repayment in full in cash of and termination in full of all commitments and Obligations under the DIP Note. |
| | *See* DIP Note § 8. |
| **Waiver/Modification of the Automatic Stay:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(v)* | The DIP Lender may, in its sole discretion, file financing statements, deeds of trust, mortgages, security agreements, notices of liens and other similar documents, and is granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so (deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases).<br><br>*See* Interim Order ¶ 6.<br><br>Any automatic stay imposed is modified pursuant to the terms of the |

| Summary and Material Terms | |
|---|---|
| | DIP Documents as necessary to (i) permit the Debtors to grant the DIP Liens and to incur all DIP Obligations and all liabilities and obligations under the DIP Documents, as the case may be, and (ii) authorize the DIP Lender to retain and apply payments, and otherwise enforce their respective rights and remedies under the DIP Documents.<br><br>*See* Interim Order ¶ 8. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(vii)* | The Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.<br><br>*See* Interim Order ¶ 6. |
| **Indemnification:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Borrower agrees to (i) indemnify and hold harmless DIP Lender, SPL, and the officers, directors, trustees, employees, agents, advisors and affiliates of DIP Lender and SPL (each, an "**Indemnified Party**"), from and against any and all actual losses, claims, damages, obligations, penalties, judgments, awards and other liabilities as and when incurred by such Indemnified Party (collectively, "**Liabilities**") and (ii) fully reimburse such Indemnified Party for any and all reasonable and documented out of pocket fees, costs, expenses and disbursements (in all such cases, whether legal or otherwise) as and when incurred by such Indemnified Party (collectively, "**Expenses**"), including those of investigating, preparing for (including, without limitation, preparing, reviewing or furnishing documents), participating in, defending against or giving testimony with respect to any governmental requests, inquiries, investigations, actions, claims, interrogatories, subpoenas, suits, litigation, proceedings or injunctions, whether or not in connection with any threatened or actual litigation, arbitration or other dispute resolution process and whether or not such Indemnified Party is a direct party thereto, in the case of each of the foregoing clauses (i) and (ii) directly or indirectly caused by, relating to, based upon, arising out of or in connection with any of the following: (w) any actions or inactions by Borrower (or any of its affiliates) with respect to the DIP Note (including without limitation any breach of any provision hereof), (x) the transactions contemplated in the DIP Note or (y) the determination and enforcement by such Indemnified Party of its rights pursuant to the DIP Note (including, without limitation, these indemnification provisions); <u>provided</u>, <u>however</u>, that such indemnification agreement will not apply to any portion of any such Liability or Expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence, bad faith or willful misconduct of, or material breach of the DIP Note by, any Indemnified Party (or its affiliates and controlling persons and their respective directors, officers, or employees).<br><br>*See* DIP Note § 12(d). |

| Summary and Material Terms | |
|---|---|
| **Waiver of 11 U.S.C. §§ 506(c) and 552(b)**<br><br>*Bankruptcy Rule 4001(1)(B)(c)(x);*<br>*Local Rules 4001-2(a)(i)(C) and 4001-2(a)(i)(H)* | Subject to entry of the Final Order, Debtors agree that there will be no surcharge of the DIP Collateral for any purpose unless agreed to in writing by the DIP Lender and, effective upon entry of the Final Order, each Debtor, on behalf of its estate, will be deemed to have waived any and all rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code, the "equities of the case" exception under section 552(b) of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) as they may relate to, or be asserted against, the DIP Lender, or any DIP Collateral.<br><br>*See* Interim Order ¶ 9. |
| **Liens on Avoidance Actions:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi);*<br>*Local Rule 4001-2(a)(i)(D)* | Upon entry of a Final Order, DIP Collateral shall include proceeds of Avoidance Actions, which shall be available, to the extent necessary, to pay any administrative claim held by the DIP Lender in respect of the DIP Facility.<br><br>*See* Interim Order ¶ 3(c). |

## B.  Legal Argument

19.    Section 364 of the Bankruptcy Code gives bankruptcy courts the power to authorize postpetition financing for a chapter 11 debtor-in-possession.  *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), *aff'd*, 145 B.R. 312 (B.A.P. 9th Cir. 1992). Section 364 provides, in pertinent part, as follows:

> (c)    If the [debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> > (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

20.    "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit.'"   *Defender Drug Stores*, 126 B.R. at 81 (quoting *Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 603 (6th Cir. 1987), *cert. denied*, 488 U.S. 817 (1988)).   The incentives enumerated in section 364 are not intended to be an exhaustive list of the inducements that a court may grant.   *Id*.   In fact, it is not uncommon for a court to approve a lending arrangement containing terms that far exceed those authorized by section 364.   *Id*.

21.    Generally, courts apply a three-part test to determine whether a debtor-in-possession may obtain credit under section 364(c) of the Bankruptcy Code.   Under such test, the Debtor may incur postpetition financing under the DIP Facility pursuant to section 364(c) if it demonstrates that (a) it cannot obtain unsecured credit under section 364(b) (i.e., by providing the lender with an administrative claim under section 503(b)(1)(A)), (b) the DIP Facility is necessary to preserve the assets of its estate, and (c) the terms of the DIP Facility are fair, reasonable and adequate given the circumstances of the debtor, as borrower, and the proposed lender.   *See In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

22.    Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and accord significant weight to the necessity for obtaining the financing.   *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990).   Debtors-in-possession are generally permitted to exercise their basic business judgment consistent with their fiduciary duties when evaluating the necessity of proposed protections for a party extending credit under section 364 of the Bankruptcy Code.   *Id*. at 38.

**(i)**    **The Debtor is Unable to Obtain Unsecured Credit With Administrative Priority**

23.    To show that the credit required is not obtainable on an unsecured basis with administrative priority, the Debtors need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Sav. Bank*, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); *Ames*, 115 B.R. at 37-40 (holding that debtor-in-possession must show that it has made a reasonable effort to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1998) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"), *aff'd sub nom.*, *Anchor Sav. Bank*, 99 B.R. at 117.

24.    As discussed above and in the First Day Declaration, the Debtors' assets are subject to the Prepetition Liens. Because of the Debtors' prepetition debt, the Prepetition Lenders would not have consented to the granting of senior or *pari passu* liens to a new third party debtor-in-possession lender. The Debtors thus concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lender under the DIP Facility are currently unobtainable.

**(ii)**    **The DIP Facility is Necessary to Preserve the Assets of the Debtors' Estates**

25.    If the Debtors are unable to obtain approval of the DIP Facility, their ability to

maintain their business operations as debtors-in-possession will be jeopardized, substantially reducing recoveries to all creditors. Entry of the Interim Order and, after the requisite notice and the Final Hearing, the Final Order is therefore critical to the Debtors' ability to preserve and maximize the value of Debtors' estates, in the best interests of the Debtors and their estates, and necessary to avoid irreparable harm to the Debtors, their creditors and their assets, business, goodwill, reputation and employees. Furthermore, use of the proceeds under the DIP Facility is necessary to avoid immediate and irreparable harm to the value of the Debtors' assets.

26.    As indicated above, the proposed financing is critical to the Debtors' operation and their ability to preserve the value of their assets pending successful reorganization under chapter 11 of the Bankruptcy Code. The proposed financing under the DIP Facility is needed to maintain an appropriate level of liquidity and help fund the Debtors' day-to-day operations.

27.    The Debtors are operating on a shoestring budget and have very limited cash available to maintain current day-to-day operations, including the payment of their Employees and vendors on a timely basis. The Debtors therefore require the immediate use of funds from the DIP Facility in order to maintain sufficient liquidity to ensure uninterrupted business operations. Absent such relief from the Court, the Debtors will not only lack that necessary liquidity, but will suffer a substantial loss of asset value to the detriment of all parties in interest. It is therefore critical that the Debtors have the initial $7 million of the DIP Facility in place on an interim basis, and up to $35 million of the DIP Facility in place on a final basis, in order to ensure that the Debtors have enough cash to operate the business. If the Debtors are unable to obtain approval of the DIP Facility, the Debtors' ability to maintain their business operations and successfully reorganize will be jeopardized.

28.    The DIP Facility is critical to the Debtors' ability to continue to operate during the

chapter 11 process.  If the Debtors are unable to obtain such financing for such purposes, the recoveries to all creditors would be greatly reduced because the value of the Debtors' estates would decline dramatically.  Entry of the Interim Order and, after the requisite notice and the Final Hearing, the Final Order is therefore in the best interests of the Debtors and their estates and necessary to avoid irreparable harm to the Debtors, their creditors, and their assets, businesses, goodwill, reputation and employees.

### (iii)  The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Debtors' Estates

29.     The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable.  The DIP Facility is necessary to support the Debtors' ongoing operations and will signal the Debtors' continued strength to complete their anticipated construction project and function as a going concern.  The DIP Facility will also ensure the continued support of the Debtors' employees and business associates.  Furthermore, as is more fully explained in the Erickson Declaration, the Debtors undertook an effort to obtain the best available terms for debtor-in-possession financing.  Based upon these efforts, the interest rates and fees appear to be consistent with the existing market for debtor-in-possession loans of this nature.  The Debtors believe that the proposed DIP Facility is the best financing available and well within the exercise of sound business judgment.

30.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interests [of the debtor]

and its creditors"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible."). In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985); *see also In re Los Angeles Dodgers LLC*, 2011 WL 2937905 (Bankr. D. Del. July 22, 2011) ("Under the [Business Judgment] rule, courts will not second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving at the decision."). Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the proposed DIP Facility.

31. Moreover, the Debtors have made a concerted good faith effort to obtain credit on the most favorable terms available. Specifically, in connection with the marketing of the Debtors' assets, the Debtors also sought debtor-in-possession financing from interested parties, none of whom would agree to provide financing on a junior basis. The DIP Facility was ultimately determined to provide the requisite liquidity on the most advantageous terms given that the Prepetition Lenders expressed their lack of consent to a senior or *pari passu* third party debtor-in-possession lender. Absent such consent, distracting and costly litigation over the propriety of any priming or *pari passu* third party debtor-in-possession financing would likely have ensued, with potentially severe consequences for the Debtors, their estates, and creditors.

32. Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lender, engaged in negotiations with the DIP Lender regarding the

proposed terms, and eventually agreed to the DIP Lender's proposal as the proposal best suited to the Debtors' needs.  The terms and conditions of the DIP Facility were negotiated by the parties (with the assistance of their legal and financial advisors) in good faith and at arms' length and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and to preserve the going concern status of the Debtors as well as the value of the Debtors' assets.  Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by subsequent order of this or any other court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

## V.    <u>INTERIM AUTHORIZATION</u>

33.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit under section 364 of the Bankruptcy Code may be commenced earlier than fourteen (14) days after service of such motion.  Fed. R. Bankr. P. 4001(c)(2).  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate, based on the business exigencies of the individual case.  <u>Id.</u>  In examining such requests under Bankruptcy Rule 4001, courts apply the same business judgment standard as is applicable to other business decisions.  *See*, *e.g.*, *Ames*, 115 B.R. at 36 n.2.  The Debtors submit that, for the reasons set forth herein, authority to obtain postpetition financing on an interim basis as requested in this Motion is necessary to enable the Debtors to maintain ongoing operations and avert the immediate and irreparable harm to their business.

## VI.    <u>NOTICE</u>

34.    Notice of this Motion has been provided to (a) the Office of the United States Trustee for the District of Delaware, (b) counsel to all parties asserting a lien on or a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (c) all known parties with an interest in the collateral including, without limitation, the prepetition lenders; (d) the Office of the United States Attorney for the District of Delaware; (e) the Internal Revenue Service, and (f) the Committee.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided

35.    No previous motion for the relief sought herein has been made to this or any other court.

## VII.    CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: July 19, 2016                    Respectfully submitted,

                                        */s/ L. John Bird*
                                        Jeffrey M. Schlerf (DE No. 3047)
                                        L. John Bird (DE No. 5310)
                                        **FOX ROTHSCHILD LLP**
                                        919 North Market Street, Suite 300
                                        Wilmington, DE 19801
                                        Telephone: (302) 654-7444
                                        Facsimile: (302) 656-8920
                                        jschlerf@foxrothschild.com
                                        jbird@foxrothschild.com

                                        Thomas E Lauria (pro hac vice pending)
                                        Matthew C. Brown (pro hac vice pending)
                                        **WHITE & CASE LLP**
                                        Southeast Financial Center
                                        200 South Biscayne Boulevard
                                        Suite 4900
                                        Miami  Florida 33131-2352
                                        Telephone:   (305) 371-2700
                                        Facsimile:   (305) 385-5744
                                        tlauria@whitecase.com
                                        mbrown@whitecase.com

                                        Craig H. Averch (pro hac vice)
                                        Ronald K. Gorsich (pro hac vice)
                                        **WHITE & CASE LLP**
                                        555 South Flower Street
                                        Suite 2700
                                        Los Angeles, California 90071
                                        Telephone:   (213) 620-7700
                                        Facsimile:   (213) 452-2329
                                        caverch@whitecase.com
                                        rgorsich@whitecase.com

                                        *Proposed Attorneys for the Debtors and Debtors in*
                                        *Possession*

21