**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 16-11626 (BLS)<br><br>(Jointly Administered)<br>**Related to Docket No. 69** |

**DECLARATION OF STUART ERICKSON IN SUPPORT OF
MOTION OF DEBTORS FOR AN ORDER (A) AUTHORIZING DEBTORS TO
OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 362 AND 364 AND
(B) SCHEDULING FINAL HEARING**

I, STUART ERICKSON, hereby state and declare as follows:

1. I am a Senior Managing Director at Guggenheim Securities, LLC ("Guggenheim Securities"), an investment banking and financial advisory firm with principal offices located at 330 Madison Avenue, New York, New York 10017, as well as at other locations worldwide.

2. Guggenheim Securities is a subsidiary of Guggenheim Partners, LLC, a global financial services firm. Guggenheim Securities provides a broad range of advisory services to its clients, including investment banking, securities brokerage, and other financial advisory services. The investment banking and financial advisory professionals employed by Guggenheim Securities have been advising clients around the world for more than 20 years.

3. I have experience handling complex financial and other restructuring matters for a variety of companies (distressed or otherwise, both in and out-of-court), in a wide spectrum of industries. My areas of expertise include, among other things, (i) advising on financial restructuring strategies, (ii) business plans and related financial projections, (iii) liquidity

---

[1] The last four digits of Essar Steel Minnesota LLC's federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

management, and (iv) sizing, structuring, raising and executing all aspects of financing transactions, including distressed and debtor-in-possession financings. I have more than 20 years of restructuring related investment banking experience across a wide range of industries.

4. I have been employed at Guggenheim Securities since February 2016. Prior to joining Guggenheim Securities I was a Managing Director at Miller Buckfire & Co. for 10 years. Prior to joining Miller Buckfire & Co., I was a Vice President in the financial restructuring group at Dresdner Kleinwort Wasserstein and its predecessor, Wasserstein Perella. Prior to joining Wasserstein Perella, I worked at Houlihan Lokey Howard & Zukin. I graduated with an MS in Finance from the London School of Economics and a B.S.B.A from Georgetown University.

5. I submit this declaration in support of the Debtors' motion (the "**DIP Financing Motion**") for entry of an order (a) authorizing the Debtors to obtain postpetition financing pursuant to 11 U.S.C. §§ 362 and 364 and (b) scheduling a final hearing.

6. This declaration provides an overview of the Debtors' needs for liquidity, including the availability of postpetition debtor-in-possession financing (the "**DIP Facility**"). Unless otherwise defined herein, all capitalized terms shall have the same meanings ascribed to them in the DIP Financing Motion.

7. Guggenheim Securities has provided investment banking services to the Debtors since March 7, 2016 and is familiar with the Debtors and their businesses and operations. I understand that the Debtors will file an application to employ Guggenheim Securities as their investment banker in these Chapter 11 Cases. Consequently, in my capacity as a Senior Managing Director at Guggenheim Securities working on this matter, I have (i) become familiar with the financial affairs of the Debtors and (ii) participated in many aspects of the Debtors' attempts to restructure their capital structure on an out-of-court basis over the past several

months. Among other activities, I have assisted the Debtors in their efforts to raise financing and, in particular, with their structuring, negotiation and documentation of the proposed DIP Facility, including advising on the preparation of the Debtors' proposed budget in connection with their interim use of cash, as well as on the terms and conditions of the DIP Facility.

8. Except as otherwise stated in this Declaration, I have personal knowledge of or have relied upon the knowledge of others employed by Guggenheim Securities with respect to the matters set forth herein. If called to testify, I could and would testify competently to the facts set forth herein.

### General Background

9. As described in the First Day Declaration, the Debtors are two separate entities: (a) ESML, a Minnesota limited liability company, and (b) Holdings, ESML's direct parent company, a Delaware corporation.

10. As set forth in the First Day Declaration, (a) Holdings has no operations, but has guaranteed certain obligations of ESML, (b) ESML was formed to develop and operate a fully-integrated, seven million tonnes per annum (mtpa) capacity pellet production facility (the "**Project**") in the western Mesabi Range in northern Minnesota and (c) the Project is intended to consist of an open-pit iron ore mine, crushing, concentrating and pelletizing facilities, and a rail line and train-loading system.

11. As is more fully discussed in the First Day Declaration, work substantially ceased on the Project in November 2015 and the Project remains significantly incomplete.

12. On July 8, 2016 (the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101, et seq., the

"**Bankruptcy Code**") by filing with this Court a voluntary petition under chapter 11 of the Bankruptcy Code.

### The Need for Liquidity

13. The Debtors informed me that, as of the Petition Date, ESML had approximately $700,000 in cash. I understand the Debtors have obtained authority to use such cash on an interim basis pursuant to the *Interim Order Granting Debtors' Motion for Entry of an Interim Order (I) Authorizing the Use of Available Cash and (II) Scheduling a Final Hearing* [Dkt. No. 36]. As described in the DIP Financing Motion, the use of this cash is intended to fund certain short-term working capital needs.

14. I have been advised by the Debtors that they have no current operations or source of cash inflows and require sufficient liquidity during these Chapter 11 Cases to fund working capital and general corporate requirements, to preserve and maintain the value of ESML's assets, and to continue their efforts to complete the construction of the Project.

15. The Debtors have also informed me that they intend to use the proceeds of the DIP Facility to, among other things, expend further time and effort to validate the costs to complete the Project, engage contractors to perform the required preliminary work, secure long term pellet purchase agreements and raise the financing to complete the construction of the Project. In light of this, failure to approve the DIP Facility would likely frustrate the Debtors' ability to maintain their business operations as debtors in possession and maximize the value of their assets, substantially reducing recoveries to all creditors.

### Negotiations of the DIP Facility

16. Since its retention, Guggenheim Securities has, among other activities, assisted the Debtors in their efforts to raise interim financing to provide the liquidity runway the Debtors

needed to engage in efforts to complete the Project.  These efforts have focused on both in and out-of-court financing options.  Upon the commencement of these Chapter 11 Cases, these efforts have shifted to obtaining debtor-in-possession financing ("**DIP Financing**").

17. In connection therewith, the Debtors, with the assistance of Guggenheim Securities and its other advisors, have pursed three alternative paths to obtain the necessary DIP Financing.

18. <u>First</u>, the Debtors, with the assistance of Guggenheim Securities, solicited DIP Financing proposals from its prepetition secured creditors: (i) lenders under its September 2014 term loan facility (the "**U.S. Term Lenders**") and (ii) lenders under its December 2010 multi-tranche term loan (the "**Project Finance Debt Lenders**").  The Debtors began negotiations with the U.S. Term Lenders regarding DIP Financing in April 2016.  These negotiations involved multiple due diligence meetings and calls between the Debtors and the U.S. Term Lenders and their respective advisors (including Guggenheim Securities).  During that time, the Debtors and the U.S. Term Lenders exchanged several drafts of a DIP Financing term sheet.  The Debtors determined that the terms proposed by the U.S. Term Lenders were substantially inferior to the terms of the DIP Facility, and the parties have since not continued their negotiations or proceeded into drafting definitive documentation.  As such, there is currently no binding proposal or financing commitment from the U.S. Term Lenders that the Debtors could consider or accept.  As specified above, Guggenheim Securities, at the request and on behalf of the Debtors, also solicited a DIP Financing proposal from the Project Finance Debt Lenders, but they did not express any interest in providing the necessary DIP Financing.

19. <u>Second</u>, the Debtors, with the assistance of Guggenheim Securities, initiated discussions with SPL Advisors LLC ("**SPL**"), with whom the Debtors negotiated for roughly one

month to provide a $50 million interim financing facility on an out-of-court basis.  In conjunction with these discussions, SPL also signed a letter of intent to provide the Debtors with equity capital to complete the Project, subject to certain conditions.  The discussions between the parties proceeded over several weeks prior to the filing of these Chapter 11 Cases and involved the exchange of multiple drafts of term sheets and extensive negotiations of a loan agreement to document the terms of the contemplated interim financing facility.  Upon the commencement of these Chapter 11 Cases, the Debtors immediately requested SPL to consider providing a DIP Facility in lieu of their proposed out-of-court financing facility.  The Debtors, with the assistance of Guggenheim Securities and the Debtors' legal counsel, engaged in intense negotiations for over a week to agree on the terms, form and substance of the DIP Facility agreement.  The negotiations preceding the execution of the DIP Facility were robust, including with respect to the size of the financing facility, the intended use of proceeds, governance rights, interest rate and fees, among others.  As set forth more fully in the DIP Financing Motion, the Debtors propose to secure their obligations under the DIP Facility by, among other things, granting the DIP Lender certain first priority liens on, and security interests in, substantially all of the Debtors' unencumbered assets and junior liens on, and security interests in, substantially all of the Debtors' encumbered assets (each, with certain exclusions), without having to prime the existing liens and security interests held by the holders of the Debtors' prepetition secured debt.  This is an important feature of the DIP Facility.  Obtaining a DIP Financing from third party lenders which would be secured by senior or *pari passu* liens to the liens securing the Debtors' prepetition secured debt was determined by the Debtors not to be a viable option at this time, as the holders of the Debtors' prepetition secured debt have indicated they would not have

consented to the granting of senior or *pari passu* liens to a new third party debtor-in-possession lender.

20. <u>Finally</u>, Guggenheim Securities¸ at the request and on behalf of the Debtors, contacted six additional potential third-party DIP Financing lenders. Four of these parties were not sufficiently interested in providing a DIP Financing. The two remaining parties negotiated and executed non-disclosure agreements with the Debtors and were subsequently provided due diligence material and a DIP Financing budget. These two parties have not provided a term sheet or expressed serious interest in providing such financing, especially since, for the reasons described above, a substantial portion of the collateral would have to be secured with liens and security interests that are junior to the liens securing the Debtors' prepetition secured debt. Other than SPL, through its affiliate, Strategic Partners Holdings Limited, none of the other third party prospective providers of DIP Financing were willing to provide debt where a substantial portion of the security would have consisted of liens and security interests that are junior to the liens securing the Debtors' prepetition secured debt.

21. The Debtors have concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lender under the DIP Facility are currently unobtainable, and that the proposed terms are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

**Fair and Reasonable**

22. For the reasons set forth above, I believe that the Debtors have made a concerted effort to obtain credit on the most favorable terms available. Although the Debtors contacted various lending institutions, no lender other than the DIP Lender was willing to provide an

adequate stand-alone financing facility without requiring that the liens and security interests held by the holders of the Debtors' prepetition secured debt be primed, which would have likely resulted in an expensive and distracting priming battle at the outset of these Chapter 11 Cases. Against this backdrop, the Debtors carefully evaluated the proposed financing structure from SPL (and its affiliates), engaged in extensive negotiations with SPL regarding the proposed terms, worked with their various advisors in an effort to obtain the best possible pricing from SPL, and, eventually, agreed to SPL's proposal as the proposal best suited to the Debtors' current needs.  In my view, the terms and conditions of the DIP Facility were negotiated by the parties (and their legal and financial advisors) at arm's length and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and to preserve the going concern status of the Debtors as well as the value of the prepetition collateral.

### Conclusion

23.     Based upon the foregoing and the facts and circumstances of these cases, I am of the view that without access to postpetition financing, the Debtors would be unable to maintain their business as a going concern, which would significantly impair the value of the Debtors' assets, to the likely detriment of all creditor constituencies.  By obtaining the DIP Facility, the Debtors should be in a better position to seek to preserve the value of their assets and the going concern value of their business during the chapter 11 process for the benefit of all creditors.  The Debtors have determined that the terms of the DIP Facility will enable the Debtors to meet ongoing operational expenses, protect the value of the Debtors' assets and properties, and facilitate the implementation of the Debtors' financial restructuring.

24. In short, the Debtors need sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the likely detriment of all creditors. The proceeds of the DIP Facility are, therefore, necessary to preserve the Debtors' assets and property (including the Prepetition Collateral) during the Chapter 11 Cases.

[SIGNATURE PAGE FOLLOWS]

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: July 19, 2016

Stuart Erickson
Senior Managing Director
Guggenheim Securities, LLC