## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS) |
| Debtors. | (Jointly Administered) |

## PROPOSED DISCLOSURE STATEMENT RELATING TO THE CHAPTER 11 PLAN OF REORGANIZATION OF MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC) AND ESML HOLDINGS INC.

Dated: February 2, 2017

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131-2352
Telephone:   (305) 371-2700
Facsimile:   (305) 385-5744

and

**WHITE & CASE LLP**
Craig H. Averch (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
Lauren Fujiu-Berger (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433
Telephone:   (213) 620-7700
Facsimile:   (213) 452-2329

*Attorneys for the Debtors and Debtors in Possession*

**FOX ROTHSCHILD LLP**
Jeffrey M. Schlerf (No. 3047)
L. John Bird (No. 5310)
Courtney A. Emerson (No. 6229)
919 North Market Street, Suite 300
Wilmington, Delaware 19801-3062
Telephone:   (302) 654-7444
Facsimile:   (302) 656-8920

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC. The last four digits of its federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ............................................................................................1

II. GENERAL INTRODUCTION ...........................................................................................4

III. NOTICE TO HOLDERS OF CLAIMS .............................................................................5

IV. EXPLANATION OF CHAPTER 11 ..................................................................................7
    A.    Overview of Chapter 11............................................................................................7
    B.    Chapter 11 Plan.........................................................................................................8
    C.    Confirmation of a Chapter 11 Plan. .........................................................................8

V. OVERVIEW OF THE PLAN .............................................................................................9
    A.    Summary of the Key Plan Terms...............................................................................9
    B.    Summary of Distributions Under the Plan..............................................................11
    C.    DNR Enhancement. ................................................................................................17

VI. GENERAL INFORMATION ...........................................................................................18
    A.    Business of the Debtors. .........................................................................................18
    B.    Prepetition Capital and Debt Structure. .................................................................19
    C.    The Debtors' Prior and Current Management. .......................................................20
    D.    History of the Project and Events Precipitating the Commencement of the
           Chapter 11 Cases...................................................................................................22
           1.    Offtake Agreements. ..................................................................................22
           2.    Defaults under the Prepetition Credit Facilities.......................................22
           3.    Infrastructure Grant Funds.........................................................................23
           4.    Great Lakes Litigation. ..............................................................................23
           5.    Mechanic's Liens. ......................................................................................23
           6.    Mineral Leases. ..........................................................................................24

VII. THE CHAPTER 11 CASES.............................................................................................24
    A.    First Day Pleadings and Orders. .............................................................................24
    B.    Appointment of New Chief Executive Officer. ......................................................24
    C.    Appointment of Chief Restructuring Officer..........................................................25
    D.    Changes to the Debtors' Boards of Governors or Directors. ..................................25
    E.    Employment of Professionals for the Debtors........................................................25
    F.    Appointment of the Committee. .............................................................................25
    G.    Final DIP Order.......................................................................................................25
    H.    Continued Operations. ............................................................................................26
    I.    Debtors' Offtake Agreements.................................................................................26
    J.    Settlement with the Minnesota Power and Nashwauk Public Utilities
           Commission. ..........................................................................................................26
    K.    Matters Relating to Unexpired Leases and Executory Contracts. ..........................27
           1.    Agreements and Amendments to Langdon/Warren Lease. ......................28
           2.    Extension of Time to Assume or Reject Mineral Leases...........................28
    L.    Claims Bar Date.....................................................................................................28

Americas 92417336 (2K)

VIII. PENDING LITIGATION AND INVESTIGATIONS ......................................................29
    A.    Debtors' Affiliates Investigation and Litigation. ...............................................29
    B.    DNR Leases and Litigation. ...............................................................................29
    C.    Great Lakes Matter. ............................................................................................30
    D.    Other Pending Adversary Proceedings. ...............................................................30
        1.    American Bank of the North v. Essar Steel Minnesota, LLC, Adv. No. 16-51504. .................................................................................30
        2.    Removed Mechanic's Lien Actions, Adv. Nos. 16-51543 and 16-51877. ..................................................................................................30
    E.    Other Pending Prepetition Litigation. .................................................................31

IX. THE CHAPTER 11 PLAN ..........................................................................................32
    A.    Plan Treatment of Claims and Equity Interests. .................................................32
        1.    Class 1 – Priority Claims. .......................................................................32
        2.    Class 2 – Project Finance Secured Claims. ............................................32
        3.    Class 3 – Term Loan Secured Claims. ....................................................32
        4.    Class 4 – Supplier Credit Secured Claims. .............................................33
        5.    Class 5 – Mechanic's Lien Claims. .........................................................33
        6.    Class 6 – Other Secured Claims. ............................................................34
        7.    Class 7 – Project Unsecured Claims. ......................................................34
        8.    Class 8 – General Unsecured Claims. .....................................................35
        9.    Class 9 – Equity Interests. ......................................................................36
    B.    Plan Treatment of Administrative Claims. ..........................................................36
        (a)    Time for Filing Administrative Claims. ..................................................36
        (b)    Time for Filing Fee Claims. ....................................................................36
        (c)    Allowance of Administrative Claims. .....................................................36
        (d)    Payment of Allowed Administrative Claims. ..........................................37
        (e)    Allowance and Payment of DIP Claims. .................................................37
        (f)    Treatment of Tax Claims. .......................................................................37
    C.    Exculpation Provisions. ......................................................................................37
    D.    The Litigation Trust. ...........................................................................................37
        1.    Creation of the Litigation Trust and Appointment of the Litigation Trustee. .......................................................................................38
        2.    Property of the Litigation Trust. .............................................................38
        3.    Purpose of the Litigation Trust. ..............................................................39
        4.    Litigation Trustee Selection Committee. .................................................39
        5.    Powers and Responsibilities of the Litigation Trustee. ...........................40
        6.    The Litigation Trust Advisory Board. .....................................................42
        7.    Litigation Trust Beneficiaries. ................................................................42
        8.    Governance of Litigation Trust. ..............................................................42
        9.    Cash. .......................................................................................................43
        10.    Compensation of the Litigation Trustee. ................................................43
        11.    Litigation Trust Distributions. ................................................................43
        12.    Retention of Professionals by the Litigation Trustee. .............................43
        13.    Noncertificated Litigation Trust Interests. ..............................................43
        14.    Dissolution of the Litigation Trust. .........................................................43
        15.    Securities Exempt. ..................................................................................44

Americas 92417336 (2K)

E.      Plan Controls...........................................................................................44

X. RISK FACTORS.............................................................................................................44
  A.      General Considerations......................................................................................44
  B.      Certain Bankruptcy Considerations....................................................................44
  C.      Amount or Classification of a Claim May be Subject to Objection. ...................45
  D.      Estimated Claim Amounts by Class May Not Be Accurate. ................................45
  E.      Risk Factors That May Affect the Recoveries Through the Litigation Trust. .......46
          1.      General Risks That May Affect the Recovery Through the
                  Litigation Trust. ...................................................................................46
          2.      Section 1145(a)(1). ..............................................................................46
  F.      Economic Risks Related to the Reorganized Debtor's Financial Projections. ......46
  G.      Risk or Restrictions and Covenants Related to Exit Facility or Plan Sponsor
          Equity Contribution. .........................................................................................47
  H.      Risks Associated with the Reorganized Debtor's Operations to Project
          Completion........................................................................................................47
          1.      The Debtors Do Not Have an Operating History and Their Future
                  Profitability Is Uncertain......................................................................47
          2.      Profitability Could Be Adversely Affected by Delays in
                  Constructing and in Initiating Operations at the Project or by
                  Construction Costs that Are Higher than Estimated. ...............................48
          3.      Profitability Could Be Adversely Affected by Competition,
                  Regulatory Developments, and Other Factors Beyond the Debtors'
                  Control. ...............................................................................................48
          4.      Financial Performance Is Highly Dependent on the Iron Ore Market
                  and Reduced Global Demand for Steel or Decreases in Steel
                  Production Could Have a Material Adverse Effect on the Debtors'
                  Business. ..............................................................................................49
          5.      Risks Related to Environmental Laws and Requirements..........................49
          6.      Reasonably Priced Raw Materials and Mining Equipment May Be
                  Unavailable. .........................................................................................50

XI. CONFIRMATION AND CONSUMMATION PROCEDURES ...........................................50
  A.      Overview...........................................................................................................50
  B.      Confirmation of the Plan....................................................................................52
          1.      Elements of Section 1129 of the Bankruptcy Code. ...............................52
          2.      Acceptance. ..........................................................................................53
          3.      Best Interests of Creditors Test..............................................................53
          4.      Feasibility.............................................................................................56
  C.      Cramdown.........................................................................................................57
          1.      No Unfair Discrimination. ....................................................................57
          2.      Fair and Equitable Test. ........................................................................57
  D.      Effect of Confirmation.......................................................................................58

XII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ......................................58
  A.      U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to
          Holders of Allowed Claims. ..............................................................................59
          1.      General Tax Considerations for Holders of Allowed Claims...................59

        2.      Certain Other Tax Considerations for Holders of Allowed Claims...........60

        3.      Tax Consequences to Certain Holders of Allowed Claims. .....................60

  B.     U.S. Federal Income Tax Consequences to Holders of Contested Claims............60

  C.     Tax Treatment of the Litigation Trust. ..................................................................61

  D.    Consequences to Pre-Bankruptcy Holders of Equity Interests. ...........................62

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ......................................................................................................................62

  A.     Liquidation Under Chapter 7 of the Bankruptcy Code. .......................................63

  B.     Alternative Chapter 11 Plans. .............................................................................63

XIV. CONCLUSION AND RECOMMENDATION..................................................................64

## SCHEDULES AND EXHIBITS

List of Defined Terms .................................................................................... **Schedule 1**

Schedule of Assumed Executory Contracts and Unexpired Leases .................................. **Schedule 2**

Schedule of Project Unsecured Claims ............................................................ **Schedule 3**

Chapter 7 Liquidation Analysis ...................................................................... **Exhibit A**

Chapter 11 Plan ...................................................................................... **Exhibit B**

Disclosure Statement Order .......................................................................... **Exhibit C**

Financial Projections and Assumptions............................................................... **Exhibit D**

iv

# I.

## PRELIMINARY STATEMENT

Mesabi Metallics Company LLC, formerly known as Essar Steel Minnesota LLC ("**ESML**" or "**Mesabi Metallics**" or the "**Company**") is a project company that has been developing a fully integrated, seven (7) million tonnes per annum (mtpa) capacity iron ore pellet production facility (the "**Project**").  It was part of the vast global enterprise controlled by its owner, Essar Global Fund Limited ("**EGFL**").  EGFL and certain of its affiliates entered into various agreements with ESML and its lenders, including a lump sum turnkey contract to build the Project for a fixed sum and an agreement to provide equity contributions necessary to complete the Project.

For some time prior to its bankruptcy, ESML experienced considerable liquidity problems that compromised the Project.  These problems arose from the failure of EGFL and its affiliates to honor their contractual commitments to build and fund the Project.  Put simply, it appears that EGFL and its affiliates used large amounts of funds raised for the Project for other purposes.  As a result, Mesabi Metallics has commenced a lawsuit against EGFL, its affiliates and former management for breach of contract, fraudulent transfer, breach of fiduciary duty and other actions.  That lawsuit, which seeks recoveries for creditors and lenders that have suffered losses, followed an investigation commissioned by independent directors of Mesabi Metallics and overseen by new management.

The Project's liquidity issues resulted in defaults under various contracts and agreements, which caused numerous disputes with lenders, lessors, contractors and others, disrupting relationships that were crucial to the Project's success.  Contractors and suppliers slowed or ceased performance and delivery, causing project delays.  Increasingly frustrated by non-payment, many contractors filed "mechanic's liens" to protect themselves.  Ultimately construction ceased altogether and the Company simply ran out of money.

The Company's failure left in its wake a stream of disappointed stakeholders, including lenders, contractors, suppliers and many others.  Among the disappointed stakeholders were holders of private and public mineral rights, leased by the Company, which are the sources of iron ore to be processed by the finished Project.  Approximately fifty-five percent of those mineral rights was secured from private landowners and a crucial forty-two percent was leased from the DNR.  The Company's mineral leases were negotiated and amended multiple times over the course of construction as the Project fell behind.

It is against this backdrop that the State of Minnesota DNR sought, in July 2016, to terminate the DNR Mineral Leases.  The DNR Mineral Leases are essential to the Project; without them it would be virtually impossible for the Company to reorganize and to complete the Project.  As a result, on July 8, 2016, the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in an effort to protect and preserve the DNR Mineral Leases and facilitate the reorganization of the Company.  Accordingly, although there are multiple reasons for the Project's failure including, as indicated above, EGFL's failure to honor its various obligations, it was the DNR's effort to terminate the DNR Mineral Leases that was the immediate precipitating event for the Chapter 11 Cases.

1

A central purpose of bankruptcy protection is to facilitate the reorganization of the debtor. Ideally, creditors, lenders and other stakeholders work together with debtor's management to maximize value through a reorganization, if possible, and to distribute the value among them. In large part, this is what has happened in the Chapter 11 Cases to date. The Debtors' current management, which has sued EGFL and is no longer accountable to EGFL or any other holder of an Equity Interest, is working closely with parties in interest to reorganize the Debtors' business as a going concern, under new management and ownership, and to maximize value and to increase distributions under the Plan. Contractors and trade creditors have worked with the Debtors' current management to determine the cost and timing to complete the Project; secured creditors and the Committee have worked together and supported the Debtors' efforts to reorganize; private owners of mineral rights essential to the Project's completion and success have negotiated extensions of time to permit construction of the Project to resume.

In sum, nearly every party in interest in the Chapter 11 Cases, other than the DNR, has expended significant time and effort to effectuate a successful reorganization. Until now, the DNR has continued to focus on terminating the DNR Mineral Leases. Nonetheless, the Debtors are optimistic that, as the Chapter 11 Cases progress, the DNR will recognize the benefits of the Plan, including the value preserved for creditors, and will ultimately support the Plan.

The DNR Mineral Leases remain essential to the Debtors' efforts to maximize value and reorganize as a going concern. In addition, as the Company has demonstrated in the Bankruptcy Court, Mesabi Metallics is in the best position to mine and process more iron ore sooner than any new lessee of the mineral rights would be able to do. A new lessee of the DNR Mineral Leases would be required, among other things, to obtain all permits and reassemble the land package and mineral leases necessary to operate a completed project, which would take at least five years. The Company already has the necessary infrastructure in place, including employees at the site, permits, a mining plan, and interest from counterparties to financing and offtake agreements. Given the current status of the Project, if the Plan is confirmed, the Project can be completed within two years.

The proposed Plan therefore is conditioned on an order of the Bankruptcy Court permitting the Company to assume the DNR Mineral Leases.

This Disclosure Statement and the proposed Plan present the Company's creditors with a stark choice:

- If the Plan is not approved by creditors and confirmed by the Bankruptcy Court, the Company will be liquidated and its lenders, contractors, mineral lessors and other creditors stand to receive very low recoveries, as illustrated in this Disclosure Statement. The principal source of recovery for most creditors would likely be proceeds of litigation brought by the Company against EGFL or others.

- If the Plan is approved by creditors and confirmed by the Bankruptcy Court, creditors will receive vastly improved recoveries, the Company will be able to complete the Project, and the employees and community in which the Project is based will greatly benefit.

Americas 92417336 (2K)

Fortunately, the Company has made great strides toward reorganization. It has reached agreements to extend its private mineral leases. It has identified parties interested in entering offtake agreements and is currently in discussions with them. It is in advanced negotiations with the DIP Lender on the specific terms of its equity commitment to act as the Plan Sponsor. Finally, it is identifying sources of debt financing to move forward with when the Plan is confirmed.

However, to proceed further with the anticipated financing and to enable it to complete documentation of its offtake agreements, the Company needs to demonstrate to the parties in question that it has secured the necessary, continued rights to mine under the DNR Mineral Leases. Accordingly, after creditors have approved the Plan, the Bankruptcy Court has confirmed it and permitted the Debtors to assume the DNR Mineral Leases, the Company will proceed to finalize the offtake agreements and exit financing. In connection with confirmation, the Company will demonstrate to the Bankruptcy Court that the Plan is feasible and that it can finalize the contemplated offtake agreements and financing.

The Plan has been formulated to provide for the assumption of the DNR Mineral Leases. The Company would prefer to achieve this with the DNR's consent, or at least without the DNR's opposition. To facilitate that, the Plan has been crafted to meet many of the objectives that the State of Minnesota and its agencies have previously expressed in connection with the Project:

- EGFL and its affiliates will no longer have any stake or role in the project, other than as a defendant in litigation from which recoveries are sought for the benefit for creditors.
- A cure payment will be made to the DNR in the amount of millions of dollars that would otherwise be lost; indeed, the Plan provides for assurance that cure payments will be made even if the Plan does not become effective. Absent the Plan, the Debtors will not be able to make such payments.
- More iron ore can be mined sooner than if the Company does not reorganize, which will increase the revenue stream to the State agencies that benefit from the DNR Mineral Leases.
- The Company will put hundreds of contractors and workers to work completing construction of the Project.
- Project contractors – many of which would receive no recovery if the Company does not reorganize – will receive enhanced recoveries.

Among the various concerns expressed by the State of Minnesota has been ensuring that contractors on the Project are treated fairly on account of their claims and losses. Accordingly, to further enhance the prospects for the DNR's support of the Plan, the Project's proposed new sponsor has agreed to improve further the recoveries to Project contractors if the Plan is confirmed and assumption of the DNR Mineral Leases is achieved without DNR opposition. The Company's secured lenders, who will suffer the largest losses in the bankruptcy, have indicated that they will support this. These improvements to recoveries would ensure that the majority of Project contractors will be paid in full and that others that would otherwise receive nothing will receive significant recoveries. **Thus, if the DNR does not object to the Plan, the**

Americas 92417336 (2K)

**Plan provides for enhanced recoveries to Project contractors. By contrast, if the Plan is not confirmed, the alternative is liquidation, which would decrease or eliminate recoveries to all, including to the DNR and to contractors and vendors involved with the Project.**

A successful reorganization is in the best interests of all creditors, including the State of Minnesota.

## II.

## GENERAL INTRODUCTION

BY ORDER DATED [●], 2017 (THE "**DISCLOSURE STATEMENT ORDER**"), THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "**BANKRUPTCY COURT**") APPROVED THE DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") RELATING TO THE CHAPTER 11 PLAN FOR MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC) AND ESML HOLDINGS INC. (COLLECTIVELY, THE "**DEBTORS**"). THE DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE CHAPTER 11 PLAN FOR THE DEBTORS (THE "**PLAN**"), A COPY OF WHICH IS ATTACHED HERETO AS **EXHIBIT B**. CLASS 1 – PRIORITY CLAIMS AND CLASS 6 – OTHER SECURED CLAIMS ARE UNIMPAIRED UNDER THE PLAN AND ARE NOT ENTITLED TO VOTE ON THE PLAN. CLASS 9 – EQUITY INTERESTS WILL NOT RECEIVE A DISTRIBUTION UNDER THE PLAN AND IS NOT ENTITLED TO VOTE ON THE PLAN. CLASS 2 – PROJECT FINANCE SECURED CLAIMS, CLASS 3 – TERM LOAN SECURED CLAIMS, CLASS 4 – SUPPLIER CREDIT SECURED CLAIMS, CLASS 5 – MECHANIC'S LIEN CLAIMS, CLASS 7 – PROJECT UNSECURED CLAIMS, AND CLASS 8 – GENERAL UNSECURED CLAIMS ARE ENTITLED TO VOTE ON THE PLAN. ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM HOLDERS OF CLASS 2, CLASS 3, CLASS 4, CLASS 5, CLASS 7, AND CLASS 8 CLAIMS.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF CLAIMS. ALL HOLDERS OF CLASS 2, CLASS 3, CLASS 4, CLASS 5, CLASS 7, AND CLASS 8 CLAIMS ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE DISCLOSURE STATEMENT ORDER, A TRUE AND CORRECT COPY OF WHICH IS ATTACHED HERETO AS **EXHIBIT C**. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. **TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY 4:00 P.M. (PREVAILING EASTERN TIME), ON [●], 2017 (THE "VOTING DEADLINE").**

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN," BELOW.

## III.

## NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.  *See* "Confirmation and Consummation Procedures," below.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THE EXHIBITS AND SCHEDULES ANNEXED TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

Americas 92417336 (2K)

On [●], 2017, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code, finding that the Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the holders of the Claims against the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and certain of the professionals they have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement, and if other information is given or made, such information may not be relied upon as having been authorized by the Debtors. You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the Disclosure Statement Schedules and Disclosure Statement Exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached Disclosure Statement Schedules and Disclosure Statement Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot, and return the same to the address set forth on the ballot, in the enclosed, postage prepaid, return envelope so that it will be actually received by Epiq Bankruptcy Solutions, LLC (the "**Solicitation Agent**"), no later than the Voting Deadline. All votes to accept or reject the Plan must be cast by using the appropriate ballot. Votes which are cast in any other manner will not be counted. **All ballots must be actually received by the Solicitation Agent no later than [●], 2017 at 4:00 p.m., Prevailing Eastern Time. For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit C.**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You will be bound by the Plan if it is accepted by the requisite holders of Claims and confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan or if you are the holder of an unimpaired Claim. *See* "Confirmation and Consummation Procedures," below.

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") on [●], 2017, at [●] [a/p.]m., Prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge of the United States Bankruptcy Court for the District of Delaware. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before [●], 2017, in the manner described in the Disclosure Statement Order attached hereto as Exhibit C.**

6

**THE DEBTORS BELIEVE THAT THE PLAN MAXIMIZES RECOVERIES TO CREDITORS AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

IV.

**EXPLANATION OF CHAPTER 11**

**A.     Overview of Chapter 11.**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity holders, and other parties in interest.   On July 8, 2016 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, thereby commencing the chapter 11 cases jointly administered as *In re Essar Steel Minnesota LLC and ESML Holdings Inc.,* Case No. 16-11626 (BLS) (the "**Chapter 11 Cases**").

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor in property as of the date the petition is filed.   Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.   Since the Petition Date, the Debtors have continued to operate their businesses as debtors and debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code.   Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business.   Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers.   Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case.   The plan sets forth the means for satisfying claims against and interests in a debtor's estate.   Unless a trustee is appointed, only a debtor may file a plan during the first 120 days of a chapter 11 case (the "**Filing Period**"), and the debtor will have 180 days to solicit acceptance of such plan (the "**Solicitation Period**" and, together with the Filing Period, the "**Exclusive Periods**").   However, section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Exclusive Periods upon a showing of "cause."   The Filing Period and Solicitation Period may not be extended beyond 18 months and 20 months, respectively, from the date of the entry of the order for relief.   On October 25, 2016, the Debtors filed a motion requesting that the Filing Period and the Solicitation Period be extended to May 4, 2017 and July 5, 2017, respectively [D.I. 468] (the "**Motion to Extend Exclusivity**").   On December 5, 2016, the Bankruptcy Court entered an order [D.I. 581] granting the Motion to Extend Exclusivity and extending the Debtors' exclusive period to file a plan to May 4, 2017 and the exclusive period within which to solicit

7

that plan to July 5, 2017.  Accordingly, no other creditor or party in interest may file a plan during the extended Exclusive Periods.

**B.**    **Chapter 11 Plan.**

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets.  In either event, upon confirmation of the plan, the plan becomes binding on the debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  For a description of key components of the Plan, *see* "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  **This Disclosure Statement is presented to holders of Project Finance Secured Claims, Term Loan Secured Claims, Supplier Credit Secured Claims, Mechanic's Lien Claims, Project Unsecured Claims, and General Unsecured Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

**C.**    **Confirmation of a Chapter 11 Plan.**

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  *See* "Confirmation and Consummation Procedures – Confirmation of the Plan."  **The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan.  *See* "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote.  Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.  *See* "Confirmation and Consummation Procedures."  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.  **Class 1 – Priority Claims and Class 6 – Other Secured Claims are unimpaired under the Plan and holders of such claims are not entitled to vote on the Plan.  Class 9 – Equity Interests will not receive a distribution under the Plan and the holders of such claims are not entitled to vote on the Plan.  Class 2 – Project Finance Secured Claims, Class 3 – Term Loan Secured Claims, Class 4 – Supplier Credit Secured Claims, Class 5 – Mechanic's Lien Claims, Class 7 – Project Unsecured Claims, and Class 8 – General Unsecured Claims are entitled to vote on the Plan.**

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. *See* "Confirmation and Consummation Procedures – Cramdown." **The Plan has been structured so that it will satisfy the foregoing requirements as to any class that has rejected or is deemed to reject the Plan.**

## V.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in the Debtors.

**A.    Summary of the Key Plan Terms.**

The Plan is built around the following key elements:

- <u>Investment by New Owner and Issuance of Equity Securities</u>.  On the Effective Date, the existing Equity Interests in the Debtors shall be cancelled.  The Reorganized Debtor shall, thereafter, on the Effective Date, without further order of the Bankruptcy Court, (a) authorize [●] units of New Membership Interests, and (b) distribute [●] units of New Membership Interests (equal to 100% of the Membership Interests in the Reorganized Debtor less the Membership Interests distributed to the holders of Prepetition Lender Secured Claims in Article IV of the Plan) to the Plan Sponsor in exchange for, at least $250,000,000 in Cash.

- <u>The Exit Facility</u>.  On or about the Effective Date, the Reorganized Debtor, as borrower, the Exit Facility Agent, and the Exit Facility Lenders will enter into certain agreements in respect of a credit facility for $600 million.  The Reorganized Debtor's obligation under the Exit Facility Documents shall be secured by a first priority lien in and upon substantially all the assets of the Reorganized Debtor, subject only to certain customary permitted liens.

- <u>Issuance of Notes</u>.  The Reorganized Debtor shall execute the Plan Notes Documents, including, but not limited to, (a) the Prepetition Lender Notes and (b) the Prepetition Lien Trade Creditor Notes, in each case in accordance with the Plan.  Without limiting the generality of the foregoing, the Plan Notes Documents shall provide that (a) the obligations of the Reorganized Debtor in connection with the Prepetition Lender Notes shall be secured by a junior lien in and upon substantially all of the assets of the Reorganized Debtor, subject only to the liens granted pursuant to the Exit Facility Documents and certain customary permitted liens and (b) the obligations of the Reorganized Debtor in connection with the Prepetition Lien Trade Creditor Notes shall be secured by assets to be determined at the Confirmation Hearing.

- <u>The Litigation Trust</u>.  On the Effective Date, the Litigation Trust shall be established for the benefit of holders of Class A-1 Beneficial Trust Interests, Class A-2 Beneficial Trust Interests, Class A-3 Beneficial Trust Interests, Class B-1 Beneficial Trust Interests, Class B-2 Beneficial Trust Interests, Class B-3 Beneficial Trust Interests, and Class B-4 Beneficial Trust Interests on any Plan Distribution Date.

  The Litigation Trustee, in consultation with the Litigation Trust Advisory Board, shall administer the Litigation Trust by (a) prosecuting through judgment or settling the Transferred Causes of Action and compelling the prosecution and/or settlement of the Insurance Coverage Actions; (b) facilitating the prosecution and/or settlement of objections to, and estimations of Trust Claims; (c) calculating and implementing all Plan Distributions to be made from the Litigation Trust Assets; (d) filing all required tax returns, and paying taxes and all other obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (e) otherwise administering the Litigation Trust; (f) providing annual reports to the Litigation Trust Beneficiaries (and providing copies of the same to the Reorganized Debtor and [●]) (i) reflecting expenditures, receipts, and distributions of the Litigation Trust; and (ii) detailing the prosecution and resolution of the Transferred Causes of Action and the objections to the Trust Claims; and (g) such other  responsibilities as may be vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust.  The following Assets, among others, will be transferred to the Creditor Trust on the Effective Date: (a) $5 million in Cash from the Cash Collateral of the Prepetition Lenders, (b) the Transferred Causes of Action, (c) any proceeds derived from any Insurance Coverage Action, and (d) any Plan Distributions by the Litigation Trustee pursuant to the Litigation Trust Agreement that become Unclaimed Property.

- <u>Dissolution of Holdings</u>.  On the Effective Date or as soon as practicable thereafter, the Debtors shall take all actions necessary to dissolve Holdings.

- <u>Assumption of the Mineral and Surface Leases</u>.  The Plan incorporates a motion to assume the Mineral and Surface Leases pursuant to section 365 of the Bankruptcy Code, among other executory contracts and unexpired leases as provided in the Plan.  The Debtors will provide proof of ability to provide adequate assurance of future performance as required under section 365(b) of the Bankruptcy Code at the Confirmation Hearing.  The Debtors served a notice of motion when it filed the Plan to put lessors on notice that they have moved to assume the leases.  If the Court does not approve assumption of leases the Plan will not be confirmed.

- <u>Cure</u>.  The Debtors shall post a $5 million letter of credit, escrow, or similar financial guarantee to secure the payment of any cure amounts due and owing under the Mineral and Surface Leases within five (5) Business Days after the Confirmation Order becomes a Final Order; provided, further, that if the Effective

10

Date does not occur within six (6) months after the Confirmation Date, the lessors may draw and/or apply the entire $5 million as liquidated damages.

- <u>New Governing Documents and New Board</u>.  The Reorganized Debtor shall be governed by New Governing Documents and a New Board.  The New Board will be comprised of governors appointed by the Plan Sponsor.

- <u>Post-Emergence Trade Agreement Procedure</u>.  The Debtors, in their business judgment and sole discretion, shall determine if the Reorganized Debtor will have a continuing need for the goods and services of certain holders of Mechanic's Lien Claims and Project Unsecured Claims.  Once the Debtors have made such a determination, the Debtors shall (a) include such holders of Mechanic's Lien Claims or Project Unsecured Claims that they have selected to enter into a Post-Emergence Trade Agreement on the "Schedule of Post-Emergence Trade Creditors" filed herewith, as amended from time to time prior to the Voting Deadline; and (b) provide such holder with a Notice of Desire to Enter into Post-Emergence Trade Agreement.  If the holder of a Mechanic's Lien Claim or Project Unsecured Claim is willing to enter into and comply with the terms of the Post-Emergence Trade Agreement, such holder shall return to the Debtors a completed Notice of Desire to Enter into a Post-Emergence Trade Agreement by no later than five (5) days prior to the Voting Deadline.  Providers that enter into a Post-Emergence Trade Agreement will receive specific treatment under the Plan in exchange for their continued business, as described below.  A form of the (A) Post-Emergence Trade Agreement and (B) Notice of Desire to Enter into a Post-Emergence Trade Agreement shall be filed with the Bankruptcy Court as a Plan Document.

- <u>Management and Employee Incentive Programs</u>.  The details of the management and employee incentive programs will be filed with the Bankruptcy Court as a Plan Document.

**B.    Summary of Distributions Under the Plan.**

The following is a summary of the distributions under the Plan.  It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit B**.  In addition, for a more detailed description of the terms and provisions of the Plan, *see* "The Chapter 11 Plan" section of this Disclosure Statement.

The claim amounts set forth below are based on information contained in the Debtors' Schedules or filed proofs of claim, and reflect what the Debtors believe to be reasonable estimates of the likely resolution of currently outstanding disputed Claims.  The amounts specified may differ materially from the outstanding filed Claim amounts.

The following chart summarizes the estimated Plan Distributions to holders of Allowed Claims and each class on the Effective Date (unless otherwise provided):[2]

| Class | Claim Type | Treatment of Classes of Claims | Estimated Allowed Amount | Impairment/ Voting |
|---|---|---|---|---|
|  | **Unclassified Non-Voting Claims** |
| N/A | **Administrative Claims** | On the Plan Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment; or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; *provided*, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim.<br><br>**Estimated Recovery:** 100% of Allowed Administrative Claim | $[●] | N/A |
| N/A | **Priority Tax Claims** | Each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (i) payments in Cash, in regular installments over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (iii) such other treatment as may be agreed upon in writing by such holder; *provided*, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim.<br><br>**Estimated Recovery:** 100% of Allowed Tax Claim | $9,000,000[3] | N/A |
| N/A | **DIP Claims** | The DIP Claims shall be Allowed Administrative Claims on the Effective Date and shall be paid in full in Cash on the Effective Date.<br><br>**Estimated Recovery:** 100% | $[25,000,000] | N/A |

---

[2] There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

[3] This amount is based on the proofs of claim filed by the Internal Revenue Service and the Minnesota Department of Revenue [Claim Nos. 4, 40, and 68].

| Class | Claim Type | Treatment of Classes of Claims | Estimated Allowed Amount | Impairment/ Voting |
|-------|-----------|-------------------------------|-------------------------|---------------------|
| | | **Classified Claims and Equity Interests** | | |
| 1 | **Priority Claims** | All legal, equitable, and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, except as provided in section 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Priority Claim shall be paid on the Plan Distribution Date in full and in Cash. **Estimated Recovery: 100%** | $[●] | Unimpaired; deemed to accept. |
| 2 | **Project Finance Secured Claims** | Each holder of an Allowed Project Finance Secured Claim shall receive (i) a Pro Rata Share of the Prepetition Lender Notes, (ii) the Class A-1 Beneficial Trust Interests,[4] (iii) the Class B-1 Beneficial Trust Interests,[5] (iv) [●] units of the New Membership Interests, and (v) the Pro Rata Share of the remaining Cash Collateral on the Effective Date less the $5 million transferred to the Litigation Trust and for any other agreed uses in the Plan. **Estimated Recovery:** | $552,736,000[6] | Impaired; entitled to vote. |
| 3 | **Term Loan Secured Claims** | Each holder of an Allowed Term Loan Secured Claim shall receive (i) a Pro Rata Share of the Prepetition Lender Notes, (ii) the Class A-2 Beneficial Trust Interests,[7] (iii) the Class B-2 Beneficial Trust Interests,[8] (iv) [●] units of the New Membership Interests, and (v) the Pro Rata Share of the remaining Cash Collateral on the Effective Date less the $5 million transferred to the Litigation Trust and for any other agreed uses in the Plan. **Estimated Recovery:** | $409,702,000[9] | Impaired; entitled to vote. |

---

[4] A Pro Rata Share of [___%] of the Beneficial Interests of the Litigation Trust capped at full recovery on their claims including any amount recovered from third parties.

[5] A Pro Rata Share of [___%] of the Beneficial Interests of the Litigation Trust distributed on account of their deficiency claims, capped at full recovery on their claims including any amount recovered from third parties.

[6] This amount is based on the proof of claim filed by ICICI Bank, as Facility Agent for the ICICI Lenders, on September 28, 2016 [Claim No. 113].

[7] A Pro Rata Share of [___%] of the Beneficial Interests of the Litigation Trust capped at full recovery on their claims including any amount recovered from third parties.

[8] A Pro Rata Share of [___%] of the Beneficial Interests of the Litigation Trust distributed on account of their deficiency claims, capped at full recovery on their claims including any amount recovered from third parties.

[9] This amount is based on the proof of claim filed by U.S. Bank, as Agent on behalf of the Tern Loan lenders, on September 30, 2016 [Claim No. 161].

Americas 92417336 (2K)

| Class | Claim Type | Treatment of Classes of Claims | Estimated Allowed Amount | Impairment/ Voting |
|---|---|---|---|---|
| 4 | Supplier Credit Secured Claims | Each holder of an Allowed Supplier Credit Secured Claim shall receive (i) a Pro Rata Share of the Prepetition Lender Notes, (ii) the Class A-3 Beneficial Trust Interests,[10] (iii) the Class B-3 Beneficial Trust Interests,[11] (iv) [●] units of the New Membership Interests, and (v) the Pro Rata Share of the remaining Cash Collateral on the Effective Date less the $5 million transferred to the Litigation Trust and for any other agreed uses in the Plan.<br><br>**Estimated Recovery:** | $150,417,000 | Impaired; entitled to vote. |
| 5 | Mechanic's Lien Claims | Each holder of an Allowed Mechanic's Lien Claim shall receive, at its option, in full satisfaction of its Allowed Mechanic's Lien Claim, (A) its Pro Rata share of the following payments, not to exceed 70% of such holder's Allowed Mechanic's Lien Claim: (1) two-thirds of the Mechanic's Lien Claims A Pool Amount ([$52.3 million]) on the first Plan Distribution Date and (2) one-third of the Mechanic's Lien Claims A Pool Amount ([$52.3 million]) on the twelve-month anniversary of the Production Date or (B) a Prepetition Lien Trade Creditor Note equal to the amount of the liquidation value of the collateral securing the Claim, to the extent such holder's Allowed Claim exceeds its Allowed Secured Claim, the difference shall be included and treated in Class 8.<br><br>**If the DNR does not object to (A) the assumption of the DNR Leases or (B) confirmation of the Plan**: Each holder of an Allowed Mechanic's Lien Claim that is equal to or less than $1,000,000 (each a "**Mechanic's Lien Convenience Claim**") shall receive on the first Plan Distribution Date, in full satisfaction of its Allowed Mechanic's Lien Claim a single Cash payment in an amount equal to the amount of such holder's Allowed Mechanic's Lien Claim. Each holder of an Allowed Mechanic's Lien Claim that exceeds $1,000,000 shall receive, at its option, in full satisfaction of its Allowed Mechanic's Lien Claim, (A) a Pro Rata share of the following payments, not to exceed 75% of such holder's Allowed Mechanic's Lien Claim: (1) two-thirds of the Mechanic's Lien Claims B Pool Amount ([$59.3 million]) on the first Plan Distribution Date and (2) one-third of the Mechanic's Lien Claims B Pool Amount ([$59.3 million]) on the twelve-month anniversary of the Production Date and (B) a Prepetition Lien Trade Creditor Note equal to such holder's Allowed Secured Claim and, to the extent such | $74,000,000[12] | Impaired; entitled to vote. |

---

[10] A Pro Rata Share of [___%] of the Beneficial Interests of the Litigation Trust capped at full recovery on their claims including any amount recovered from third parties.

[11] A Pro Rata Share of [___%] of the Beneficial Interests of the Litigation Trust distributed on account of their deficiency claims, capped at full recovery on their claims including any amount recovered from third parties.

[12] Based upon the Debtors' books and records and Liens filed.

Americas 92417336 (2K)

| Class | Claim Type | Treatment of Classes of Claims | Estimated Allowed Amount | Impairment/ Voting |
|---|---|---|---|---|
| | | holder's Allowed Claim exceeds its Allowed Secured Claim, the difference shall be included and treated in Class 8.  Each holder of an Allowed Mechanic's Lien Claim that exceeds $1,000,000 but is less than $1,340,000 may elect to reduce its Allowed Mechanic's Lien Claim to $1,000,000 and receive treatment as a Mechanic's Lien Convenience Claim pursuant to subsection 4.1(e)(ii) of the Plan.  If the holder of an Allowed Mechanic's Lien Claim does not execute an enforceable Post-Emergence Trade Agreement, such holder shall receive a Prepetition Lien Trade Creditor Note equal to such holder's Allowed Secured Claim and, to the extent such holder's Allowed Claim exceeds its Allowed Secured Claim, the difference shall be included and treated in Class 8.  **Estimated Recovery:** 70-75% | | |
| 6 | **Other Secured Claims** | Each holder of an Allowed Other Secured Claim, other than a DIP Claim, against any of the Debtors shall receive, at the Reorganized Debtor's election, on the Plan Distribution Date, in full satisfaction of its Allowed Other Secured Claim, (A) a single Cash payment equal to the sum of (1) its Allowed Other Secured Claim and (2) accrued postpetition interest through the Effective Date, at an interest rate agreed to by the parties, or, if no agreement can be reached, as determined by the Bankruptcy Court after notice and a hearing; (B) the collateral that secured payment of such Other Secured Claim; (C) if such Allowed Other Secured Claim is subject to a valid right of recoupment or setoff, such Claim shall be setoff to the extent of the amount subject to setoff in accordance with sections 506(a) and 553 of the Bankruptcy Code;  or (D) the otherwise indubitable equivalent.  Notwithstanding any of the foregoing, the Debtors and any holder of an Allowed Other Secured Claim may agree to any alternate treatment for such Other Secured Claim; except that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of the amount of such holder's Allowed Secured Claim.  **Estimated Recovery:** 100% | $[●] | Unimpaired; deemed to accept. |
| 7 | **Project Unsecured Claims** | Each holder of an Allowed Project Unsecured Claim shall receive, in full satisfaction of its Allowed Project Unsecured Claim, at the election of the holder of the Allowed Project Unsecured Claim: (A) its Pro Rata share of the following payments, not to exceed 40% of such holder's Project Unsecured Claim: (1) two-thirds of the Project Unsecured Claims A Pool Amount ([$1.25 million]) on the first Plan Distribution Date and (2) one-third of the Project Unsecured | $3,000,000 (increasing to $22,000,000 if the DNR does not object to assumption of the DNR Leases or Confirmation | Impaired; entitled to vote. |

15

| Class | Claim Type | Treatment of Classes of Claims | Estimated Allowed Amount | Impairment/ Voting |
|-------|-----------|-------------------------------|--------------------------|---------------------|
|  |  | Claims A Pool Amount ([$1.25 million]) on the twelve-month anniversary of the Production Date or (B) its Pro Rata Share of the Class B-4 Beneficial Trust Interests.  If the holder of an Allowed Project Unsecured Claim does not execute an enforceable Post-Emergence Trade Agreement, such Allowed Project Unsecured Claim, shall be included in and treated as a Class 8 Claim.<br><br>**If the DNR does not object to (A) the assumption of the DNR Leases or (B) confirmation of the Plan**:<br><br>    (i) The Disbursing Agent will not object to any Project Unsecured Claim for goods or services related to the Project if such holder is a party to an agreement with EPUL or another of the Debtors' affiliates, on the grounds that (1) there is no privity between the Debtors and the holder of the Claim; or (2) the proof of claim was not filed in accordance with the Bar Date Order, if the proof of claim was filed prior to the Confirmation Date.<br><br>    (ii) Each holder of an Allowed Project Unsecured Claim shall receive on the Plan Distribution Date, (1) if such Allowed Project Unsecured Claim is equal to or less than $100,000 (each a "**Project Unsecured Convenience Claim**"), a single Cash payment in an amount equal to the amount of such holder's Allowed Project Unsecured Claim; or (2) if such Allowed Project Unsecured Claim exceeds $100,000, at the holder of the Allowed Project Unsecured Claim's election: (x) its Pro Rata share of the following payments, not to exceed 65% of such holder's Project Unsecured Claim: (aa) two-thirds of the Project Unsecured Claims B Pool Amount ([$14.31.8 million]) on the first Plan Distribution Date and (bb) one-third of the Project Unsecured Claims B Pool Amount ([$14.31.8 million]) on the twelve-month anniversary of the Production Date or (y) its Pro Rata Share of the Class B-4 Beneficial Trust Interests.  Holders of Allowed Project Unsecured Claims that (1) have Claims that exceed $100,000 but is less than $154,000 and (2) execute an enforceable Post-Emergence Trade Agreement, may elect to reduce their claim to $100,000 and receive treatment as a Project Unsecured Convenience Claim.   If the holder of an Allowed Project Unsecured Claim does not execute an enforceable Post-Emergence Trade Agreement, such Allowed Project Unsecured Claim, shall be included in and treated as a Class 8 Claim.<br><br>**Estimated Recovery:** 40-65% | of the Plan) |  |

| Class | Claim Type | Treatment of Classes of Claims | Estimated Allowed Amount | Impairment/ Voting |
|-------|-----------|-------------------------------|--------------------------|-------------------|
| 8 | **General Unsecured Claims** | Each holder of an Allowed General Unsecured Claim shall receive on the Plan Distribution Date its Pro Rata Share of the Class B-4 Beneficial Trust Interests.[13]<br><br>**Estimated Recovery:** Unknown[14] | $2,060,000,000[15] | Impaired; entitled to vote. |
| 9 | **Equity Interests** | On the Effective Date, all Equity Interests in the Debtors shall be cancelled, and each holder of an Equity Interest in the Debtors shall neither receive nor retain any property under the Plan on account such interests.<br><br>**Estimated Recovery:** None | None | Impaired; entitled to vote. |

C.    **DNR Enhancement.**

The Debtors hold leases to approximately 6,000 acres of mineral leases within the boundary of the Project.  These mineral leases are essential to the Project.  Without the ability to mine the taconite iron ore, there can be no product for the Project to produce.  The State of Minnesota's Department of Natural Resources is the owner of the largest percentage of the Debtors' leased mineral rights, approximately 40% (the leases thereof, the "**DNR Mineral Leases**," together with the DNR Surface Leases, the "**DNR Leases**").

Since the filing of the Chapter 11 Cases, the Debtors have actively and diligently worked with the mineral rights holders to preserve the Debtors' mineral leases.  To that end, the Debtors have received support of their restructuring efforts from most of the mineral rights holders.  The DNR, however, has not yet joined the Debtors' creditors, lenders, and other parties in interest at the table to develop and effect a restructuring of the Debtors' business that would preserve and enhance value available to all parties in interest, including Minnesota, through funding and completing the Project.  Although the DNR's absence from such negotiations creates challenges to a successful conclusion of the Chapter 11 Cases, the Debtors remain optimistic that the DNR will recognize the benefits of, and eventually support, the Plan.

For these reasons the Plan incorporates a motion to assume all unexpired mineral leases, including the DNR Leases.  If the DNR does not object to the assumption of the DNR Leases and does not object to the Plan, the Plan provides for certain enhanced recoveries to creditors.  If the DNR objects, but the Plan is confirmed over its objection, such enhanced recoveries will not take effect.

---

[13] A Pro Rata Share of [__%] of the Beneficial Interests of the Litigation Trust.

[14] Recovery for General Unsecured Claims is based on proceeds from the Litigation Trust, which amounts are unknown at this time.

[15] The General Unsecured Claims have an initial claims amount of approximately $2.060 billion for voting purposes, based on the estimates of the Debtors and the claims that have been scheduled and filed to date.

Americas 92417336 (2K)

Specifically, if the DNR does not object to the assumption of the DNR Leases and does not object to the Plan, the following enhancements will be available for creditors and the DNR:

- Holders of Mechanic's Lien Claims and Project Unsecured Claims will have the option to elect significantly better treatment. In fact, holders of smaller Claims will be afforded the opportunity to receive 100% payment under some circumstances.

- The Disbursing Agent or the Litigation Trustee, as applicable, will not object to any Claims for goods or services related to the Project, if the holder of such claim is a party to an agreement with EPUL, or other affiliate of the Debtors, on the grounds that (i) there is no privity between the Debtors and the holder of the Claim; or (ii) the proof of claim was not filed in accordance with the Bar Date Order, if the proof of claim was filed prior to the Confirmation Date.

The best value for all creditors will be realized if all the mineral leases are assumed and the Reorganized Debtor is able to resume construction and complete the Project. If the Debtors are unable to reorganize successfully, the only alternative is a liquidation, in which all creditors' recoveries will be substantially decreased.

## VI.

## GENERAL INFORMATION

The discussion below briefly describes the Debtors, their businesses, and the events leading up to the Chapter 11 Cases.

**A.    Business of the Debtors.**

The Debtors are two separate entities: (a) ESML,[16] a Minnesota limited liability company, and (b) Holdings, ESML's direct parent company, a Delaware corporation. From inception, the Debtors were part of a larger Essar conglomerate, owned and directed by the Debtors' ultimate parent company, EGFL.

ESML was formed to develop and operate the Project in the western Mesabi Range in northern Minnesota. The Project is one of the largest "greenfield" projects being constructed in the United States and will, when complete, consist of an open-pit iron ore mine, crushing, concentrating, and pelletizing facilities, and a rail line and train-loading system. In addition to the Project, the Debtors maintain office space in Hibbing, Minnesota and New York, New York.

The Debtors own the surface rights to approximately 13,861 contiguous acres of land and hold another approximately 6,167 acres under long-term leasing agreements, with 800 acres remaining unleased, for a total of approximately 20,837 acres expected to be utilized to operate the Project (collectively, the "**Project Site**").

---

[16] During the Chapter 11 Cases, ESML changed its name to Mesabi Metallics Company LLC.

Americas 92417336 (2K)

Construction of the mine, crushing, concentrating, and pelletizing facilities, as well as the use of the associated tailings basin in connection with processing the ore mined at the Project, will all be conducted at the Project Site.  This estimated area is the extent of the land area within which the DNR has issued a "Permit to Mine."

The majority of the mineral rights in the Project area are controlled by the State of Minnesota ("**Minnesota**"), Glacier Park Iron Ore Properties LLC ("**GPIOP**"), Superior Mineral Resources LLC ("**Superior**"), and the Langdon/Warren families ("**Langdon/Warren**").  The Debtors hold leases to mineral rights for approximately 6,000 acres in connection with the Project (collectively, with any other mineral or real property leases of the Debtors, the "**Mineral Leases**"), which constitute the majority of the Debtors' mineral rights.  The Debtors' largest percentage of mineral rights is leased from the DNR, representing approximately 40% of the Debtors' total mineral rights, followed by GPIOP, representing approximately 30%, Superior, representing approximately 20%, and Langdon/Warren representing approximately 5%.  ESML owns the remaining mineral rights controlled by the Debtors (less than 5%).

Upon completion, with the Project running consistently at its highest potential capacity, proven and probable reserves of magnetite iron resources at the  Project Site are likely sufficient to support a mine life of approximately seventy (70) years.

## B.    Prepetition Capital and Debt Structure.

As of the Petition Date, the Debtors had over one billion dollars of secured obligations, which are secured by liens, subject to certain exceptions, on substantially all the Debtors' assets —namely those assets constituting the Project.  These debt obligations consist of:

- a multi-tranche term loan (the "**Project Finance Debt**") issued pursuant to that certain Senior Secured Credit Agreement, dated as of December 29, 2010 (as amended from time to time, the "**Project Finance Credit Agreement**") by an among ESML, as borrower, Holdings and certain other affiliates of ESML, as guarantors, ICICI Bank Limited, Singapore Branch, as Facility Agent, Wilmington Trust, National Association, as Security Agent, ICICI Bank Limited, New York Branch, as a Lender and Issuing Bank, Escrow Agent, and Account Bank, and Managed Lead Arranger, through which approximately $530,000,000 was funded as of the Petition Date;

- a term loan facility (the "**Term Loan**") issued pursuant to that certain Credit and Security Agreement, dated as of September 30, 2014 (as amended from time to time, the "**Term Loan Credit and Security Agreement**"), by and among ESML, as borrower, Holdings,[17] as guarantor, the lenders signatory thereto, and U.S. Bank National Association, as Agent (the "**Term Loan Agent**"), through which approximately $349,000,000 was funded as of the Petition Date;

- certain reimbursement obligations under that certain Letter Agreement, dated March 3, 2014, as amended, by and between ESML and Essar Projects-India, and

---

[17] Holdings is a guarantor of ESML's Project Finance Debt and Term Loan obligations.  In support of its guarantee, Holdings pledged its only asset, its membership interests in ESML.

that certain Facility Agreement, dated June 1, 2012 (the "**Supplier Credit Facility Agreement**"), by and among Essar Projects-India, as borrower, Central Bank of India, as Lender, Lead Bank, and Facility Agent, and Export Import Bank of India, as Lender, through which approximately $139,000,000 was funded for the indirect benefit of ESML as of the Petition Date.

ESML is also a party to that certain Equity Contribution Agreement, dated as of September 30, 2014, by and among EGFL, ESML, and U.S. Bank National Association (the "**ECA**").  Pursuant to the terms of the ECA, EGFL agreed to provide equity contributions to ESML to fully satisfy obligations of ESML in respect of obligations under certain of the Prepetition Credit Facilities or those obligations otherwise required to be satisfied to complete the construction of the Project, including costs in excess of $1.802 billion and government grant reimbursement obligations.

The Prepetition Credit Facilities are subject to the terms of that certain Collateral Agency and Intercreditor Agreement, dated as of September 30, 2014, by and among ESML, Holdings, as Pledgor, ICICI Bank Limited, Singapore Branch, as the ICICI Facility Agent, Central Bank of India as the SC Facility Agent, U.S. Bank National Association, as the Term Loan Agent, Wilmington Trust, National Association, as the Security Agent, and other parties thereto from time to time (the "**ICA**").  The ICA governs the enforcement rights and remedies of the Debtors' secured lenders.

## C.    The Debtors' Prior and Current Management.

As of the Petition Date, the Debtors' officers and governors/directors were:

### ESML

| Name | Title |
|---|---|
| Madhu Vuppuluri | President/CEO/Governor |
| Sanjay Bhartia | CFO |
| Susan Fennessey | Executive Vice President/General Counsel |
| Samir Kalra | Vice President (Finance)/Treasurer |
| Bruce Cairnduff | Governor |
| Tarang J. Gupta | Governor |
| Vikram Jindal | Governor |
| Prashant Ruia | Governor |
| Harshad Shah | Governor |

Americas 92417336 (2K)

**Holdings**

| Name | Title |
|------|-------|
| Madhu Vuppuluri | President/CEO/Director |
| Sanjay Bhartia | CFO |
| Susan Fennessey | Secretary |
| Bruce Cairnduff | Director |
| Tarang J. Gupta | Director |
| Vikram Jindal | Director |
| Prashant Ruia | Director |
| Harshad Shah | Director |

As described more fully in section VII.D., *infra*, during the pendency of the Chapter 11 Cases, various changes were made to the Debtors' officers and governors/directors.  As of the filing date of the Disclosure Statement, the Debtors' officers and governors/directors are:

**ESML**

| Name | Title |
|------|-------|
| Matthew Stock | CEO |
| David Pauker | CRO |
| Sanjay Bhartia | CFO/Director of Finance |
| Susan Fennessey | Executive Vice President/General Counsel |
| Bruce Cairnduff | Governor |
| Tarang J. Gupta | Governor |
| Vikram Jindal | Governor |

**Holdings**

| Name | Title |
|------|-------|
| David Pauker | CRO |
| Sanjay Bhartia | CFO |
| Susan Fennessey | Secretary |
| Bruce Cairnduff | Director |
| Tarang J. Gupta | Director |
| Vikram Jindal | Director |

ESML's existing senior officers shall serve initially in the same capacities after the Effective Date for the Reorganized Debtor until replaced or removed in accordance with the New Governing Documents or company policy, or until any such individual's voluntary resignation. The New Board will be announced prior to the Voting Deadline.

Americas 92417336 (2K)

**D.      History of the Project and Events Precipitating the Commencement of the Chapter 11 Cases.**

In 2010, ESML entered into engineering, procurement, construction, and project management contracts with various affiliates to build the Project.  Subsequently, in 2012, certain of those agreements were modified, and portions were consolidated into an additional Lump Sum Turn Key Agreement (the "**LSTK**" and collectively, the "**Construction Agreements**") with another affiliate, Essar Projects Limited ("**EPL**").   Under the LSTK, as amended, ESML appointed EPL as contractor for work necessary to complete the project by March 31, 2015, in exchange for payment of the contract price, i.e., a sum-certain in the contract amount, with ESML entitled to retain 10% of the contract price until Project completion.  EGFL and ESML also entered into the ECA to ensure that Prepetition Credit Facility funds were available to maintain construction on the Project.

As of the Petition Date, ESML had paid substantially all amounts due under the Construction Agreements with the exception of a 10% holdback under the LSTK, which is not due until completion of the Project.  Nevertheless, the Project remains significantly incomplete.  In October 2015, the EPL fell behind on payments to a significant number of subcontractors, many of whom have since filed liens on ESML's assets, and work substantially ceased on the Project in November 2015.

The Project's stalled development resulted in a series of material events that threatened the Project and resulted in a chain of events that, ultimately resulted in the Chapter 11 Cases.

**1.      Offtake Agreements.**

The Project's anticipated output of seven (7) mtpa of iron ore pellets was supported by offtake agreements (output sale contracts) with an affiliate of the Debtors, Essar Steel Algoma Inc. ("**Algoma**") for 2.5 mtpa and ArcelorMittal USA LLC ("**ArcelorMittal**") for 4.5 mtpa. To date, neither ESML nor Algoma has taken steps to assume, reject, terminate, renegotiate, or otherwise alter the Algoma Offtake Agreement.  On May 27, 2016, ArcelorMittal informed ESML that it was terminating its 4.5 mtpa offtake agreement, leaving ESML with uncertainty in respect of a significant percent of its expected revenue upon completion of the Project and an obstacle to obtaining financing.

**2.      Defaults under the Prepetition Credit Facilities.**

Beginning in September 2015, EGFL failed to make contributions to a cost-overrun escrow account in favor of the Term Loan lenders required pursuant to the ECA, and did not meet certain other obligations to provide equity contributions to fund the extraordinary Project expenses as required by the ECA.  EGFL's failure to contribute key amounts to the cost overrun account, as required under the ECA, resulted in defaults under ESML's Prepetition Credit Facilities and in unavailability of Term Loan funds, cutting off ESML's critical financial lifeline and initiating in large part the subsequent chain of events that led to the filing of the Chapter 11 Cases.

Because of the Debtors' defaults, the Prepetition Credit Facilities were accelerated.  Specifically, on February 23, 2016, the Term Loan Agent accelerated the obligations under the

Term Loan.   In connection with the acceleration notice, the Term Loan Agent seized approximately $120 million that would have otherwise been distributed to ESML for the continued development of the Project, and applied the funds to payments of their fees, interest, a prepayment penalty, and an involuntary paydown under the Term Loan.   Approximately two months later, on April 25, 2016, ICICI Bank, in its capacity as Facility Agent acting on behalf of the lenders thereunder, accelerated ESML's obligations under the Project Finance Credit Agreement.

### 3.    Infrastructure Grant Funds.

The Project has benefitted from a regional infrastructure build-out, which has been funded through a grant of approximately $65.9 million from Minnesota to Itasca County, Minnesota.   Pursuant to the terms of the agreements governing the grant, EGFL and ESML were required to reimburse Itasca County for the grant funds used to develop the Project if construction was not complete by October 1, 2015.   Despite negotiations that extended over a three-year period, ESML was not able to obtain an extension of the construction completion deadline from Minnesota.   EGFL and ESML reached an agreement in principle with Minnesota in December 2015 for deferred repayment terms, but ESML could not honor that commitment because it was not able to obtain the consent of its Prepetition Lenders to make payments on account of the grant.

### 4.    Great Lakes Litigation.

ESML was party to litigation that was commenced by Great Lakes Gas Transmission Limited Partnership ("**Great Lakes**"), in which a judgment was entered against ESML in excess of $32 million.   ESML filed an appeal (the resulting appeal, "**Great Lakes Appeal**"), but the matter could not have gone forward without ESML's provision of a bond in excess of $37 million, which was provided by a surety company.   Approximately $23 million of ESML's cash collateralized the bond, and the surety company had demanded that an additional $15.3 million in cash collateral be provided.   ESML did not have the funds to provide the additional cash collateral and on April 25, 2016, the surety company commenced a lawsuit against ESML seeking the funds.[18]

### 5.    Mechanic's Liens.

A number of contractors and vendors that have worked on the Project, including EPUL's subcontractors, filed mechanic's liens against the Project that put certain of ESML's material agreements at risk of default and/or termination.

---

[18] As more fully explained, *infra*, ESML was granted relief from the automatic stay put in place upon filing of its voluntary chapter 11 petition to continue litigating the Great Lakes Appeal.   On December 5, 2016, the Eighth Circuit Court of Appeals reversed the decision and directed the District Court to dismiss the lawsuit for lack of jurisdiction.   On January 2, 2017, Great Lakes filed a *Petition for Rehearing En Banc and Panel Rehearing*, which was denied by the Eighth Circuit on January 30, 2017.   The District Court is expected to dismiss the underlying lawsuit shortly.

Americas 92417336 (2K)

6.      **Mineral Leases.**

The Debtors' Mineral Leases are vital to the completion and success of the Project. Prior to the Petition Date, Minnesota took the position that ESML's mineral lease agreements with the DNR, which account for approximately 41.6% of ESML's access to iron ore—the raw material around which the Project is being developed and which is essential for the plant's production— could be terminated after noon on July 8, 2016. A loss of access to the natural resources provided under these leases would be devastating to ESML and its stakeholders, and would nullify many years of effort and hundreds of millions of dollars invested to date. In addition to the catalysts described below, this threat of loss of ESML's largest group of mineral leases was the immediate precipitating event for the Chapter 11 Cases as the Debtors sought Bankruptcy Court protection to stay termination of the leases and facilitate the reorganization for the benefit of creditors.

## VII.

## THE CHAPTER 11 CASES

A.      **First Day Pleadings and Orders.**

On or about the Petition Date, the Debtors filed the following motions for usual and customary relief with the Bankruptcy Court: (i) motion for the joint administration of cases; (ii) motion authorizing the Debtors to file a consolidated master list of creditors; (iii) motion seeking an extension of the time for Debtors to file Schedules and Statements; (iv) motion authorizing payment of prepetition wages, compensation, employee benefits, and related obligations; (v) motion authorizing continued use of cash management system, bank accounts, and business forms and waiving investment and deposit requirements; (vi) motion authorizing payment of prepetition trust fund taxes and use taxes; (vii) motion for order prohibiting utility companies from altering, refusing, or discontinuing service to the Debtors, deeming utility companies adequately assured of future payment, and establishing procedures for determining requests for additional adequate assurance; (viii) motion authorizing the use of available cash; (ix) motion authorizing certain ordinary course payments relating to lease of the Debtors' New York offices; (x) motion authorizing Debtors to maintain insurance program, maintain insurance premium financing program, pay insurance premiums in the ordinary course, and pay all obligations associated therewith; (xi) motion authorizing the Debtors to obtain postpetition financing and scheduling a final hearing; and (xii) motion to retain and employ ordinary course professionals. The Bankruptcy Court held hearings on July 12, 2016, July 26, 2016, and August 10, 2016 in connection with the above-referenced motions, and, between July 12, 2016 and September 16, 2016, the Bankruptcy Court entered orders granting the relief requested in such motions.

B.      **Appointment of New Chief Executive Officer.**

On or about July 11, 2016, Madhu Vuppuluri resigned from his positions as ESML and Holdings' Chief Executive Officer. Pursuant to terms of an employment agreement dated July 11, 2016, Matthew Stock replaced Mr. Vuppuluri as Chief Executive Officer of ESML. Holdings is a third party beneficiary under Mr. Stock's employment agreement.

Americas 92417336 (2K)

C.     **Appointment of Chief Restructuring Officer.**

Pursuant to an employment application filed with the Bankruptcy Court and a subsequent order entered by the Bankruptcy Court, David Pauker was appointed as the Chief Restructuring Officer of the Debtors as of August 1, 2016.

The Debtors' current management, in place from the Petition Date or soon thereafter, reports only to the Debtors' Boards of Governors or Directors.  No member of management answers to EGFL or any other Essar affiliate.

D.     **Changes to the Debtors' Boards of Governors or Directors.**

On or about July 15, 2016, Harshad Shah resigned from ESML's Board of Governors and from Holdings' Board of Directors.  On or about November 30, 2016, Mr. Vuppuluri, and on or about December 1, 2016, Prashant Ruia, resigned from the boards of both ESML and Holdings. Each of the remaining governors/directors of the Debtors is disinterested, and none is an insider as defined in section 101(31) of the Bankruptcy Code.

E.     **Employment of Professionals for the Debtors.**

Pursuant to employment applications filed with, and subsequent orders entered by, the Bankruptcy Court, the Debtors employed the following professionals to assist them with the administration of the Chapter 11 Cases: (i) White & Case LLP as counsel; (ii) Fox Rothschild LLP as Delaware bankruptcy co-counsel; (iii) Guggenheim Securities, LLC ("**Guggenheim**") as investment banker; and (iv) Epiq Bankruptcy Solutions LLC as Claims Agent and Solicitation Agent.  All professionals retained by the Debtors have been, or will be, paid their allowed fees and expenses incurred on behalf of the Debtors pursuant to orders entered by the Bankruptcy Court.

F.     **Appointment of the Committee.**

On or about July 20, 2016, the Office of the United States Trustee appointed the Committee.  The Committee's current members are: Axis Capital, Inc., ArcelorMittal USA LLC, and FLSmidth USA, Inc.  The Committee engaged the law firms of Hogan McDaniel and Kasowitz, Benson, Torres & Friedman LLP to serve as its counsel and Zolfo Cooper LLC to serve as its bankruptcy consultant and financial advisor.  All professionals retained by the Committee have been, or will be, under the terms of the Plan, paid their allowed fees and expenses incurred on behalf of the Committee pursuant to orders entered by the Bankruptcy Court.  Moreover, the allowed expenses of the Committee members have been, or will be, paid pursuant to orders entered by the Bankruptcy Court.

G.     **Final DIP Order.**

On August 10, 2016, the Bankruptcy Court entered the *Final Order Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 362 and 364* [D.I. 216] (the "**Final DIP Order**").  The Final DIP Order approved the DIP Facility, by and among ESML, as borrower, and the DIP Lender, providing for a debtor-in-possession facility in an amount up to

$35 million to fund the Debtors' operations during the Chapter 11 Cases. The Final DIP Order also approved the other related documents, including the DIP Guaranty.

## H.    Continued Operations.

All proceeds of the Term Loan were expended by approximately September 2015. As of the Petition Date, ESML was not operating and had received no funds other than equity contributions since May 2015. As discussed in section VII.G., *supra*, after commencement of the Chapter 11 Cases, the Debtors were able to procure DIP financing and continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## I.    Debtors' Offtake Agreements.

As discussed, *supra*, prior to the commencement of the Chapter 11 Cases, ESML was party to two offtake agreements intended to support the seven (7) mtpa output of the completed Project: (1) that certain Pellet Sale and Purchase Agreement dated January 10, 2014, by and among Essar Steel Ltd., ESML, and ArcelorMittal (as amended and restated, the "**ArcelorMittal Offtake Agreement**"), and (2) that certain Pellet Sale and Purchase Agreement dated January 28, 2014, by and between ESML and Algoma (the "**Algoma Offtake Agreement**"). On May 27, 2016, ArcelorMittal informed ESML that it was terminating the ArcelorMittal Offtake Agreement.

To date, neither ESML nor Algoma has taken steps to assume, reject, terminate, renegotiate, or otherwise alter the Algoma Offtake Agreement; however, Algoma is one of a number of affiliated entities party to ongoing bankruptcy proceedings in Canada.[19] Ancillary to the Canadian proceedings, chapter 15 cases have been filed and are ongoing in the Delaware Bankruptcy Court. With regard to their respective bankruptcy proceedings, neither ESML nor Algoma has moved to assume or reject the Algoma Offtake Agreement.

## J.    Settlement with the Minnesota Power and Nashwauk Public Utilities Commission.

ESML, Minnesota Power, and Nashwauk Public Utilities Commission ("**NPUC**") are parties to that certain Facilities Construction Agreement dated as of July 27, 2011 (as subsequently amended, the "**FCA**"), pursuant to which Minnesota Power, among other things, agreed to perform system upgrades on Minnesota Power's existing transmission system for ESML's benefit. ESML agreed, in turn, to reimburse Minnesota Power for the cost of the system upgrades. Pursuant to the terms of the FCA, ESML tendered $25,000,000 to Minnesota Power to ensure the performance of ESML's obligations under the FCA (the "**FCA Security Deposit**"). Throughout the contractual relationship, Minnesota Power periodically made withdrawals from the FCA Security Deposit as reimbursement for system upgrades. As of the Petition Date, the balance of the FCA Security Deposit was $11,000,000.

---

[19] The Canadian Companies Creditors Arrangement Act case is styled as: In the Matter of the Companies Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended and in the Matter of a Plan of Compromise or Arrangement of Essar Steel Algoma Inc., Essar Tech Algoma Inc., Essar Steel Algoma (Alberta) ULC, Cannelton Iron Ore Company and Essar Steel Algoma Inc. USA, Court File No. CV-15-000011169-00CL, filed in the Ontario Superior Court of Justice (Commercial List) on November 9, 2015.

ESML and NPUC are also parties to that certain Large Industrial Service Agreement, dated as of July 27, 2011 (as subsequently amended, the "**LISA**"), a retail electric service agreement pursuant to which ESML agreed to purchase power from NPUC.

In its motion for order prohibiting utility companies from altering, refusing, or discontinuing service to the Debtors, deeming utility companies adequately assured of future payment, and establishing procedures for determining requests for additional adequate assurance [D.I. 7] (the "**Utility Motion**"), ESML estimated that the average monthly cost for power at the Project should be approximately $7,500. Minnesota Power and NPUC asserted an informal objection to the Utility Motion. A final order was entered on the Utility Motion on August 10, 2016, on the understanding that ESML, Minnesota Power, and NPUC would enter into an agreement to settle the dispute as to the average monthly cost of the continued provision of electricity and the validity and amounts due under the FCA, LISA, and all related claims.

On August 23, 2016, the Debtors filed a motion pursuant to Bankruptcy Rule 9019, seeking approval of a settlement between ESML, Minnesota Power, and NPUC. No objections were filed and on September 8, 2016, an order was entered granting the Debtors' motion and approving the settlement.

Pursuant to the terms of the settlement, Minnesota Power was granted relief from the automatic stay for the purpose of applying $1.2 million per month from July 1, 2016 through December 31, 2016, and $600,000 per month from January 1, 2017 to March 31, 2017, to the amounts invoiced for such months and withdrawing such amounts from the FCA Security Deposit. Additionally, NPUC agreed to continue to provide ESML with power at its usual and customary rates, and to accept deposit of the funds detailed in the order approving the Utility Motion; however, regardless of the actual amount of invoices issued to ESML, ESML is only responsible to pay $7,500 toward each monthly LISA invoice upon receipt.

ESML agreed that, no later than March 31, 2017, ESML will, in writing, advise Minnesota Power and NPUC of its intent to assume or reject the LISA and/or FCA, and will assume or reject those contracts by no later than June 30, 2017. If ESML fails to timely advise Minnesota Power and NPUC of its intention, the LISA and/or FCA shall be deemed rejected without further order of the Bankruptcy Court. Should ESML reject the LISA and/or FCA, Minnesota Power and NPUC agreed to limit collection of their rejection damages claims and, subject to certain exceptions, any accrued administrative expense claims, if any, to the remaining funds in the FCA Security Deposit, and shall be deemed to have waived any and all other claims and rights to payment arising under or related to the LISA or FCA. ESML also released and discharged Minnesota Power and NPUC from all claims with ESML or the Debtors' estates may assert against Minnesota Power and/or NPUC that arise in connection with the LISA and the FCA.

Finally, in the event ESML seeks to assume or assume and assign the LISA and/or FCA, Minnesota Power and NPUC fully reserved all claims, defaults, and any other cure or obligations required for assumption thereof.

**K.     Matters Relating to Unexpired Leases and Executory Contracts.**

Americas 92417336 (2K)

Prior to the Petition Date, the Debtors were party to several executory contracts and unexpired leases.  Importantly, the Debtors have a large number of unexpired Mineral Leases, including the DNR Mineral Leases, which the Debtors have carefully evaluated.   Throughout the Chapter 11 Cases the Debtors have sought to work with their mineral lessors to maintain their vital mineral rights.

### 1.    Agreements and Amendments to Langdon/Warren Lease.

The Debtors' attempts to preserve their essential mineral rights portfolio on a consensual basis were successful with respect to the Langdon/Warren Mineral Lease.  On October 25, 2016, the Debtors moved for Bankruptcy Court approval of certain agreements and amendments to the Langdon/Warren Mineral Lease, which, among other things, extended the Debtors' time to assume the Langdon/Warren Lease through the date of confirmation of the Plan, or by June 30, 2017. Additionally, pursuant to the negotiated amendments, Langdon/Warren agreed to extend the term of their lease and operating agreement with ESML by ten years, through 2047.  Further, ESML was granted license to use and encumber stockpiled materials located on certain of ESML's property in connection with ESML's construction of a rail corridor.  The Bankruptcy Court approved the amendments to the Langdon/Warren Mineral Lease by order entered on November 10, 2017.

### 2.    Extension of Time to Assume or Reject Mineral Leases.

Because the Debtors were unable to reach similar agreements with the other lessors and counterparties to the unexpired Mineral Leases, the Debtors filed their Motion for Interim and Final Orders Extending the Deadline to Assume or Reject Unexpired Non-Residential Real Property Leases [D.I. 450] (the "**Extension Motion**").  On November 15, 2016, the Bankruptcy Court entered a final order granting the Extension Motion and extending the Debtors' deadline to assume or reject nonresidential real property leases was extended through and including February 3, 2017.  Through the Plan and Disclosure Statement, the Debtors seek to assume the DNR Leases.

## L.    Claims Bar Date.

On August 9, 2016, the Bankruptcy Court entered the Bar Date Order (i) establishing bar dates for filing certain proofs of claim; (ii) establishing ramifications for failure to comply therewith; (iii) approving proof of claim form and bar date notice; and (iv) approving publication notice and publication procedures.  Specifically, the Bar Date Order established the following bar dates: (i) September 30, 2016 at 4:00 p.m. Pacific Time as the deadline for each person or entity (other than governmental units, as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim for prepetition claims against the Debtors; (ii) October 30, 2016 at 4:00 p.m. Pacific Time as the deadline for co-debtors, sureties, or guarantors (under section 501(b) of the Bankruptcy Code) to file proofs of claim; and (iii) January 4, 2017 at 4:00 p.m. Pacific Time as the deadline for governmental units to file proofs of claim.

The Debtors later reached an agreement with certain of their affiliates, extending the deadline for such affiliates to file proofs of claim from September 30, 2016 to October 30, 2016.

As of February 1, 2017, approximately 196 proofs of claim appear on the official claims register, totaling approximately $7 billion, approximately $3.7 billion of which were asserted by affiliates of the Debtors against whom the Debtors have already filed a Complaint and are seeking substantial recoveries. The Debtors have not completed claim reconciliation work (and do not anticipate doing so before the Effective Date of the Plan).

## VIII.

## PENDING LITIGATION AND INVESTIGATIONS

### A.    Debtors' Affiliates Investigation and Litigation.

On the Effective Date, a Litigation Trust will be created and the Debtors shall be deemed to have automatically transferred to the Litigation Trust, as administered by the Litigation Trustee, all Causes of Action, Avoidance Actions, and Insurance Coverage Actions.  *See* "The Chapter 11 Plan – The Litigation Trust" and Article VIII of the Plan.  On January 11, 2017, ESML filed a complaint styled, *Essar Steel Minnesota LLC v. Essar Global Fund Limited et al.*, Adv. No. 17-50001 (BLS) in the Bankruptcy Court against certain affiliates of the Debtors: EGFL, EPL, Essar Projects USA, LLC, Essar Projects (India) Limited, Essar Project Management Company Limited, Essar Constructions Limited, Essar Projects Middle East FZE, Essar Engineering Services Limited, Global Supplies FZE, Essar Logistics Limited, Madhu Vuppuluri, and Does 1-1000 (collectively, the "**Affiliate Defendants**").

The complaint alleges claims for breaches of contract, claims for breach fiduciary duty by directors and officers and the controlling shareholder of the Debtors, aiding and abetting breach of fiduciary duties, tortious interference with contract, promissory estoppel and fraud, claims against insiders, claims against entities affiliated with the Debtors, and certain Avoidance Actions.  ESML seeks compensatory damages for all losses and damages suffered as a result of the Affiliate Defendants' alleged wrongdoing, which total an estimated approximately $1.8 billion.  In addition, the complaint contains non-substantive objections to proofs of claim numbers 179 through 186 filed by certain Affiliate Defendants.

The claims identified in the complaint arose out of an investigation conducted by independent counsel under the supervision of the Debtors' Chief Restructuring Officer.  The investigation was commenced at the direction of the Debtors' independent directors, who instructed outside counsel to investigate potential Causes of Action against related parties in connection with the stalled construction and development of the Project.

The Litigation Trust, acting through the Litigation Trustee, shall be authorized to, among other things, prosecute through judgment or settle the Transferred Causes of Action, including the adversary proceeding against the Affiliate Defendants.

### B.    DNR Leases and Litigation.

On September 2, 2016, the DNR filed Motion for Relief from Stay or in the Alternative for an Order Shortening the Time to Assume Nonresidential Leases [D.I. 274] (the "**DNR Lift Stay Motion**"), seeking to terminate the DNR Leases.  In connection thereto, the DNR also filed

a motion for document production and discovery from the Debtors under Rule 2004 of the Bankruptcy Rules. The Debtors objected to the DNR Lift Stay Motion, which objection was joined in by the Committee and supported by separate objections filed by the Project Finance lenders and the Term Loan lenders. Among other reasons, the Debtors believed that the termination of the DNR Leases at such an early stage of the Chapter 11 Cases would materially hamper ESML's ability to mine its remaining interests for the Project and severely jeopardize the Debtors' prospects of reorganization.

The Bankruptcy Court held a two-day evidentiary hearing on the DNR Lift Stay Motion on November 14 and November 15, 2016, at which time the Bankruptcy Court also considered the Debtors' Extension Motion. Live and written testimonies were submitted into evidence by both sides, with opportunities for cross- and direct-examinations. At the close of the evidentiary hearings, the Bankruptcy Court denied the DNR Lift Stay Motion, without prejudice, and granted the Debtors' Extension Motion with orders entered to that effect on November 17, 2016 and November 15, 2016, respectively.

## C.    Great Lakes Matter.

The Great Lakes Appeal, styled *Great Lakes Gas Transmission Limited Partnership v. Essar Steel Minnesota LLC et al.,* No. 09-CV-03037, is pending before the United States District Court for the District of Minnesota. During the underlying litigation, the District Court entered a judgment in Great Lakes' favor, which the Debtors and their related entities appealed to the Court of Appeals for the Eighth Circuit, No. 16-1101. After briefing on the Great Lakes Appeal was complete, the Eighth Circuit Court of Appeals issued an opinion and entered its judgment on December 6, 2016, reversing and vacating the District Court judgment and remanding with instruction to dismiss for lack of jurisdiction. On January 3, 2017, Great Lakes filed a Petition for Rehearing *En Banc* and Panel Rehearing, which the Eighth Circuit did not grant per its order entered on January 30, 2017.

## D.    Other Pending Adversary Proceedings.

### 1.    *American Bank of the North v. Essar Steel Minnesota, LLC*, Adv. No. 16-51504.

On September 28, 2016, American Bank of the North, issuer of a certain letter of credit, secured by a restricted cash collateral account of ESML and for the benefit of the DNR, initiated a declaratory judgment action against ESML as an adversary proceeding before the Bankruptcy Court. In its complaint, American Bank of the North seeks to enforce its recoupment rights or alternatively, its right of setoff in accordance with its letter of credit and other related documents. On or about October 12, 2016, ESML and American Bank of the North entered into a stipulation to, among other things, stay all deadlines until further Bankruptcy Court order, which stipulation was approved by agreed order entered on October 14, 2016.

### 2.    Removed Mechanic's Lien Actions, Adv. Nos. 16-51543 and 16-51877.

Beginning on July 20, 2016, several holders of Mechanic's Lien Claims began filing in the Bankruptcy Court notices of perfection of lien and motions for relief from the automatic stay

to file enforcement actions in Minnesota state court and preserve their previously recorded liens, under Minnesota law, for work conducted on the Project. In response, the Debtors entered into various stipulations and consented to the entry of agreed orders granting limited relief from the automatic stay for certain of those holders of Mechanic's Lien Claims. Given the vast number of motions and requests that were filed or otherwise presented to the Debtors and in an effort to efficiently address the mechanic's lienholders' requested relief and avoid litigation in multiple jurisdictions, the Debtors obtained a Bankruptcy Court order approving a protocol by which mechanic's lienholders were granted limited relief from the automatic stay to file lien enforcement actions in Minnesota, or to file an answer, cross-claims, and counterclaims to such a filed lien enforcement action, with the understanding that the actions would subsequently be removed and transferred to the Bankruptcy Court [D.I. 448] (the "**Protocol Order**").

On October 12, 2016, pursuant to the terms of the relevant agreed order and the Protocol Order, some of the holders of Mechanic's Lien Claims initiated an action to enforce and foreclose upon their respective mechanic's liens styled *A.W. Kuettel & Sons, Inc., Edwards Oil, Inc., Hammerlund's Champion Steel, n/k/a/ Champion Steel Minnesota, Inc., d/b/a Champion Steel, Hammerlund Construction Inc., Lakehead Constructors, Inc., et al., v. Essar Steel Minnesota LLC et al.,* No. 31-CV-16-2832 before the Ninth Judicial District Court for the State of Minnesota (the "**First State Court Action**"). On October 28, 2016, the Debtors filed a notice of removal in the Minnesota Bankruptcy Court and thereafter, moved to transfer the First State Court Action to the Delaware Bankruptcy Court pursuant to the Protocol Order. On December 7, 2016, the First State Court Action was transferred to, and is pending in, the Delaware Bankruptcy Court as Adversary Case No. 16-51543 (BLS).

On October 28, 2016, a second action was initiated by separate holders of Mechanic's Lien Claims in the Ninth Judicial District Court for the State of Minnesota styled, *TrueNorth Steel, Inc. v. Essar Steel Minnesota, LLC, et al.*, No. 31-CV-16-29959 (the "**Second State Court Action**," together with the First State Court Action, the "**Removed Actions**"). Similar to the First State Court Action, the Debtors filed a notice to remove the Second State Court Action to the Minnesota Bankruptcy Court and subsequently filed a motion to transfer the Second State Court Action from the Minnesota Bankruptcy Court to the Delaware Bankruptcy Court. On December 20, 2016, the Second State Court Action was transferred to, and is pending in, the Delaware Bankruptcy Court as Adversary Case No. 16-51877 (BLS).

**E.    Other Pending Prepetition Litigation.**

As of the Petition Date, the additional following actions were pending: (i) *Atlantic Specialty Insurance Company v. Essar Steel Minnesota LLC, et al.,* No. 652199/2016 before the Superior Court of the State of New York for the County of New York; (ii) *Axis Capital, Inc., et al., v. Essar Steel Minnesota LLC,* No. 31-CV-16-501 before the District Court of the State of Minnesota for the County of Itasca; (iii) *Great Lakes Gas Transmission Limited Partnership v. Essar Steel Minnesota LLC, et al.,* No. 62-CV-15-1024 before the District Court of the State of Minnesota for the County of Ramsey; (iv) *Great Lakes Gas Transmission Limited Partnership vs. Essar Steel Minnesota LLC, Essar Steel Limited f/k/a Essar Steel Holdings, Ltd., Essar Steel India Limited f/k/a Essar Steel Limited, and Essar Global Fund Ltd. f/k/a Essar Global Limited*, Case No. 15-cv-00581-JRT-LIB before the United States District Court for the District of Minnesota (v) *K Building Components, Inc. v. Essar Steel Minnesota LLC, et al.,* No. 69DU-CV-

31

16-1464 before the District Court of the State of Minnesota for the County of St. Louis; (vi) *Kenneth D. Kinsey v. Essar Steel Minnesota LLC,* No. 69HI-CO-16-67 before the Conciliation Court of the State of Minnesota for the County of St. Louis.

## IX.

## THE CHAPTER 11 PLAN

As a result of the Chapter 11 Cases and through the Plan, the Debtors submit that creditors will obtain a greater recovery under the Plan than any recovery that would be available if the Assets were to be liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as **Exhibit B** and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the Plan.

**A.    Plan Treatment of Claims and Equity Interests.**

The classes of Claims against the Debtors and Equity Interests in the Debtors shall be treated under the Plan as follows:

**1.    Class 1 – Priority Claims.**

Priority Claims consist of any Claims against the Debtors to the extent such Claims are entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Secured Claims, Administrative Claims, and Tax Claims.

Each holder of an Allowed Priority Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, except as provided in section 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Priority Claim shall be paid on the Plan Distribution Date in full and in Cash.

**2.    Class 2 – Project Finance Secured Claims.**

Project Finance Secured Claims consist of any Claims arising under the Project Finance Credit Agreement Documents.

Each holder of an Allowed Project Finance Secured Claim shall receive (i) a Pro Rata Share of the Prepetition Lender Notes, (ii) the Class A-1 Beneficial Trust Interests, (iii) the Class B-1 Beneficial Trust Interests, (iv) [●] units of the New Membership Interests, and (v) the Pro Rata Share of the remaining Cash Collateral on the Effective Date less the $5 million transferred to the Litigation Trust and for any other agreed uses in the Plan.

**3.    Class 3 – Term Loan Secured Claims.**

Term Loan Secured Claims consist of any Claims arising under the Term Loan Credit and Security Agreement Documents.

32

Each holder of an Allowed Term Loan Secured Claim shall receive (i) a Pro Rata Share of the Prepetition Lender Notes, (ii) the Class A-2 Beneficial Trust Interests, (iii) the Class B-2 Beneficial Trust Interests, (iv) [●] units of the New Membership Interests, and (v) the Pro Rata Share of the remaining Cash Collateral on the Effective Date less the $5 million transferred to the Litigation Trust and for any other agreed uses in the Plan.

### 4.    Class 4 – Supplier Credit Secured Claims.

Supplier Credit Secured Claims consist of any Claims arising under the Supplier Credit Facility Agreement Documents.

Each holder of an Allowed Supplier Credit Secured Claim shall receive (i) a Pro Rata Share of the Prepetition Lender Notes, (ii) the Class A-3 Beneficial Trust Interests, (iii) the Class B-3 Beneficial Trust Interests, (iv) [●] units of the New Membership Interests, and (v) the Pro Rata Share of the remaining Cash Collateral on the Effective Date less the $5 million transferred to the Litigation Trust and for any other agreed uses in the Plan.

### 5.    Class 5 – Mechanic's Lien Claims.

Mechanic's Lien Claims consist of any Secured Claims that are secured by a mechanic's or miner's lien recorded against the Debtors that (a) have been properly preserved, noticed, and perfected, and is otherwise enforceable under applicable law; (b) are not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law; (c) have been properly noticed in the Chapter 11 Cases pursuant to section 546(b)(2) of the Bankruptcy Code; and, (d) is deemed or treated under the Plan as a Mechanic's Lien Claim.

Each holder of an Allowed Mechanic's Lien Claim shall receive, at its option, in full satisfaction of its Allowed Mechanic's Lien Claim, (A) its Pro Rata share of the following payments, not to exceed 70% of such holder's Allowed Mechanic's Lien Claim: (1) two-thirds of the Mechanic's Lien Claims A Pool Amount on the first Plan Distribution Date and (2) one-third of the Mechanic's Lien Claims A Pool Amount on the twelve-month anniversary of the Production Date or (B) a Prepetition Lien Trade Creditor Note equal to such holder's Allowed Secured Claim and, to the extent such holder's Allowed Claim exceeds its Allowed Secured Claim, the difference shall be included and treated in Class 8.

**If the DNR does not object to (A) the assumption of the DNR Leases or (B) confirmation of the Plan**: Each holder of an Allowed Mechanic's Lien Claim that is equal to or less than $1,000,000 (each a "**Mechanic's Lien Convenience Claim**") shall receive on the first Plan Distribution Date, in full satisfaction of its Allowed Mechanic's Lien Claim a single Cash payment in an amount equal to the amount of such holder's Allowed Mechanic's Lien Claim. Each holder of an Allowed Mechanic's Lien Claim that exceeds $1,000,000 shall receive, at its option, in full satisfaction of its Allowed Mechanic's Lien Claim, (A) a Pro Rata share of the following payments, not to exceed 75% of such holder's Allowed Mechanic's Lien Claim: (1) two-thirds of the Mechanic's Lien Claims B Pool Amount on the first Plan Distribution Date and (2) one-third of the Mechanic's Lien Claims B Pool Amount on the twelve-month anniversary of the Production Date and (B) a Prepetition Lien Trade Creditor Note equal to such holder's Allowed Secured Claim and, to the extent such holder's Allowed Claim exceeds its Allowed

33

Secured Claim, the difference shall be included and treated in Class 8. Each holder of an Allowed Mechanic's Lien Claim that exceeds $1,000,000 but is less than $1,340,000 may elect to reduce its Allowed Mechanic's Lien Claim to $1,000,000 and receive treatment as a Mechanic's Lien Convenience Claim pursuant to subsection 4.1(e)(ii) of the Plan.

If the holder of an Allowed Mechanic's Lien Claim elects to receive a Cash distribution pursuant to subsection 4.1(e) of the Plan but does not execute an enforceable Post-Emergence Trade Agreement, such holder shall receive a Prepetition Lien Trade Creditor Note equal to such holder's Allowed Secured Claim and, to the extent such holder's Allowed Claim exceeds its Allowed Secured Claim, the difference shall be included and treated in Class 8.

## 6.    Class 6 – Other Secured Claims.

Other Secured Claims means any Secured Claims arising prior to the Petition Date against any of the Debtors, other than a Prepetition Lender Secured Claim or a Mechanic's Lien Claim.

Each holder of an Allowed Other Secured Claim, other than a DIP Claim, against any of the Debtors shall receive, at the Reorganized Debtor's election, on the Plan Distribution Date, in full satisfaction of its Allowed Other Secured Claim, (A) a single Cash payment equal to the sum of (x) the Allowed Other Secured Claim and (y) accrued postpetition interest through the Effective Date, at an interest rate agreed to by the parties, or, if no agreement can be reached, as determined by the Bankruptcy Court after notice and a hearing; (B) the collateral that secured payment of such Other Secured Claim; (C) if such Allowed Other Secured Claim is subject to a valid right of recoupment or setoff, such Claim shall be setoff to the extent of the amount subject to setoff in accordance with sections 506(a) and 553 of the Bankruptcy Code; or (D) the otherwise indubitable equivalent. Notwithstanding any of the foregoing, the Debtors and any holder of an Allowed Other Secured Claim may agree to any alternate treatment for such Other Secured Claim; except that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of the amount of such holder's Allowed Secured Claim. Class 6 consists of separate sub-classes, one for each Other Secured Claim. Each sub-class is deemed to be a separate class for all purposes under the Bankruptcy Code, including for voting purposes.

## 7.    Class 7 – Project Unsecured Claims.

Project Unsecured Claims consist of any Unsecured Claims related to or arising from goods or services for the Project that are listed on the "Schedule of Project Unsecured Claims" filed as a Disclosure Statement Schedule hereto, as amended from time to time. For the avoidance of doubt, the term shall not include (a) any Claim arising from an employee or individual independent contractor relationship between any Debtor and any Person, (b) any Claim arising from the rejection of an executory contract or unexpired lease, or (c) any Mechanic's Lien Claim.

Each holder of an Allowed Project Unsecured Claim shall receive, in full satisfaction of its Allowed Project Unsecured Claim, at the election of the holder of the Allowed Project Unsecured Claim: (A) its Pro Rata share of the following payments, not to exceed 40% of such

holder's Project Unsecured Claim: (1) two-thirds of the Project Unsecured Claims A Pool Amount on the first Plan Distribution Date and (2) one-third of the Project Unsecured Claims A Pool Amount on the twelve-month anniversary of the Production Date or (B) its Pro Rata Share of the Class B-4 Beneficial Trust Interests. If the holder of an Allowed Project Unsecured Claim does not execute an enforceable Post-Emergence Trade Agreement, such Allowed Project Unsecured Claim, shall be included in and treated as a Class 8 Claim.

**If the DNR does not object to (A) the assumption of the DNR Leases or (B) confirmation of the Plan**:

- The Disbursing Agent will not object to any Project Unsecured Claim for goods or services related to the Project if such holder is a party to an agreement with EPUL or another of the Debtors' affiliates on the grounds that (1) there is no privity between the Debtors and the holder of the Claim; or (2) the proof of claim was not filed in accordance with the Bar Date Order, if the proof of claim was filed prior to the Confirmation Date.

- Each holder of an Allowed Project Unsecured Claim shall receive on the Plan Distribution Date, (1) if such Allowed Project Unsecured Claim is equal to or less than $100,000 (each a "**Project Unsecured Convenience Claim**"), a single Cash payment in an amount equal to the amount of such holder's Allowed Project Unsecured Claim; or (2) if such Allowed Project Unsecured Claim exceeds $100,000, at the holder of the Allowed Project Unsecured Claim's election: (x) its Pro Rata share of the following payments, not to exceed 65% of such holder's Project Unsecured Claim: (aa) two-thirds of the Project Unsecured Claims B Pool Amount on the first Plan Distribution Date and (bb) one-third of the Project Unsecured Claims B Pool Amount on the twelve-month anniversary of the Production Date or (y) its Pro Rata Share of the Class B-4 Beneficial Trust Interests. Holders of Allowed Project Unsecured Claims that (1) have Claims that exceed $100,000 but is less than $154,000 and (2) execute an enforceable Post-Emergence Trade Agreement, may elect to reduce their claim to $100,000 and receive treatment as a Project Unsecured Convenience Claim.

If the holder of an Allowed Project Unsecured Claim does not execute a Post-Emergence Trade Agreement, such Allowed Project Unsecured Claim, shall be included in and treated as a Class 8 Claim.

    **8.    Class 8 – General Unsecured Claims.**

General Unsecured Claims consist of any Unsecured Claims, other than a Project Unsecured Claim.

Each holder of an Allowed General Unsecured Claim shall receive on the Plan Distribution Date its Pro Rata Share of the Class B-4 Beneficial Trust Interests.

9.    **Class 9 – Equity Interests.**

Equity Interests consist of (a) any outstanding ownership interest in the Debtors, including interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation; and (b) any Claim against the Debtors that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

On the Effective Date, all Equity Interests in the Debtors shall be cancelled, and each holder of an Equity Interest in the Debtors shall neither receive nor retain any property under the Plan on account such interests.

B.    **Plan Treatment of Administrative Claims.**

(a)    Time for Filing Administrative Claims.

The holder of an Administrative Claim, other than (i) a Fee Claim, (ii) a Claim for Statutory Fees, (iii) a DIP Claim, or (iv) an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the Office of the United States Trustee, notice of such Administrative Claim within forty-five (45) days after service of the Notice of Confirmation.  Such notice must include at a minimum (i) the name of the holder of the Claim; (ii) the amount of the Claim; and (iii) the basis of the Claim.  **Failure to timely and properly file and serve a request for payment of an Administrative Claim shall result in such Administrative Claim not being entitled to any distribution under the Plan.**

(b)    Time for Filing Fee Claims.

Each Professional Person who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date.  **Failure of a Professional Person to timely and properly file and serve a Fee Application shall result in such Professional Person's Fee Claim not being entitled to any distribution under the Plan.**

(c)    Allowance of Administrative Claims.

An Administrative Claim with respect to which notice has been properly filed and served pursuant to Section 5.2(a) of the Plan shall become an Allowed Administrative Claim if no objection is filed on or before the later of (i) the date that is ninety (90) days after the Effective Date; and (ii) such date as may be (A) agreed to by the holder of such Administrative Claim, or (B) approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed by the applicable objection deadline (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

Americas 92417336 (2K)

A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 5.2(b) of the Plan shall become an Allowed Administrative Claim only to the extent allowed by order of the Bankruptcy Court.

(d)    Payment of Allowed Administrative Claims.

On the Plan Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment; or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; *provided*, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim.  Notwithstanding anything else set forth herein, an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business at any time.

(e)    Allowance and Payment of DIP Claims.

The DIP Claims shall be Allowed Administrative Claims on the Effective Date and shall be paid in full in Cash on the Effective Date.

(f)    Treatment of Tax Claims.

Each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (i) payments in Cash, in regular installments over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (iii) such other treatment as may be agreed upon in writing by such holder; *provided*, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim.

## C.    Exculpation Provisions.

None of the Debtors, the Reorganized Debtor or any of their respective officers, directors, governors, members, employees, agents, representatives, advisors, attorneys, or successors and assigns will have or incur any liability to any Person for any act or omission in connection with, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the implementation or administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as finally determined by the Bankruptcy Court, and, in all respects shall be entitled to rely upon the advice of counsel and all information provided by other exculpated persons herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under the Plan.

## D.    The Litigation Trust.

Americas 92417336 (2K)

1.      **Creation of the Litigation Trust and Appointment of the Litigation Trustee.**

The Litigation Trust Agreement shall be executed on or before the Effective Date, and all other necessary steps shall be taken to establish the Litigation Trust and the Litigation Trust Assets, which shall be for the benefit of the Litigation Trust Beneficiaries.  A copy of the form of the Litigation Trust Agreement shall be filed with the Bankruptcy Court as a Plan Document and the terms of the Litigation Trust Agreement are hereby incorporated by reference.  Article VIII of the Plan sets forth certain of the rights, duties, and obligations of the Litigation Trustee.

On the Effective Date, the Litigation Trust will be created pursuant to the Litigation Trust Agreement.

2.      **Property of the Litigation Trust.**

On the Effective Date, in accordance with section 1141 of the Bankruptcy Code, all of the Litigation Trust Assets, as well as the rights and powers of the Estates applicable to the Litigation Trust Assets, shall automatically vest in the Litigation Trust, free and clear of all Claims and interests, for the benefit of the Litigation Trust Beneficiaries.  The Litigation Trust Assets include (a) $5 million in Cash from the Cash Collateral of the Prepetition Lenders, (b) the Transferred Causes of Action, (c) any proceeds derived from any Insurance Coverage Action, and (d) any Plan Distributions by the Litigation Trustee pursuant to the Litigation Trust Agreement that become Unclaimed Property.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date, the Debtors shall be deemed to have automatically transferred to the Litigation Trust all of their right, title, and interest in and to the Litigation Trust Assets, including the Transferred Causes of Action and the Insurance Coverage Actions, and any proceeds thereof. In accordance with section 1141 of the Bankruptcy Code, on the Effective Date, the transfer of the Litigation Trust Assets, including the Transferred Causes of Action and the Insurance Coverage Actions shall automatically vest in the Litigation Trust free and clear of all Claims and interests, for the benefit of the holders of Litigation Trust Interests.  The Litigation Trust shall be the successor to the Debtors for purposes of (a) prosecuting and/or settling the Transferred Causes of Action, and (b) litigating and allowing (i) Claims held by any Creditor that is adverse to the Litigation Trust with respect to the Transferred Causes of Action, (ii) all General Unsecured Claims, and (iii) any Claim held by a Litigation Trust Beneficiary (collectively the "**Trust Claims**").

In connection with the vesting and transfer of the Litigation Trust Assets, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written or oral and including but not limited to all electronic information) relating to the Litigation Trust Assets and objections to the Trust Claims shall vest in the Litigation Trust.  The Debtors, the Reorganized Debtor, and the Litigation Trustee are authorized and required to take all necessary actions to effectuate the transfer of such privileges, protections, and immunities.

3.        **Purpose of the Litigation Trust.**

On the Effective Date, the Litigation Trust will be established.  The Litigation Trust Assets, which include the Transferred Causes of Action, will vest in the Litigation Trust.  A Litigation Trustee will be appointed by a selection committee comprising of a representative from each of the Project Finance Lenders, the Term Loan Lenders, the Committee, and the Debtors.  The Litigation Trust Advisory Board, which will oversee the Litigation Trustee, will be comprised of a representative from each of the Project Finance Lenders, the Term Loan Lenders, and the Committee.

The Litigation Trust will be administered for the benefit of The Litigation Trust shall be established for the purposes of (a) liquidating its assets in accordance with Treas. Reg. § 30 1.770 1-4(d) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust, (b) administering the Litigation Trust Assets, and (c) after consultation with the Litigation Trust Advisory Board, (i) resolving all Trust Claims and (ii) making all Plan Distributions to the Litigation Trust Beneficiaries.

The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Litigation Trust Agreement.

The transfer of the Litigation Trust Assets to the Litigation Trust shall be made for the benefit and on behalf of the Litigation Trust Beneficiaries.  The Litigation Trust Assets comprising the Litigation Trust shall be treated for federal income tax purposes as being transferred by the Debtors to the Litigation Trust Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Litigation Trust Beneficiaries to the Litigation Trust. The Litigation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the holders of Litigation Trust Interests treated as grantors and owners of the Litigation Trust.  As soon as practicable after the Effective Date, the Litigation Trustee (to the extent that the Litigation Trustee deems it necessary or appropriate in its sole discretion) shall value the assets of the Litigation Trust based on the good faith determination of the Litigation Trustee. The valuation shall be used consistently by all parties for all federal income tax purposes.  The Bankruptcy Court shall resolve any dispute regarding such valuation.

The Litigation Trust, acting through the Litigation Trustee, shall be authorized to exercise and perform the rights, powers, and duties held by the Estates with respect to the Litigation Trust Assets, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of the bankruptcy or insolvency trustee or examiner, or a receiver for the Committee, to provide for the prosecution, objection, settlement, adjustment, retention, and enforcement of the Transferred Causes of Action and Trust Claims.

4.        **Litigation Trustee Selection Committee.**

The initial Litigation Trustee shall be selected through a process led by the Litigation Trustee Selection Committee.  The Litigation Trustee Selection Committee shall consist of four members, one member appointed by each of the Term Loan Lenders, the Project Finance Lenders, the Committee, and the Debtors.

Americas 92417336 (2K)

On the Effective Date, the Litigation Trustee Selection Committee shall automatically dissolve and the members appointed by each of the Term Loan Lenders, the Project Finance Lenders, and the Committee to the Litigation Trustee Selection Committee shall become the members of the Litigation Trust Advisory Board.

### 5.    Powers and Responsibilities of the Litigation Trustee.

(a)    The responsibilities of the Litigation Trustee shall include, but shall not be limited to: (i) prosecuting through judgment or settling the Transferred Causes of Action and compelling the prosecution and/or settlement of the Insurance Coverage Actions; (ii) facilitating the prosecution and/or settlement of objections to, and estimations of Trust Claims; (iii) calculating and implementing all Plan Distributions to be made from the Litigation Trust Assets; (iv) filing all required tax returns, and paying taxes and all other obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (v) otherwise administering the Litigation Trust; (vi) providing annual reports to the Litigation Trust Beneficiaries (and providing copies of the same to the Reorganized Debtor and [●]) (A) reflecting expenditures, receipts, and distributions of the Litigation Trust; and (B) detailing the prosecution and resolution of the Transferred Causes of Action and the objections to the Trust Claims; and (vii) such other  responsibilities as may be vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust.  If the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, determines that any reports required by Section 8.5(a) of the Plan require the execution of a confidentiality agreement, the Litigation Trustee shall have the right and power to condition release of such report on the execution of such confidentiality agreement.

(b)    The Litigation Trust shall maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to the Litigation Trust Beneficiaries contemplated or effectuated under the Plan.

(c)    The powers and authority of the Litigation Trustee, without any further approval from the Bankruptcy Court, shall include the power, in consultation with the Litigation Trust Advisory Board: (i) to invest the Litigation Trust Assets, and withdraw funds from the Litigation Trust, make distributions, incur obligations for reasonable and necessary expenses of liquidating and converting the Litigation Trust Assets to Cash, and pay taxes and other obligations owed by the Litigation Trust from funds held by the Litigation Trustee in accordance with the Plan; (ii) to engage professionals and service providers to assist the Litigation Trustee with respect to its responsibilities; (iii) to evaluate and determine strategy with respect to the Transferred Causes of Action, the Insurance Coverage Claims, and the objections to Trust Claims, and to prosecute, compromise, transfer, release, abandon, and/or settle the Transferred Causes of Action, the Insurance Coverage Claims, and the objections to Trust Claims on behalf of the Litigation Trust, (iv) to liquidate any remaining Litigation Trust Assets, and provide for the distributions therefrom in accordance with the provisions of the Plan; (v) to interpret the provisions of the Plan relating to the Litigation Trust in the Litigation Trustee's reasonable discretion; (vi) to obtain insurance, as necessary; (vii) to establish reserves

40

to fund ongoing litigation; (viii) to purchase assignments of Claims; (ix) to enter into joint prosecution agreements providing for allocation of expenses and proceeds; (x) to maintain an office; (xi) to otherwise administer the Litigation Trust; and (xii) to exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets. In all circumstances, the Litigation Trustee shall act in the best interests of the Litigation Trust Beneficiaries and in furtherance of the purpose of the Litigation Trust.

(d)    To effectively investigate, prosecute, compromise, and/or settle the Transferred Causes of Action and the objections to Trust Claims on behalf of the Litigation Trust, the Litigation Trustee, the Debtors, and the Reorganized Debtor shall enter into the Transition Services Agreement.

(e)    Except as otherwise provided in this section, the Litigation Trustee, together with any and all of its officers, directors, employees, agents, and representatives, are exculpated by all Persons, including holders of Claims against and Equity Interests in the Debtors and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Litigation Trustee by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Litigation Trustee's willful misconduct or gross negligence. No Person shall have or pursue any Cause of Action (i) against the Litigation Trustee or the Litigation Trust's officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan; or (ii) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in this section shall preclude or impair any holder of an Allowed Claim from bringing an action in the Bankruptcy Court against the Litigation Trustee to compel the making of Plan Distributions contemplated by the Plan on account of such holder's Allowed Claim.

(f)    From and after the Effective Date, the Litigation Trustee, its firm, company, partners, officers, directors, employees, professionals, representatives, successors, and assigns (collectively, the "**Trust Indemnified Parties**" and each a "Trust Indemnified **Party**") shall be, and hereby are, indemnified by the Litigation Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Trust Indemnified Party's good faith exercise of what such Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Trust Indemnified Party reasonably understands to be its duties conferred by the Litigation Trust Agreement, the Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the Transferred Causes of Action or objections to Trust Claims, on and after the Effective Date. The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to (i) the Litigation Trust Agreement or the Plan; (ii) the services to be

41

rendered pursuant to the Litigation Trust Agreement or the Plan; (iii) any document or information, whether verbal or written, referred to herein or supplied to the Litigation Trustee; or (iv) proceedings by or on behalf of any creditor. The Litigation Trust shall, on demand, advance, or pay promptly out of the Litigation Trust Assets, on behalf of each Trust Indemnified Party, reasonable attorneys' fees and other expenses and disbursements to which such Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; *provided, however*, that any Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Trust Indemnified Party. In any matter covered by the first two sentences of this subsection, any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Litigation Trustee, at the Litigation Trust's expense, subject to the foregoing terms and conditions.

(g) Upon (i) the final Plan Distribution, (ii) the final accounting of the Litigation Trust, and (iii) notice to the Litigation Trust Beneficiaries, the Litigation Trustee shall be released and discharged of all duties under Litigation Trust Agreement, the Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise.

## 6. The Litigation Trust Advisory Board.

On the Effective Date, the Litigation Trust Advisory Board shall be created pursuant to the Litigation Trust Agreement. The initial members of the Litigation Trust Advisory Board shall be the members appointed by each the Term Loan Lenders, the Project Finance Lenders, and the Committee to the Litigation Trustee Selection Committee.

The Litigation Trustee Advisory Board's powers and responsibilities shall include: (a) approval of the Litigation Trustee's retention of professionals and service providers and the terms thereof; (b) approval of the Litigation Trustee's annual budgets; (c) approval of all Plan Distributions to be made from the Litigation Trust Assets; (d) approval of all settlements of the Transferred Causes of Action and the Trust Claims; (e) termination of the Litigation Trustee, for cause, and (f) the appointment of any successor Litigation Trustee.

## 7. Litigation Trust Beneficiaries.

The Litigation Trust Beneficiaries shall be holders of Class A-1 Beneficial Trust Interests, Class A-2 Beneficial Trust Interests, Class A-3 Beneficial Trust Interests, Class B-1 Beneficial Trust Interests, Class B-2 Beneficial Trust Interests, Class B-3 Beneficial Trust Interests, and Class B-4 Beneficial Trust Interests on any Plan Distribution Date.

## 8. Governance of Litigation Trust.

The Litigation Trust shall be governed and administered by the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, pursuant to the Litigation Trust Agreement.

Americas 92417336 (2K)

9.      **Cash.**

The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

10.     **Compensation of the Litigation Trustee.**

The Litigation Trustee shall be entitled to reasonable compensation as provided in the Litigation Trust Agreement.

11.     **Litigation Trust Distributions.**

(a)     Prior to any distribution to Class B Beneficial Trust Interests, the Litigation Trust shall distribute $5 million, together with accrued interest (accruing at a reasonable interest rate after the Effective Date), to the Class A Beneficial Trust Interests.

(b)     Prior to any Plan Distributions to holders of Prepetition Lender Claims, such holders must provide the Litigation Trustee with the Prepetition Lender Recovery Certification.

(c)     On each Plan Distribution Date, the Litigation Trust shall distribute all Net Available Cash on account of the Class A Beneficial Trust Interests before calculating the distribution to holders of Class B-1 Beneficial Trust Interests, Class B-2 Beneficial Trust Interests, and Class B-3 Beneficial Trust Interests, and making distributions on account of the Class B Beneficial Trust Interest.

12.     **Retention of Professionals by the Litigation Trustee.**

The Litigation Trustee may retain and reasonably compensate professionals and service providers to assist the Litigation Trustee with respect to its responsibilities as approved by the Litigation Trust Advisory Board and on terms as approved by the Litigation Trust Advisory Board, without Bankruptcy Court approval.  The Litigation Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

13.     **Noncertificated Litigation Trust Interests.**

The beneficial interests in the Litigation Trust shall not be certificated, except as otherwise provided in the Litigation Trust Agreement.

14.     **Dissolution of the Litigation Trust.**

The Litigation Trustee and the Litigation Trust shall be discharged and dissolved, respectively, at such time as (a) all assets of the Litigation Trust have been liquidated; and (b) all distributions required to be made by the Litigation Trustee under the Plan have been made, but in

no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date. The Litigation Trustee, in consultation with the Litigation Trust Advisory Board, may obtain one extension of up to five (5) years by filing a notice of such extension with the Bankruptcy Court, without Bankruptcy Court approval, after the Litigation Trustee has obtained a favorable letter ruling from the IRS that such an extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes.

### 15. Securities Exempt.

The issuance of any beneficial interests of the Litigation Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

## E. Plan Controls.

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. This Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

## X.

## RISK FACTORS

The holder of a Claim against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan.

## A. General Considerations.

The Plan sets forth the means for satisfying the Claims against the Debtors. Reorganization of the Debtors' business and operations under the proposed Plan also avoids the potentially adverse impact of a protracted and costly liquidation under chapter 7 of the Bankruptcy Code. The Plan is proposed after a careful consideration of all reasonable restructuring alternatives.

## B. Certain Bankruptcy Considerations.

There is no assurance that the requisite acceptances to confirm the Plan will be obtained. Thus, there is no guarantee that the Plan will be accepted by the requisite classes entitled to vote on the Plan. If the Plan is not confirmed and consummated, there can be no assurance that any alternative plan would be on terms as favorable to the holders of impaired Claims as the terms of the Plan. In addition, if the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' Assets for distribution in accordance with the priorities established by the Bankruptcy

Americas 92417336 (2K)

Court, it is likely that holders of Claims would receive less than they will receive under the Plan. *See* Section XIII, *infra*, and "Liquidation Analysis," attached hereto as **Exhibit A**.

Even if all voting Classes voted in favor of the Plan or the requirements of "cramdown," if applicable, are met with respect to any class that rejected the Plan, the Bankruptcy Court, as court of equity, may choose not to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Moreover, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy. If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could adversely affect, among other things, the Debtors' ability to maintain its Mineral Leases.

In the event that certain conditions are not satisfied (or waived) and the Effective Date does not occur, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any new chapter 11 plan would be as favorable to claim holders as the current Plan. Either outcome may materially reduce distributions to the holders of Claims.

**C.      Amount or Classification of a Claim May be Subject to Objection.**

The Disbursing Agent and Litigation Trustee, as applicable, reserve the right to object to the amount or classification of any Claim except any such Claim that is deemed an Allowed Claim under the Plan or except as otherwise provided in the Plan. The estimated Claim amounts set forth herein reflect the Debtors' expectation of the Claims that will ultimately be Allowed in each class. However, there can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein. Such differences may adversely affect the percentage recovery to the holders of such Allowed Claims under the Plan.

**D.      Estimated Claim Amounts by Class May Not Be Accurate.**

There can be no assurance that the estimated Claim amounts assumed for the purposes of preparing the Plan are correct. The actual amount of Allowed Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated for the purpose of preparing the Plan. Depending on the outcome of objections to Claims, the estimated recovery percentages provided in this Disclosure Statement may be different than the actual recovery percentages that are realized under the Plan.

Americas 92417336 (2K)

E.      **Risk Factors That May Affect the Recoveries Through the Litigation Trust.**

      1.      **General Risks That May Affect the Recovery Through the Litigation Trust.**

The uncertain nature of litigation makes it impossible to predict the recovery and subsequent distribution to the holder of the Litigation Trust Interests of any recoveries from the Transferred Causes of Action, including proceeds from the Insurance Coverage Actions. There can be no assurance that the Litigation Trustee will be successful in the prosecution of the Transferred Causes of Action or the Insurance Coverage Action.

      2.      **Section 1145(a)(1).**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property. To the extent that the rights to distributions from the Litigation Trust are deemed to constitute securities issued in accordance with the Plan, the Debtors believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities law.

Holders of Litigation Trust Interests should also be aware that their rights to distribution from the Litigation Trust are not transferable. Therefore, there will not be any trading market for such rights, nor will those rights be listed on any public exchange or other market. The lack of liquidity of the rights to distributions from the Litigation Trust may have a negative impact on their value.

F.      **Economic Risks Related to the Reorganized Debtor's Financial Projections.**

The financial projections set forth in **Exhibit D** represent the Debtors' best estimate of the future financial performance of the Reorganized Debtor, based on currently known facts and assumptions about future operations, as well as the United States and world economics and market conditions as related to the iron ore industry. The actual financial results may differ significantly from the projections. Moreover, many of the assumptions considered in the financial projections are beyond the control of the Debtors and may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the financial projections may adversely affect the financial results of the Reorganized Debtor. If the Reorganized Debtor does not achieve its projected financial result, then the value of the Reorganized Debtor's debt or equity issued pursuant to the Plan may be affected.

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not

intend to update the financial projections in **Exhibit D** for the purposes hereof; thus, the financial projects will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying such financial projections.

### G.    Risk or Restrictions and Covenants Related to Exit Facility or Plan Sponsor Equity Contribution.

If the Plan is confirmed, but the Debtors do not enter into the Exit Facility, or the Plan Sponsor fails to contribute $250,000,000 of new equity, it would become necessary to amend the Plan to provide alternative treatment of Claims.  To the extent that the Debtors do not enter into the Exit Facility, or the Plan Sponsor fails to contribute $250,000,000 of new equity, as contemplated by the Plan, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of impaired Claim as the terms of the Plan.  If any modifications to the Plan are material, it will be necessary to resolicit votes from those adversely affected by the modifications with respect to such amended Plan.

### H.    Risks Associated with the Reorganized Debtor's Operations to Project Completion.

The continued operation of the Reorganized Debtor in connection with the construction of the Project involves various risks, including, without limitation:

- adverse weather conditions;
- interruptions in fuel supply;
- disruptions in procurement or delivery of necessary equipment;
- breakdown or failure of equipment (whether due to age or otherwise) or processes;
- labor disputes;
- violation of the Debtors' permit requirements or revocation of permits; and
- catastrophic events such as fires, explosions, floods, earthquakes, or other similar occasions.

A decrease in or elimination of revenues generated by the Project or an increase in the costs of operating such facilities could materially impact the cash flows and results of operations of the Reorganized Debtor, including cash flows available to the Reorganized Debtor to make payments on its debt or other obligations.

#### 1.    The Debtors Do Not Have an Operating History and Their Future Profitability Is Uncertain.

An evaluation of the Debtor's business and prospects must be considered in light of the risks, expenses, and difficulties frequently encountered by companies in the early stages of development.  The Debtors have had no revenues or earnings from operations and have relied upon equity and debt financing to fund their operations.  Future operating results will depend on the following, among other factors:

- the ability to complete the Project and commence operations;
- the ability to commercialize the Debtors' mineral resources and reserves;

- the ability to generate adequate working capital and manage costs;
- the ability to achieve seven (7) mtpa pellet production capacity;
- market demand for iron ore;
- the performance of the Debtors' competitors;
- the ability to maintain existing customer relationships and develop new ones;
- the ability to attract and retain key employees; and
- the ability to efficiently locate, recover, and upgrade sufficient quantities of marketable iron ore in a highly competitive and speculative environment, while maintaining quality and controlling costs.

    2.    **Profitability Could Be Adversely Affected by Delays in Constructing and in Initiating Operations at the Project or by Construction Costs that Are Higher than Estimated.**

    The Project will require investments of time and money over the course of approximately two years. The success of the Project depends in significant part on the Debtors' ability to complete construction and commence production within the planned timeframe and in accordance with cost estimates. However, the Project could experience unexpected problems and delays during construction and start-up. Moreover, the cost of the Project may be higher than the Debtors' estimates for a variety of factors, including, but not limited to, the following:

- the Debtors' contractors may fail to procure adequate components for construction of the Project;
- the pelletizing machinery and other equipment on which the pellet production facility will depend may exceed cost or timing expectations for construction;
- the Debtors' assumptions regarding the return on capital expenditures may be inaccurate;
- labor shortages or shortfalls in labor resources;
- it may be more costly than expected to comply with regulatory requirements that apply to the Project; and
- catastrophic weather events, fires, or unexpected social or community objections may occur.

    Any of the foregoing events could materially and adversely affect the Debtors' ability to timely complete construction or to initiate production at the Project. Such delays would increase the costs related to the Project and delay or decrease expected profitability.

    3.    **Profitability Could Be Adversely Affected by Competition, Regulatory Developments, and Other Factors Beyond the Debtors' Control.**

    The ability to operate the Project profitably depends on a number of factors, some of which are beyond the Debtors' direct control. These factors include the following:

- the domestic and foreign demand and supply for iron ore;
- the quantity and quality of iron ore available from domestic and foreign competitors;

Americas 92417336 (2K)

- competition within the industry;
- the demand for steel, which may lead to price fluctuations in the iron ore market;
- adverse weather, climatic or other natural conditions, such as cave-ins or landslides and other natural disasters;
- customers failing to meet their contractual obligations;
- domestic and foreign economic conditions, including economic slowdowns; and
- legislative, regulatory, and judicial developments, environmental regulatory changes, or changes in energy policy and energy conservation measures that would adversely affect the Debtors' industry.

The occurrence or continuation of one or more of these factors could materially and adversely affect the Debtors' business, prospects, financial condition and results of operations.

**4.      Financial Performance Is Highly Dependent on the Iron Ore Market and Reduced Global Demand for Steel or Decreases in Steel Production Could Have a Material Adverse Effect on the Debtors' Business.**

The Debtors are dedicated exclusively to the production and marketing of iron ore pellets. As a result of this focus, the Debtors would likely be impacted more acutely by factors affecting the iron ore industry than if they were more diversified.  Iron ore is a commodity and the market for iron ore is highly competitive and affected by global supply and demand.  Iron ore prices are affected by numerous factors beyond the Debtors' control, including the relative exchange rate of the United States dollar with other major currencies, global and regional demand for iron ore and steel, political and economic conditions, steel and iron ore production levels and costs and transportation costs in major iron ore producing regions.

**5.      Risks Related to Environmental Laws and Requirements.**

The Debtors' business is subject to extensive environmental regulation by federal, state, and local authorities, which requires continuous compliance with conditions established by their operating permits.  To comply with those legal requirements, the Debtors must spend significant sums on environmental monitoring, permits, pollution control equipment, and emissions allowances.  The Reorganized Debtor may also be exposed to compliance risks that have developed over the course of the Chapter 11 Cases.  Although the Debtors have budgeted for significant expenditures to comply with current requirements, actual expenditures may be greater than budgeted amounts.  If the Debtors were to fail to comply with these requirements, they could be subject to civil or criminal liability and the imposition of liens or fines.  With the trend toward stricter standards, greater regulation, and more extensive permitting requirements, the Debtors expect environmental expenditures of the Reorganized Debtor to be substantial in the future.   The Reorganized Debtor's business, operations and financial condition could be adversely affected by this trend.

In general, environmental laws, particularly with respect to air emissions, are becoming more stringent, which may require the Debtors to acquire new or amended permits to construct or to operate, or restrict operations to meet more stringent standards.  The Debtors cannot predict with certainty the level of capital expenditures that will be required due to changing

environmental and safety laws and regulations.  The unexpected requirement of large capital expenditures could have a material adverse effect on the Reorganized Debtor's financial performance and condition.

The Reorganized Debtor may not be able to obtain from time to time desired environmental regulatory approvals.  Such approvals could be delayed or subject to onerous conditions.  If there is a delay in obtaining any environmental regulatory approvals or if onerous conditions are imposed, the construction and/or operation of the Project could be prevented or become subject to additional costs.

**6.    Reasonably Priced Raw Materials and Mining Equipment May Be Unavailable.**

The Debtors require a variety of raw materials and mining equipment in their business. To the extent these materials or equipment are unavailable or available only at significantly increased prices, the Debtors' business, prospects, financial condition and results of operations could be adversely impacted.

## XI.

## CONFIRMATION AND CONSUMMATION PROCEDURES

**A.    Overview.**

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a liquidation of a debtor's assets.  In either event, upon confirmation of a plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  **This Disclosure Statement is presented to holders of Project Finance Secured Claims, Term Loan Secured Claims, Supplier Credit Secured Claims, Mechanic's Lien Claims, Project Unsecured Claims, and General Unsecured Claims to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible."  The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.  **The Debtors believe that the Plan satisfies all the**

**applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors' test and the feasibility requirement.**

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a chapter 11 plan for the bankruptcy court to determine that the class has accepted the plan. Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan. **Class 1 – Priority Claims and Class 6 – Other Secured Claims are unimpaired, and Class 9 – Equity Interests will not receive a distribution under the Plan. Accordingly, Class 2 – Project Finance Secured Claims, Class 3 – Term Loan Secured Claims, Class 4 – Supplier Credit Secured Claims, Class 5 – Mechanic's Lien Claims, Class 7 – Project Unsecured Claims, and Class 8 – General Unsecured Claims are the only classes of claims entitled to vote on the Plan.**

The bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims and equity interests accept such plan. For a chapter 11 plan to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claim.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

Americas 92417336 (2K)

The Plan has been structured so that it will satisfy the foregoing requirements as to the rejecting class of Claims or Equity Interests, and can therefore be confirmed, if necessary, over the deemed rejection of Class 9 - Equity Interests or objection of any (but not all) classes of Claims.

**B.    Confirmation of the Plan.**

**1.    Elements of Section 1129 of the Bankruptcy Code.**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

(a)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(b)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(c)    The Plan has been proposed in good faith and not by any means proscribed by law.

(d)    Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(e)    The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors or a successor to the Debtors under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(f)    With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

(g)    In the event that the Debtors do not move to confirm the Plan nonconsensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

(h)    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority

Claims will be paid in full, in cash, on the Effective Date and Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the allowed amount of such Tax Claims.

(i)    At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

(j)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any other successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

(k)    All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Debtors believe that the Plan will satisfy all of the applicable provisions of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the applicable provisions of the Bankruptcy Code, and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.**

2.    **Acceptance.**

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims.

3.    **Best Interests of Creditors Test.**

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Ordinarily, to determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtors in a chapter 7 liquidation case.  The proceeds that would be available for satisfaction of Claims against and Equity Interests in the Debtors would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtors and the cash held by the Debtors at the time of the commencement of the liquidation case.  Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the termination of the business of the Debtors and the use of chapter 7 for the purposes of liquidation.

Additionally, the costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid

53

expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 case. Additionally, a chapter 7 trustee and the persons it employs will need time to develop the knowledge necessary to assist the chapter 7 trustee examine claims and distribute the Debtors' assets.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions which would be available in a liquidation scenario are compared to the net present value of the distributions projected under the Plan.

**After consideration of the effects that a chapter 7 liquidation would have on the distributions to creditors in the Chapter 11 Cases, including the additional costs associated with the appointment of the chapter 7 trustee, the Debtors have determined that confirmation of the Plan will provide each holder of a Project Finance Secured Claim, Term Loan Secured Claim, Supplier Credit Secured Claim, Mechanic's Lien Claim, Project Unsecured Claim, and General Unsecured Claim with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The Liquidation Analysis is attached hereto as Exhibit A.**

(a)     Litigation Recoveries.

The uncertain nature of litigation makes it impossible to predict the recovery and subsequent Plan Distributions to creditors of any recoveries from the Transferred Causes of Action, including proceeds from the Insurance Coverage Actions. Although the Debtors believe that various Transferred Causes of Action have the prospect of generating significant recoveries for the Estates, there can be no assurance that the Litigation Trustee or a chapter 7 trustee would be successful in the prosecution of any Transferred Causes of Action. Accordingly, the Debtors have estimated recovery from the Transferred Causes of Action as zero for purposes of the Liquidation Analysis.

The Plan provides for the Litigation Trustee to pursue all of the Transferred Causes of Action, including those actions that are pledged as collateral to the Prepetition Lenders, in an efficient and cost effective manner. The prosecution of the Transferred Causes of Action by a single representative of the Estates will decrease the costs associated with litigation, reduce the potential for competing claims against the same sources of recovery, and eliminate the potential for prolonged litigation about the respective rights of secured and unsecured creditors over entitlements to recoveries. In a chapter 7 liquidation, recoveries from the Transferred Causes of Action could be affected by increased litigation costs and unavailability of witnesses or documents. For example, the Prepetition Lenders might seek to foreclose on their collateral and pursue separate causes of action in competition with the chapter 7 trustee, increasing the total spending across the litigation portfolio and giving rise to potential disputes over such matters as ownership and access to documents and information, discovery rights, allocation of proceeds of certain causes of actions, and other matters. The Plan provides for funding of litigation from Cash Collateral; in a chapter 7 liquidation, there is no source of funding and obtaining such funding could be difficult and/or costly.

Under the Plan, Administrative Claims, Priority Claims, and DIP Claims are paid by the Reorganized Debtor and, as a result, the proceeds of the Transferred Causes of Action inure to the benefit of secured and unsecured creditors.  In a chapter 7 liquidation, recoveries to unsecured creditors would be subordinated to and reduced by (a) the claims of the DIP Lender, which has a lien and a superpriority administrative expense claim on the proceeds of certain Causes of Action, and (b) holders of Administrative Claims and Priority Claims, which would be entitled to receive payment prior to distributions of recoveries to unsecured creditors, including holders of unsecured deficiency claims.  Finally, under the Plan certain holders of Mechanic's Lien Claims and Project Unsecured Claims will receive enhanced Cash distributions and as a result will not participate in recoveries from the Transferred Causes of Action. In a chapter 7 liquidation, such claims would participate in litigation recoveries, diluting litigation recoveries distributed to remaining creditors.

(b)     Recovery Analysis.

The Debtors, with the help of their financial advisors, Guggenheim, and other advisors, have prepared a liquidation analysis, attached hereto as **Exhibit A** (the "**Liquidation Analysis**") to assist the holders of Allowed Claims in evaluating the Plan.  The Liquidation Analysis compares the potential creditor recoveries to be realized if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the distributions to holders of Allowed Claims under the Plan.

The Debtors believe that the Plan provides the same or a greater recovery for holders of Allowed Claims as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code because of, among other things, the additional Administrative Claims generated by conversion to a chapter 7 case, including wind-down costs and fees of the chapter 7 trustee and professionals, the administrative expenses of liquidation and associated delays in connection with a chapter 7 liquidation, the negative impact on the market for the Assets caused by attempting to sell a large number of assets in a short time frame, and the failure to realize the greater going concern value of the Assets, each of which would further erode the value of the Estates.

Specifically, based on the Liquidation Analysis and the Debtors' and its advisors' review, discussions, considerations, and assumptions and solely for the purposes of the Plan, the Debtors estimate the following recovery percentages:

| Claim | Plan | Enhanced Plan | Liquidation |
|---|---|---|---|
| Administrative Claims ................................................... | 100% | 100% | 0% |
| Priority Tax Claims....................................................... | 100% | 100% | 0% |
| DIP Claims.................................................................... | 100% | 100% | -- |
| Class 1 – Priority Claims .............................................. | 100% | 100% | 0% |
| Class 2 – Project Finance Secured Claims.................... | 17%[20] | 17%[20] | 4% |

[20] Represents the estimated recovery on account of (i) the respective Prepetition Lender's Pro Rata Share of the Prepetition Lender Notes and (ii) [●] units of the New Membership Interests, and (iii) the Prepetition Lenders' Cash Collateral, less $5,000,000 in Cash from the Prepetition Lenders' Cash Collateral, which will be used to fund the Litigation Trust Assets.  Estimated recovery does not include recovery on account of Class A Beneficial Interests and Class B Beneficial Interests.  *See* footnote 27**Error! Bookmark not defined.**.

| | | | |
|---|---|---|---|
| Class 3 – Term Loan Secured Claims............................ | 17%[20] | 17%[20] | 4% |
| Class 4 – Supplier Credit Secured Claims .................... | 17%[20] | 17%[20] | 4% |
| Class 5 – Mechanic's Lien Claims................................ | 70%[21] | 80%[22] | 51% |
| Class 6 – Other Secured Claims................................... | --[23] | --[23] | --[23] |
| Class 7 – Project Unsecured Claims ............................ | 40%[24] | 69%[25] | --[26] |
| Class 8 – General Unsecured Claims........................... | -- | -- | --[27] |
| Class 9 – Equity Interests........................................... | 0% | 0% | 0% |

### 4.    Feasibility.

The Bankruptcy Code conditions confirmation of a chapter 11 plan on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed the Reorganized Debtor's capacity to service its obligations under the Plan.  Based upon their analyses and Financial Projections, the Debtors believe that the Reorganized Debtor will be able to make all payments required to be made under the Plan.  See "Financial Projections and Assumptions" attached hereto as **Exhibit D**.

---

[21]  Represents the estimated recovery based on the proposed Cash payment option to Class 5 – Mechanic's Lien Claims, which comprises Cash payments from a fixed pool amount not to exceed 70% of each holder's claims.

[22]  Represents the estimated recovery based on the enhanced proposed Cash payment option to Class 5 – Mechanic's Lien Claims, if the DNR does not object to (A) the assumption of the DNR Leases or (B) Confirmation of the Plan. The recovery is calculated on a blended basis as follows: (i) Recovery to the holders of Mechanic's Lien Convenience Claims (representing Allowed Mechanic's Lien Claims that are equal to or less than $1,000,000), which shall receive a single Cash payment in full satisfaction of their claims and (ii) Recovery to Allowed Mechanic's Lien Claims (exceeding $1,000,000) which shall receive their Pro Rata share of payments from a fixed pool amount, not to exceed 75% of their respective allowed claims.  Assumes two contractors elect to reduce their claims to $1,000,000 and receive a $1,000,000 cash payment in satisfaction of 100% of their claims.

[23]  Recovery for Class 6 – Other Secured Claims will vary depending on the value of the collateral securing each holder's Claim.

[24]  Represents the estimated recovery based on the proposed Cash payment option to Class 7 – Project Unsecured Claims, which comprises Cash payments from a fixed pool amount not to exceed 40% of each holder's claims.

[25]Represents the estimated recovery based on the enhanced proposed Cash payment option to Class 7 – Project Unsecured Claims, if the DNR does not object to (A) the assumption of the DNR Leases or (B) Confirmation of the Plan.  The recovery is calculated on a blended basis as follows: (i) Recovery to holders of the Project Unsecured Convenience Claims (representing Allowed Project Unsecured Claims that are equal to or less than $100,000) which shall receive a single Cash payment in full satisfaction of their claims and (ii) Recovery to Allowed Project Unsecured Claims (exceeding $100,000) which shall receive their Pro Rata Share of payments from a fixed pool amount, not to exceed 65% of their respective allowed claims.  Assumes ten contractors elect to reduce their claims to $100,000 and receive a $100,000 payment in satisfaction of 100% of their claims.  The total Allowed Claims in Class 7 – Project Unsecured Claims is expected to increase from approximately $[3] million to approximately $[22] million if this Plan treatment applies because the Debtors will not object to Claims in this Class if the holder of a Claim is a party to an agreement with EPUL or other affiliates of the Debtors on the ground that (1) there is no privity between the Debtors and the holder of the Claim or (2) the proof of Claim was not filed in accordance with the Bar Date Order, if the proof of Claim was filed prior to the Confirmation Date.

[26] Treated as General Unsecured Claims in liquidation.

[27]  Recovery is contingent on litigation recoveries.  Although litigation recoveries are unknown at this time, as discussed above, the Debtors believe that holders of General Unsecured Claims will recover more under the Plan than a hypothetical chapter 7 liquidation due in part because under the Plan (i) the amount of Claims in Class 8 will be lower and (ii) the Litigation Trust has a greater chance of maximizing recovery for its beneficiaries.

C.        **Cramdown.**

Because Class 9 – Equity Interests is impaired and deemed to reject the Plan, the Debtors will move for confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code.    To obtain such confirmation, the Debtors must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.

1.        **No Unfair Discrimination.**

A chapter 11 plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims.    The Debtors believe that under the Plan all impaired classes of Claims are treated in a manner that is consistent with the treatment of other classes of Claims that are similarly situated, if any, and no class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and in such class.    Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims.

2.        **Fair and Equitable Test.**

The Bankruptcy Code establishes different "fair and equitable" tests for classes of secured claims, unsecured claims, and equity interests as follows:

(a)        Secured Claims.    Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

(b)        Unsecured Claims.    Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

(c)        Equity Interests.    Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (A) the fixed liquidation preference or redemption price, if any, of such stock or (B) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

BECAUSE CLASS 9 – EQUITY INTERESTS IS DEEMED TO REJECT THE PLAN, IF CLASS 2 – PROJECT FINANCE SECURED CLAIMS, CLASS 3 – TERM LOAN SECURED

CLAIMS, CLASS 4 – SUPPLIER CREDIT SECURED CLAIMS, CLASS 5 – MECHANIC'S LIEN CLAIMS, CLASS 7 – PROJECT UNSECURED CLAIMS, OR CLASS 8 – GENERAL UNSECURED CLAIMS ACCEPT THE PLAN, THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN PURSUANT TO THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE.

**D.    Effect of Confirmation.**

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan.  Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

## XII.

## <u>CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES</u>

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan.  This discussion is based on the Internal Revenue Code, as in effect on the date of this Disclosure Statement, and on United States Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.  There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder of an Allowed Claim or Equity Interest.  The tax treatment of a holder of an Allowed Claim or Equity Interest, as the case may be, may vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and holders of an Allowed Claim or Equity Interest. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services, or persons who are not United States persons (as defined in the Internal Revenue Code).

EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. THIS DESCRIPTION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.      U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims.**

**1.      General Tax Considerations for Holders of Allowed Claims.**

The U.S. federal income tax consequences of the receipt of Plan consideration to holders of Allowed Claims may vary depending upon, among other things: the type of consideration received by the holder in exchange for its Claim, including the nature of the indebtedness owing to the holder; whether the holder has previously claimed a bad debt or worthless security deduction in respect of such holder's Claim; and whether such Claim constitutes a "security" for purposes of the reorganization provisions of the Internal Revenue Code.

As noted above, the U.S. Federal income tax consequences of the Plan to holders of Allowed Claims will depend, in part, on whether the indebtedness underlying their Claims constitutes securities for purposes of the reorganization provisions of the Internal Revenue Code. Neither the Internal Revenue Code nor the regulations thereunder define the term "securities." The determination of whether a Claim constitutes a "security" depends upon the nature of the indebtedness or obligation. Important factors to be considered include, among other things, the length of time to maturity, the degree of continuing interest in the issuer, and the purpose of the borrowing. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities. Claims for accrued interest are generally not considered securities.

**2.      Certain Other Tax Considerations for Holders of Allowed Claims.**

(a)      Bad Debt Deduction and Worthless Securities Deduction.

A holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Internal Revenue Code who receives, pursuant to the Plan, an amount of consideration that is less than such holder's tax basis in the claim in exchange of that claim, may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Internal Revenue Code, or may be entitled to a loss under section 165(a) of the Internal Revenue Code in the year of receipt.  A holder of stock or securities, the Allowed Claim with respect to which is wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Internal Revenue Code.  The rules governing the timing and amount of such deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed.  Any such loss would be limited to the holder's tax basis in the indebtedness or equity interest underlying its claim.  Holders of Allowed Claims or Equity Interests, therefore, are urged to consult their tax advisors with respect to their ability to claim such deductions.

(b)      Market Discount.

If a holder of an Allowed Claim purchased the underlying security or debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes.  Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date should be treated as ordinary income to the extent of any market discount accrued on the underlying securities or debt obligation by the holder on or prior to the date of the exchange.  Any additional accrued but unrecognized market discount should carry over to any securities or debt obligation received in a tax-free exchange pursuant to the Plan, and should be allocated among such securities or debt obligation based upon their relative fair market values as of the Effective Date.  Any gain recognized by such holder on a subsequent disposition of such securities or debt obligation received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount.

**3.      Tax Consequences to Certain Holders of Allowed Claims.**

The following summary describes the material U.S. federal income tax consequences to certain holders of Allowed Claims against the Debtors.  A holder's tax treatment may vary depending on the holder's particular situation.  All holders of Allowed Claims against the Debtors are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences of the Plan.

**B.      U.S. Federal Income Tax Consequences to Holders of Contested Claims.**

To the extent a Contested Claim is allowed, payments and distributions to the holder of such claim will be made in accordance with the provisions of the Plan governing the class of Allowed Claims to which the respective holder belongs, and will be subject to the same tax consequences that apply to the class of Allowed Claims to which the respective holder belongs.

Americas 92417336 (2K)

C.      **Tax Treatment of the Litigation Trust.**

Upon the Effective Date, the Litigation Trust shall be established for the benefit of holders of Allowed Claims, whether Allowed on or after the Effective Date.

(a)      Classification of the Litigation Trust.

The Litigation Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a disregarded entity).

However, merely establishing a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust has been structured with the intention of complying with such general criteria. In conformity with Revenue Procedure 94-45, all parties (including the Litigation Trustee and holders of Allowed Trust Claims) are required to treat, for federal income tax purposes, the Litigation Trust as a grantor trust of which the holders are the owners and grantors. The following discussion assumes that the Litigation Trust will be so respected for federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS to successfully challenge such classification, the federal income tax consequences to the Litigation Trust and the holders of Allowed Claims could vary from those discussed herein.

(b)      General Tax Reporting by the Trust and Beneficiaries.

For all federal income tax purposes, all parties must treat the transfer of the Litigation Trust Assets to the Litigation Trust as a transfer of such assets directly to the holders (including the Trust Claims), followed by the transfer of such assets by the holders to the Litigation Trust. Consistent therewith, all parties must treat the Litigation Trust as a grantor trust of which such holders are the owners and grantors. Thus, such holders (and any subsequent holders of interests in the Litigation Trust) will be treated as the direct owners of an undivided interest in the Litigation Trust Assets for all federal income tax purposes. Pursuant to the Plan, as soon as reasonably practicable, the Litigation Trustee will determine the fair market value of the Litigation Trust Assets as of the Effective Date, and all parties, including the holders, must consistently use such valuation for all federal income tax purposes, such as in the determination of gain, loss, and tax basis. The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Accordingly, each holder will be required to report on its federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Litigation Trust. *See* "Allocation of Taxable Income and Loss," below. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

61

The federal income tax reporting obligations of a holder are not dependent upon the Litigation Trust distributing any cash or other proceeds. Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Litigation Trust even if the Litigation Trust has not made a concurrent distribution to the holder. In general, a distribution of cash by the Litigation Trust to a holder will not be taxable to the holder as such holder is regarded for federal income tax purposes as already owning the underlying assets or realizing the income.

The Litigation Trustee will file with the IRS returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee will also send as soon as reasonably practicable to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct the holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. Such items generally would be reported on the holder's state and/or local tax returns in a similar manner.

## D.     Consequences to Pre-Bankruptcy Holders of Equity Interests.

Pursuant to the Plan, on the Effective Date, all Class 9 – Equity Interests will be canceled, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Class 9 – Equity Interests. Section 165(g) of the Internal Revenue Code allows a "worthless security deduction" for any security that is a capital asset and becomes worthless within the taxable year. Thus, holders of Class 9 – Equity Interests may be entitled to worthless security deductions. The authority governing the timing and amount of a worthless security deduction places considerable emphasis on the facts and circumstances of the holder, the issuer and the instrument with respect to which the deduction is claimed. Holders are therefore urged to consult their tax advisors with respect to their ability to take a worthless security deduction with respect to their Class 9 – Equity Interest.

**THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.   ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL, OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.**

## XIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

Upon evaluating numerous alternatives to the Plan, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims. The following discussion provides a summary of the analysis of the Debtors attached hereto as **Exhibit A** supporting their conclusion that a chapter 7 liquidation of the Debtors or an alternative plan of reorganization will not provide higher value to holders of Claims.

A.      **Liquidation Under Chapter 7 of the Bankruptcy Code.**

If no chapter 11 plan can be confirmed, the Chapter 11 Cases of the Debtors may be converted to a case under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  As set forth in the Liquidation Analysis attached hereto as **Exhibit A**, the Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because, among other things, the chapter 7 trustee's unfamiliarity with the Debtors, the claims against the Debtors, these Chapter 11 Cases and the relevant industry would lead to additional costs for the Estates.  Accordingly, the Debtors have determined that confirmation of the Plan will likely provide each holder of impaired Claims with at least the same recovery they would receive under a chapter 7 liquidation scenario, and, in certain cases, more.

B.      **Alternative Chapter 11 Plans.**

If the Plan is not confirmed, any other party in interest could undertake to formulate a different chapter 11 plan of reorganization.  Such a plan might involve either a reorganization and continuation of the business of the Debtors, the sale of the Debtors as a going concern, or an orderly liquidation of the properties and interests in property of the Debtors.  With respect to an alternative plan of reorganization, the Debtors believe that the Plan, as described herein, enables holders of Claims to realize the best recoveries under the present circumstances.

Americas 92417336 (2K)

# XIV.

## CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interest of all holders of Claims, and urge all such holders entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: February 2, 2017                              Respectfully submitted,

**MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC)**

By:     */s/ David Pauker*_____

       Name: David Pauker_____

       Title:  Chief Restructuring Officer_____

**ESML HOLDINGS INC.**

By:     */s/ David Pauker*_____

       Name: David Pauker_____

       Title:  Chief Restructuring Officer_____

64

# SCHEDULE 1

## LIST OF DEFINED TERMS

**Terms in this Schedule 1 are defined in the Disclosure Statement at the pages indicated below.**[28]

Affiliate Defendants ..................................................................................................................29
Algoma ....................................................................................................................................22
Algoma Offtake Agreement .......................................................................................................26
ArcelorMittal ............................................................................................................................22
ArcelorMittal Offtake Agreement ..............................................................................................26
Construction Agreements ...........................................................................................................22
Company ....................................................................................................................................1
Disclosure Statement Exhibits ...................................................................................................6
Disclosure Statement Order .......................................................................................................4
Disclosure Statement Schedules ................................................................................................6
DNR Lift Stay Motion ...............................................................................................................29
ECA ..........................................................................................................................................20
EPL ..........................................................................................................................................22
EGFL..........................................................................................................................................1
Exclusive Periods .......................................................................................................................7
Extension Motion ......................................................................................................................28
FCA ..........................................................................................................................................26
FCA Security Deposit ...............................................................................................................26
Filing Period..............................................................................................................................7
Final DIP Order ........................................................................................................................25
First State Court Action ............................................................................................................31
Great Lakes ..............................................................................................................................23
Great Lakes Appeal ..................................................................................................................23
Guggenheim .............................................................................................................................25
ICA ..........................................................................................................................................20
Liquidation Analysis ................................................................................................................55
LISA .........................................................................................................................................27
LSTK.........................................................................................................................................23
Mesabi Metallics .......................................................................................................................1
Mineral Leases .........................................................................................................................19
Minnesota.................................................................................................................................19
Motion to Extend Exclusivity ....................................................................................................7
NPUC........................................................................................................................................26
Project Finance Debt.................................................................................................................19
Project Site ...............................................................................................................................18
Protocol Order ..........................................................................................................................31
Removed Actions ......................................................................................................................31

---

[28] Certain terms listed on this Schedule 1 may also appear as defined terms in Section 1.1 of the Plan.  To the extent there is a conflict between how such terms are defined in the Disclosure Statement and how such terms are defined in the Plan, the Plan shall control.

SEC ..........................................................................................................................5
Second State Court Action.........................................................................................31
Solicitation Period......................................................................................................7
Term Loan..................................................................................................................19
Term Loan Agent.......................................................................................................19
Utility Motion ...........................................................................................................27

Americas 92417336 (2K)

**SCHEDULE 2**

**SCHEDULE OF ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**SCHEDULE 3**

**SCHEDULE OF PROJECT UNSECURED CLAIMS**

**EXHIBIT A**

**CHAPTER 7 LIQUIDATION ANALYSIS**

## Chapter 7 Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (a) accept the plan of reorganization or (b) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the applicable Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the effective date. This requirement is referred to as the "best interests" test. To make these findings, a bankruptcy court must:  (a) estimate the cash liquidation proceeds that a Chapter 7 trustee would generate if the assets of such Debtors' estate were liquidated pursuant to Chapter 7 of the Bankruptcy Code; (b) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare the holder's liquidation distribution to the distribution that the holder would receive if the plan were confirmed and consummated.

To demonstrate compliance with the "best interests" test, the Debtors estimated a range of proceeds that would be generated from a hypothetical Chapter 7 liquidation (the "**Liquidation Analysis**"). The Liquidation Analysis was prepared by the Debtors with assistance from their financial and other advisors and represents the Debtors' estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with Chapter 7 of the Bankruptcy Code. The Liquidation Analysis assumes that the Debtors' Chapter 11 cases are converted into liquidations under Chapter 7. The Liquidation Analysis assumes that the trustee will seek to liquidate the assets promptly. During this process the Debtors' estates will continue to need to use Cash Collateral and proceeds from the liquidation to operate the businesses while winding down the affairs of the estates. The Liquidation Analysis assumes the consensual use of Cash Collateral and proceeds from liquidation to permit the Chapter 7 trustee to liquidate the assets and claims during the approximately 90 days following conversion.

**The Liquidation Analysis is premised upon a number of estimates and assumptions that, although  developed and considered reasonable by the Debtors, are inherently subject to significant business, economic and competitive uncertainties beyond the control of the Debtors, and, as discussed below, may be subject to change.  Thus, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo a liquidation.  In addition, any liquidation ultimately undertaken would take place under future circumstances that cannot be predicted with certainty.  Accordingly, although the Liquidation Analysis that follows is necessarily presented with numerical specificity, if the Debtors' estates were in fact liquidated as described herein, the actual proceeds from such liquidation could vary significantly from the amounts set forth in the Liquidation Analysis.  The actual liquidation proceeds could be materially higher or lower than the amounts set forth in the Liquidation Analysis, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated from the liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code.  The Liquidation Analysis has been prepared solely for the purposes of estimating the proceeds that would be available if the Debtors liquidated under Chapter 7 of the Bankruptcy Code for purposes of the "best interests" test and does not represent values that may be appropriate for any other purpose, including the values applicable in the context of the Plan.  Nothing contained in the Liquidation Analysis is intended as or**

**constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis, as required by the "best interests" test.**

### General Assumptions

The following is a list of key assumptions that were utilized in the Liquidation Analysis:

- This Liquidation Analysis incorporates, *inter alia*, (a) information included in the Debtors' Plan (b) amounts presented in the Debtors' books and records (c) analyses performed by the Debtors and (d) a Net Forced Liquidation Value appraisal prepared by Tiger Valuation Services, LLC ("**Tiger**") as of June 24, 2016, among other information.

- The Liquidation Analysis assumes that the liquidation of the Debtors would commence after the court fails to confirm a plan, under the direction of a court-appointed Chapter 7 trustee. The Liquidation Analysis reflects the wind-down of operations and liquidation of substantially all of the Debtors' assets over a 90–day period (the "**Liquidation Period**"), during which time all of the Debtors' major assets would be sold and the cash proceeds, net of liquidation-related costs, would be distributed to satisfy claims.

- The Liquidation Analysis assumes that the Liquidation Period may not provide sufficient time to maximize value during the sale of assets of the Debtors and the Debtors' negotiation position will be weak; the assets would likely be valued and transacted upon at "distressed" levels. Liquidation values were derived by estimating proceeds from a "distressed" sale of assets that a Chapter 7 trustee might achieve. Proceeds are net of all costs assumed to be incurred.

- The Liquidation Analysis assumes that proceeds realized from a Chapter 7 liquidation would further be reduced by administrative costs incurred during the wind-down of operations, the stabilization and protection of the assets, the disposition of assets and the reconciliation of claims. These costs include professional fees, trustee fees, corporate wind down costs and post–relief date trade claims.

- The Liquidation Analysis assumes that net proceeds from the sale of the assets will be distributed in accordance with the Bankruptcy Code and that no distributions will be made to junior creditors or equity holders until all senior creditors are paid in full.

- Upon conversion of the Chapter 11 Cases to Chapter 7 liquidation, it is assumed that the Chapter 7 trustee will be permitted the use of Cash Collateral and sale proceeds for the purposes of managing a wind down and liquidation of assets.

While the Liquidation Analysis assumes liquidation over a 90–day period, it is possible that the disposition and recovery from certain assets could take longer to realize. The potential impact of litigation and actions by other creditors could increase the amount of time required to realize recoveries assumed in this analysis. Such events, including if the Chapter 7 trustee were not granted consensual use of Cash Collateral, could also add costs to the liquidation in the form of higher legal and professional fees to resolve these potential events.

The table below summarizes the estimated proceeds that would be available for distribution to the Debtors' creditors in a hypothetical liquidation of the Debtors' estates under Chapter 7 of the Bankruptcy Code. Additional assumptions with respect to the Liquidation Analysis are provided below.

| Liquidation Analysis of the Debtors' Assets | | | ($ in 000s) |
|---|---|---|---|
| | Note | Cost | Value |
| **1** **Assets** | | | |
| Land and Owner Mineral Rights | A | | $18,700 |
| Equipment & Machinery | B | | 38,500 |
| Construction Materials | C | | 6,400 |
| Mining Equipment | D | | 3,300 |
| Prepetition Lender Cash Collateral | E | | 22,300 |
| Litigation Trust | F | | 0 |
| **Est. Proceeds from Liquidation of Debtors' Assets** | | | **$89,200** |
| *Memo:* | | | |
| Proceeds Available to Mechanic's Lien Claims before Liquidation Costs | | | 41,477 |
| Proceeds Available to Secured Prepetition Lenders before Liquidation Costs | | | 47,723 |
| **Est. Proceeds from Liquidation of Debtors' Assets before Liquidation Costs** | | | **$89,200** |
| **2** **Costs Associated with Liquidation** | | | |
| Corporate Wind Down | G | 1,000 | 1,000 |
| Chapter 7 Trustee | H | 2,676 | 2,676 |
| Professionals and Administrative Costs | I | 2,000 | 2,000 |
| **Total Costs Associated with Liquidation** | | **$5,676** | **$5,676** |
| *Memo:* | | | |
| Proceeds Available to Mechanic's Lien Claims after Liquidation Costs | | | 38,838 |
| Proceeds Available to Secured Prepetition Lenders after Liquidation Costs | | | 44,686 |
| **Est. Proceeds from Liquidation of Debtors' Assets after Liquidation Costs** | | | **$83,524** |

| | Note | Claim | Allocation | Value | Recovery |
|---|---|---|---|---|---|
| **3** **Mechanic's Lien Claims** | | | | | |
| Mechanic's Lien Claims | | 74,768 | | 38,838 | 52% |
| **Proceeds Available to Secured Claims** | | **$74,768** | | **$0** | |
| **4** **Secured Claims** | | | | | |
| Project Finance Secured Claims | | 552,736 | 50% | 22,195 | 4% |
| Term Loan Secured Claims | | 409,702 | 37% | 16,451 | 4% |
| Supplier Credit Secured Claims | | 150,417 | 14% | 6,040 | 4% |
| **Total Secured Claims** | | **$1,112,855** | **100%** | **$44,686** | 4% |
| **Proceeds Available to Administrative and Priority Claims** | | | | **$0** | |
| **5** **Administrative and Priority Claims** | | | | | |
| DIP Financing Claim | J | 31,949 | | 0 | 0% |
| Priority Tax Claims | K | 9,000 | | 0 | 0% |
| Administrative Claims | L | 5,000 | | 0 | 0% |
| **Total Administrative and Priority Claims** | | **$45,949** | | **$0** | 0% |
| **Proceeds Available to Unsecured Claims** | | | | **$0** | |
| **6** **Unsecured Claims** | | | | | |
| Trade Unsecured Claims | M | 3,157 | | 0 | 0% |
| Unsecured Claims | N | 2,250,000 | | 0 | 0% |
| **Total Unsecured Claims** | | **$2,253,157** | | **$0** | 0% |
| **Residual Value after Distributions** | | | | **$0** | |

## 1) Assets

The following are assumptions with respect to specific categories of assets.

a) **Land and Owned Mineral Rights.** The Debtors own 13,985 surface acres of real property, excluding Owned Mineral Rights. Management relied on Itasca County's $18.5 million appraisal conducted by the county assessor in 2015 for the 2016 tax year. In addition to Land, the Debtors own the rights to mine 80 acres of land. Management estimated the present value of the mineral rights to be $1.2 million by discounting the anticipated future value of the mined tonnage. These values were reduced by selling costs to a net amount of $18.7 million.

b) **Equipment and Machinery.** The Debtors relied on Tiger to conduct a site inspection and appraisal of certain owned equipment and machinery located on the project site. This equipment was also categorized by the Debtors into fully and partially-installed equipment and machinery, to which Mechanic's Liens are assumed to attach, and uninstalled equipment and machinery, which is assumed to be collateral of the prepetition secured lenders. Tiger's appraisal resulted in a net forced liquidation value of approximately $35 million. In addition, the Debtors own equipment that was not appraised by Tiger. The Debtors estimate the net value of this miscellaneous equipment to be worth approximately $3.5 million.

c) **Construction Materials.** The Debtors assessed the net forced liquidation value of 54,716 short tons of project steel to be approximately $6.8 million. This is based upon price quotes obtained by management for Northern Minnesota plate and structural steel scrap of approximately $145 per short ton. This figure incorporates a 25% discount which was applied to 28,922 short tons of issued steel requiring third party demolition. These values were further reduced by selling costs to a net amount of $6.4 million.

d) **Mining Equipment.** The Debtors own one Atlas Copco drill originally purchased for $4.5 million. Based on demand in the region for used mining equipment of this type, management assessed the liquidation value to be $3.5 million. The Debtors estimate the liquidation costs to be 5% of total liquidated proceeds. These values were reduced by selling costs to a net amount of $3.3 million.

e) **Prepetition Lender Cash Collateral.** The Debtors hold $1.3 million of restricted Cash Collateral on behalf of the prepetition secured lenders. The Debtors also expect to receive approximately $21 million of net proceeds from the Great Lakes Litigation Surety Appeal Bond, which will be available to Prepetition Lenders. This Liquidation Analysis assumes the Debtors have expended all DIP financing proceeds.

f) **Litigation Trust.** The uncertain nature of litigation makes it impossible to predict the recovery and subsequent distribution to creditors of any recoveries from Causes of Action, including proceeds from the Insurance Coverage Actions. Although the Debtors believes that various Causes of Action have the prospect of generating significant

recoveries for the estate, here can be no assurance that the Litigation Trustee or a Chapter 7 trustee would be successful in the prosecution of any Causes of Action.  Accordingly, the Debtors have estimated recovery from Causes of Action as zero for purposes of this Liquidation Analysis.

The Plan provides for a Liquidation Trust to pursue all of the estates' Causes of Action, including those actions that are pledged as collateral to secured lenders, in an efficient and cost effective manner. The pursuit of those claims by a single estate representative will reduce the costs associated with litigation, reduce the potential for competing claims against the same sources of recovery and eliminate the potential for prolonged litigation about the respective rights of secured and unsecured creditors over entitlements to recoveries. In a Chapter 7 liquidation, recoveries from Causes of Action could be affected by increased litigation costs and unavailability of witnesses or documents.  For example, secured creditors might seek to foreclose on their collateral and pursue separate causes of action in competition with the Chapter 7 trustee, increasing the total spending across the litigation portfolio and giving rise to potential disputes over such matters as ownership and access to documents and information, discovery rights, allocation of proceeds of certain actions and other matters. The Plan provides for funding of litigation from Cash Collateral; in a Chapter 7 liquidation there is no source of funding and obtaining such funding could be difficult and/or costly.

Under the Plan, administrative, priority and DIP lender claims are paid by the Reorganized Debtors and as a result the proceeds of Causes of Action inure to the benefit of secured and unsecured creditors. In a Chapter 7 liquidation, recoveries to unsecured creditors would be subordinated to and reduced by (a) the claims of the DIP lender, which has a lien and a superpriority administrative expense claim on the proceeds of certain Causes of Action and (b) holders of administrative expense and priority claims, which would be entitled to receive payment prior to distributions of recoveries to unsecured creditors, including holders of unsecured deficiency claims. Finally, under the Plan certain holders of mechanics liens and project unsecured claims will receive enhanced cash distributions and as a result will not participate in recoveries from Causes of Action. In a Chapter 7 liquidation, such claims would participate in litigation recoveries, diluting litigation recoveries distributed to remaining creditors.

## 2) Costs Associated with Liquidation

The liquidation costs are assumed to be split ratably between proceeds available to Mechanic's Lien Claims and Secured Claims.

g) **Corporate Wind Down.** Corporate wind down costs include general and administrative ("**G&A**") expenses for a 90–day period. G&A costs include the retention of key management.

h) **Chapter 7 Trustee.** Fees to the Chapter 7 trustee are estimated to be 3.0% of total liquidated proceeds.

i) **Professionals and Administrative Costs.** This estimate reflects the costs of legal and financial advisors associated with a Chapter 7 liquidation assumed to be engaged by the Trustee to effectuate the liquidation plan.

## 3) Mechanic's Lien Claims

The Mechanic's Lien Claims amount used in the Liquidation Analysis are based on the Debtors' books and records. The actual amount of Allowed Claims could vary materially from these estimates. No order has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Mechanic's Lien Claims. Based on the Debtors' analysis, Mechanic's Lien Claims are assumed to attach to the Debtors' (a) Land and Owned Mineral Rights (b) fifty-percent of the Equipment and Machinery and (c) fifty-percent of the Construction Materials.

## 4) Secured Claims

The Secured Claims amounts used in the Liquidation Analysis are the Debtors' estimates based on claims that have been scheduled and filed to date by the Project Finance, Term Loan and Supplier Credit lenders. No order has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Secured Claims.

## 5) Administrative and Priority Claims

The Priority Claims amounts used in the Liquidation Analysis are estimated based on claims that have been scheduled and filed to date. Administrative Claims are based on the DIP Budget, accruals to date and internal estimates. The actual amount of Allowed Claims could vary materially from these estimates. No order has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Administrative and Priority Claims.

j) **Debtor-in-Possession Financing Claim.** The Liquidation Analysis assumes that all outstanding principal and interest pursuant to the Debtor-In-Possession Promissory Note, as amended from time to time, is paid in full upon exit under the Plan of Reorganization.

k) **Priority Tax Claims.** Priority Tax Claims include unsecured claims from the Internal Revenue Service. The actual amount of Priority Tax Claims could vary materially from this estimate. Under the Plan each holder of a Priority Tax Claim will receive full any payments in Cash in regular installments over a period ending not later than five (5) years the Petition Date.

l) **Administrative Claims.** Reflects the estimated balance of due and unpaid professional fees which were incurred during the Chapter 11 Cases.  Amounts were estimated by the Debtors based on run-rate professional fee accruals.

**6) Unsecured Claims**

The Unsecured Claims amounts used in the Liquidation Analysis are the Debtors' estimates based on claims that have been scheduled and filed to date. The amount includes as a deficiency claim the full amount of the Prepetition Lenders' Secured Claims, the ArcelorMittal claim at the amount asserted and excludes claims asserted by affiliates. The actual amount of Allowed General Unsecured Claims could vary materially from these estimates. No order has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Allowed General Unsecured Claims.

m) **Trade Unsecured Claims.** The Liquidation Analysis estimates the Trade Unsecured Claims have a total claims amount of $3.2 million against the Debtors, based on the Debtors' books and records. Under the Plan of Reorganization, in the event the DNR does not object to the Plan, certain claims against affiliates of approximately $17 million would be assumed by the Debtors.

n) **Unsecured Claims.** The Liquidation Analysis estimates the General Unsecured Claims have an initial claims amount of approximately $2.25 billion, based on the Debtors' books and records and claims that have been scheduled and filed to date. The amount includes as a deficiency claim the full amount of the Prepetition Lenders Secured Claims, the ArcelorMittal claim at the amount asserted and excludes claims asserted by affiliates. The actual amount of Allowed General Unsecured Claims could vary materially from these estimates.

**EXHIBIT B**

## <u>CHAPTER 11 PLAN</u>

**EXHIBIT C**

**<u>DISCLOSURE STATEMENT ORDER</u>**

**EXHIBIT D**

**<u>FINANCIAL PROJECTION AND ASSUMPTIONS</u>**