**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS) |
|  | (Jointly Administered) |
| Debtors. |  |

**DECLARATION OF DAVID PAUKER, CHIEF RESTRUCTURING OFFICER, IN
SUPPORT OF CONFIRMATION OF THE DEBTORS' THIRD AMENDED
CHAPTER 11 PLAN OF REORGANIZATION**

I, David Pauker, hereby declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that to the best of my knowledge and belief, and after reasonable inquiry, the following is true and correct:

1.    I am the Chief Restructuring Officer ("**CRO**" or "**Chief Restructuring Officer**") of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("**Mesabi**") and ESML Holdings Inc. (together with Mesabi, the "**Debtors**").  I submit this declaration in support of the *Debtors' Memorandum of Law in Support of Confirmation of Third Amended Chapter 11 Plan of Reorganization* (the "**Confirmation Brief**"), filed contemporaneously herewith and the confirmation of the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 990] (as may be amended or otherwise supplemented, the "**Plan**").[2]

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

[2] Where the context requires, each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such term in the Plan.

Americas 92706730

2.      Except as otherwise noted, all statements herein are based upon my personal knowledge or opinion, as obtained from the Debtors' employees and advisors or developed in the ordinary course of my responsibilities as the Debtors' CRO, and through my previous experience, described below.  I am authorized to submit this Declaration on behalf of the Debtors, and if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## Professional Background and Experience

3.      I have more than 25 years of experience as a restructuring advisor and turnaround manager in a broad array of industries, and have frequently acted as trustee, examiner, or other independent fiduciary, or as a manager or advisor to such independent fiduciaries.  Prior to my role as the Debtors' CRO, I was the Executive Managing Director of Goldin Associates, a nationally recognized turnaround management and restructuring advisory firm, where I headed its management and advisory practice.

4.      I have acted as Chief Restructuring Officer, Chief Executive Officer, or turnaround manager for numerous operating companies under bankruptcy protection, including: Young Broadcasting, Refco, Vlasic Foods/Swanson Frozen Foods, and others.  I was appointed to the Board of Directors of Reorganized Lehman Brothers, and have been Chairman of the Board's Committee for Claims and Legal Affairs since the company emerged from bankruptcy in 2012.  In such capacity, I was responsible for overseeing the review and reconciliation of claims in the largest bankruptcy in U.S. history.  I am a Fellow of the American College of Bankruptcy.  I hold a J.D. from Columbia University and a Bachelor of Science from Cornell University.

5.      I was appointed as the Debtors' CRO in these Chapter 11 Cases as of August 1,

2

2016.  In my role as CRO, I am vested with a broad range of responsibilities to maximize recoveries for the Debtors' stakeholders and creditors and to manage financial, legal, and operational matters for the Debtors, including negotiations with creditors, financing parties, and other stakeholders and counterparties.  As the Debtors' CRO, I have significant knowledge regarding the Debtors and the unique circumstances of these Chapter 11 Cases.  Specifically, my familiarity with the Debtors and these Chapter 11 Cases is based upon my review of the Debtors' books and records kept in the ordinary course of the Debtors' business, my extensive discussions with the Debtors' management team on a day-to-day basis regarding the Debtors' operations, business, and financial affairs, my participation in numerous meetings and conferences with the Board of Governors and the Debtors' retained professionals Debtors' advisors, the Plan Sponsor and its advisors, and the key constituencies regarding the negotiation, formulation, and development of the Plan.  As a result, I am familiar with the Plan and the terms and provisions thereof.

6.      I have also worked with the Debtors' retained professionals and the Plan Sponsor and its advisors to assist the Debtors with all aspects of their Chapter 11 Cases and help advance a path toward a successful emergence from chapter 11.

### Overview of the Plan

7.      The Plan is the product of months of extensive negotiations among the Debtors, the Prepetition Lenders, the DIP Lender, the Committee, the Plan Sponsor, and other key constituencies.  The Plan represents a constructive resolution of the various issues in these cases among the Prepetition Lenders, the Committee, and the DNR.  Given the support of the Prepetition Lenders, the Plan Sponsor, the DNR, the Committee and the Holders of General Unsecured Claims, the Holders of Mechanic's Lien Claims, the Holders of Other Secured

3

Claims, the Holders of Project Unsecured Claims, and the Holders of Convenience Claims, the Debtors are optimistic that they will emerge from chapter 11 expeditiously and will execute on the business plan contemplated by Chippewa Capital Partners, LLC (the "**Plan Sponsor**" or "**Chippewa**").   Such an outcome is in the best interests of the Debtors and all of their stakeholders.

8.   Based on information from the Debtors' advisors and my own personal knowledge, I believe that the Plan should be confirmed.  Specifically, I believe, among other things, that (a) the Plan is feasible, (b) the Debtors' assumption, rejection, and/or settlement and modification of certain executory contracts and unexpired leases, particularly the DNR Leases, is appropriate, and (c) the transactions contemplated in the Plan are in the best interests of the Debtors, their estates, and all Holders of claims and interests.

## Significant Events During the Chapter 11 Cases

9.   On July 8, 2016 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 the Bankruptcy Code, thereby commencing the Chapter 11 Cases, jointly administered as *In re Essar Steel Minnesota LLC and ESML Holdings Inc.,* Case No. 16-11626 (BLS).   Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

10.   When the Debtors filed the original plan on February 2, 2017 [D.I. 690] and the first amended plan on March 14, 2017 [D.I. 791], the plan sponsor was presumptively SPL Advisors, LLC, which also provided debtor-in-possession financing for the Debtors.  To market test the transactions contemplated in the Plan and provide an opportunity for competing offers

Americas 92706730

for some or all of the Debtors, the Debtors sought the approval of certain bid procedures (as amended from time to time, the "**Bid Procedures**") in connection with the Plan.    After significant negotiations among the parties, the Bid Procedures were submitted under certification of counsel and approved by the Court on April 12, 2017 [D.I. 887].

11.    Having received qualified bids, the Debtors scheduled and conducted an auction (the "**Auction**") on April 26, 2017 at 9:30 a.m. (Prevailing Eastern Time), pursuant to the Bid Procedures.    At the conclusion of the Auction, the Debtors, in consultation with the Prepetition Lenders and the Committee, selected Chippewa's proposal as the prevailing Successful Bid (as defined in the Bid Procedures), thereby designating Chippewa as the new Plan Sponsor.

12.    Since the Auction and during the pendency of the Chapter 11 Cases, the Debtors have worked hard to resolve issues and potential objections to the Plan by various parties.    I have been actively involved in and have led many extensive, arm's-length discussions and negotiations among the parties.

13.    At this time, after extensive efforts and cooperation among the principal constituencies in these cases, all objections or potential objections to the Plan have been resolved and are consistent with the terms and requirements of the Bankruptcy Code.    The Plan and the transactions contemplated thereunder are proposed in good faith and, as set forth below and in the Confirmation Brief, satisfy each requirement for confirmation.    The Plan is in the best interest of the Debtors' Estates and will result in a superior recovery for stakeholders than liquidation.

Americas 92706730

## I.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code Pursuant to Section 1129(a)(1) of the Bankruptcy Code

### A.    The Plan Properly Classifies Claims and Interests as Required under Sections 1122 and 1123(a)(1) of the Bankruptcy Code

14.    Article II of the Plan designates the separate classes of Claims and Equity Interests created by the Plan that require classification.  Under Articles II and IV of the Plan, each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within such class.

15.    Valid business, legal, and factual reasons exist for the separate classification of each of the classes of Claims and Equity Interests created under the Plan, and such classes do not unfairly discriminate between or among Holders of Claims or Equity Interests.  For example, secured Claims are classified separately from unsecured Claims because the Debtors' obligations with respect to the former are secured by collateral.  Prepetition Lender Claims are further grouped into classes based on, for instance, the relative priority of such Claims and the governing credit documents, if applicable, under which each Claim arises.  Accordingly, based on my knowledge and experience, as well as the advice and guidance provided to me by the Debtors' advisors, I believe that the Plan's classification scheme satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

### B.    The Plan Specifies Unimpaired and Impaired Classes and Provides the Same Treatment to Each Holder in a Particular Class as Required under Sections 1123(a)(2)-(4) of the Bankruptcy Code

16.    Articles III and IV of the Plan provide for, among other things, the following: (a) designated classes of Claims and Equity Interests; (b) specified treatment of classes of unimpaired Claims and Equity Interests; (c) specified treatment of classes of impaired Claims and Equity Interests; and (d) the same treatment for each Claim or Equity Interest within a particular class.  Holders of Claims in Class 1 were not entitled to vote on the Plan because such

6

Holders are entitled to a full satisfaction of their Claims pursuant to the Plan and, accordingly, are conclusively presumed to have accepted the Plan. Class 8 was not entitled to vote on the Plan because such Holders receive no distribution under the Plan and, accordingly, are deemed to reject the Plan. Moreover, the treatment of each Claim or Equity Interest within a class is the same as the treatment of each other Claim or Equity Interest in such class (or, for unimpaired classes, will likewise result in the creditor being unimpaired). I believe, based on my knowledge of the Plan, my experience in these matters, and the advice and guidance provided to me by the Debtors' advisors, that the Plan's classification scheme and treatment is proper and satisfies sections 1123(a)(2)-(4) of the Bankruptcy Code.

**C.    The Plan Provides for Adequate Means of Implementation in Compliance With Section 1123(a)(5) of the Bankruptcy Code**

17.    Articles VII of the Plan sets forth numerous provisions to facilitate implementation of the Plan. Those provisions relate to, *inter alia*, the issuance of Equity Securities, the issuance of New Membership Interests, the issuance of the Prepetition Lender Notes and the Prepetition Lien Trade Creditor Notes, the joint operations of the Reorganized Debtor and ERPI, the appointment of the Disbursing Agent, the implementation of a Post-Emergence Trade Agreement Procedure, and the approval of compensation arrangements for the Debtors' post-Effective Date officers and employees. Based on my knowledge of the Debtors and the advice and guidance provided to me by the Debtors' advisors, that Articles VII and VIII and various other provisions of the Plan and related documents provide adequate means for the Plan's implementation and, therefore, satisfies section 1123(a)(5) of the Bankruptcy Code.

**D.    The Plan Prohibits the Issuance of Non-Voting Securities in the Reorganized Debtor as Required by Section 1123(a)(6) of the Bankruptcy Code**

18.    The Debtors are not issuing any nonvoting securities. Based on my knowledge

7

and the advice and guidance provided to me by the Debtors' advisors, I believe that the Plan and related Plan Documents comply with section 1123(a)(6) of the Bankruptcy Code.

   **E.**    **The Plan Provides for the Designation of Directors and Officers in Compliance With Section 1123(a)(7) of the Bankruptcy Code**

   19.    As set forth in Sections 7.11, 7.12, and 8.4 of the Plan, I believe the Plan's provisions are consistent with the interests of creditors and equity security holders with respect to the manner of selection of any officer, director, or trustee under the Plan.  Section 7.11 provides that the New Board shall be comprised of up to seven (7) governors appointed by the Plan Sponsor, and also that the New Board will continue to serve as such until replaced or removed in accordance with the New Governing Documents, or until any such individual's voluntary resignation.  Section 7.12 provides that, unless the Plan Sponsor determines otherwise, the existing officers of Mesabi shall serve initially in the same capacities after the Effective Date for the Reorganized Debtor until replaced or removed in accordance with the New Governing Documents or company policy, or until any such individual's voluntary resignation.  Finally, Section 8.1 of the Plan provides that the SC Litigation Trustee shall be Bradley E. Scher, unless the SC Litigation Trust Pre-Effective Date Committee unanimously selects someone else no later than five (5) days prior to the Effective Date, and Sections 8.1 and 8.4 of the Plan provide for the selection of the UC Litigation Trustee by the UC Litigation Trustee Selection Committee. Accordingly, based on my knowledge and understanding of the Plan and Plan Documents, as well as the advice and guidance provided to me by the Debtors' advisors, I believe that the manner of selecting the directors and officers of the Reorganized Debtor under the Plan and the disclosure provided for in the Plan and the applicable Plan Document satisfies section 1123(a)(7) of the Bankruptcy Code.

F.    **The Plan Provides for the Assumption and Rejection of Executory Contracts and Unexpired Leases in Compliance With Section 1123(b)(2) of the Bankruptcy Code**

20.    Article XII of the Plan proposes appropriate treatment for executory contracts and unexpired leases, as permitted by section 365 of the Bankruptcy Code. The Debtors have exercised their sound business judgment in all of their decisions regarding rejection, assumption, and assumption and assignment of executory contracts and unexpired leases under the Plan. I, with the Debtors' management team, have identified and together approved the decisions to assume or reject executory leases until now. I believe such contracts and leases, especially the Mineral and Surface Leases, are necessary to the Reorganized Debtor's business operations after the Effective Date. In contrast, I believe that the contracts that the Debtors seek to reject are burdensome and of inconsequential value to the Estates. Additional decisions with respect to assumption or rejection will be made by or in consultation with the Plan Sponsor.

21.    Section 12.2 of the Plan constitutes a motion to assume the Mineral and Surface Leases pursuant to sections 365(a) and (b) of the Bankruptcy Code. A notice of the proposed assumption was filed on February 2, 2017 [D.I. 692]. I understand that pursuant to Section 12.2 of the Plan, the Debtors will post letters of credit (or similar financial guarantees) for $5 million to secure the payment of any cure amounts due under the Mineral and Surface Leases, as determined by the Bankruptcy Court or agreed upon by the parties prior to the Effective Date. I further understand that the Plan expressly provides that $4 million of those guarantees would be exclusively for the benefit of the DNR and the remaining $1 million for the benefit of the other non-DNR lessors to the Mineral and Surfaces Leases. I am informed that the Plan Sponsor has negotiated a deal with the DNR for the assumption of the DNR Leases, as modified. Based on my knowledge and the advice and guidance provided to me by the Debtors' advisors, I believe

9

that the Plan complies with section 1123(b)(2) of the Bankruptcy Code.

**G.      The Plan Complies With Section 1123(b)(6) of the Bankruptcy Code**

22.      Section 7.14 of the Plan provides that the Debtors' tail coverage under the prepetition D&O Insurance Policies remain in full force and effect.  Section 7.14 of the Plan further provides that the Debtors shall purchase tail coverage for $20 million of their postpetition D&O Insurance Policies for a term ending six years after the Effective.  I believe the D&O tail coverage is reasonable, necessary, and appropriate.

23.      Section 14.5 of the Plan (the "**Exculpation**") provides that the Debtors, the Reorganized Debtor, the Committee or any of their respective officers, directors, governors, employees, Professional Persons, or successors and assigns will have or incur any liability to any Person for any act or omission in connection with, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the implementation or administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, gross negligence, or fraud as finally determined by the Bankruptcy Court, and, in all respects shall be entitled to rely upon the advice of counsel and all information provided by other exculpated persons herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under the Plan.  The Exculpation shall only be applicable to any prepetition officers, directors, governors, or employees of the Debtors or the Reorganized Debtor who are employed by the Debtors as of the Confirmation Date.

24.      I believe, and have been informed by the Debtors' advisors, that the Exculpation is necessary because it is integral to the success of the Plan and the restructuring transactions underlying the Plan, as evidenced by the facts and circumstances of the Chapter 11 Cases, and is

10

served and continues to serve a significant role in facilitating good-faith, arms'-length negotiations among the Debtors and their constituencies.  I believe exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.

25.     Therefore, based on my knowledge and the advice and guidance provided to me by the Debtors' advisors, I believe that the Plan's provisions regarding the D&O Liability Insurance and the Exculpation are appropriate and consistent with all relevant permissible provisions of the Bankruptcy Code.

## II.     The Plan Complies With the Applicable Provisions of the Bankruptcy Code Pursuant to Section 1129(a)(2) of the Bankruptcy Code

26.     For all of the reasons set forth herein, I believe that the Debtors, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code.  Specifically, the Debtors have complied with notice, disclosure and solicitation requirements of the Plan under sections 1125 and 1126 of the Bankruptcy Code.  The Debtors, each of their respective current or former officers, directors, members, employees, agents, representatives, advisors, and attorneys, have all acted in "good faith" and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Plan.

27.     Accordingly, based on my knowledge and the advice and guidance provided to me by the Debtors' advisors, I believe that the Debtors have complied with the requirements of section 1129(a)(2) of the Bankruptcy Code.

## III.     The Debtors Have Proposed the Plan in Good Faith and the Plan Complies With Section 1129(a)(3) of the Bankruptcy Code

28.     I believe that the Debtors proposed the Plan in good faith and not by any means

Americas 92706730

forbidden by law.  It is my opinion that the Plan promotes and achieves the rehabilitative and reorganizational goals of the Bankruptcy Code by restructuring the Debtors' business affairs and preventing the adverse economic effects associated with the disposing of assets at liquidation value.  Moreover, the Plan is the product of extensive arms'-length negotiations among the Debtors, the Prepetition Lenders, the Committee, and other key constituencies.  Therefore the Plan provides the Debtors' creditors with the best possible recovery under the circumstances. Finally, the Plan complies with bankruptcy and applicable non-bankruptcy law.  It is my opinion that the Plan has been proposed in good faith and thus satisfies section 1129(a)(3) of the Bankruptcy Code.

**IV.    The Plan Provides that Debtors' Payment of Professional Fees and Expenses Is Subject to Court Approval in Compliance With Section 1129(a)(4) of the Bankruptcy Code**

29.    Pursuant to Section 5.2 of the Plan, each Professional Person who holds or asserts a Fee Claim is required to file with the Bankruptcy Court, and serve upon all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date and any fees requested in a Fee Application are payable only to the extent approved by the Court.  Based on my knowledge and the advice and guidance provided to me by the Debtors' advisors, I believe that the Plan therefore satisfies section 1129(a)(4) of the Bankruptcy Code.

**V.    The Debtors Have Disclosed or Will Disclose All Necessary Information Regarding Directors, Officers, and Insiders as Required by Section 1129(a)(5) of the Bankruptcy Code**

30.    Section 7.11 of the Plan provides a procedure for the appointment of up to seven (7) governors to comprise the New Board, with the final designation of such governors to be made in a filing with the Bankruptcy Court no later than five (5) days prior to the Effective Date. Section 7.12 of the Plan provides that, unless the Plan Sponsor determines otherwise, the existing

12

officers of Mesabi shall continue in such positions with the Reorganized Debtor until replaced or removed in accordance with the New Governing Documents or company policy, or until any of such individual's voluntary resignation.  Finally, Sections 8.1 and 8.4 of the Plan govern the appointment of the Litigation Trustees and Section 8.13 of the Plan and the SC Litigation Trust Agreement and the UC Litigation Trust Agreement, submitted as Plan Documents, govern the reasonable compensation of each respective Litigation Trustee.  Accordingly, based on my knowledge and the advice and guidance provided to me by the Debtors' advisors, I believe that the director, officer, insider, and other related disclosures provided for in the Plan and the Plan Documents satisfies section 1129(a)(5) of the Bankruptcy Code.

## VI.    The Plan Does Not Provide for Any Rate Changes in Compliance With Section 1129(a)(6) of the Bankruptcy Code

31.    Pursuant to Section 14.20 of the Plan, the Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.  As such, I understand that section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

## VII.    Confirmation of the Plan Is in the Best Interests of Creditors in Compliance With Section 1129(a)(7) of the Bankruptcy Code

32.    To determine the respective value of distributions (if any) that Holders of Claims and Equity Interests would receive on account of such Claims if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code, I caused and directed the Debtors, with the assistance of their advisors, to prepare the liquidation analysis that was filed as Exhibit A to the Disclosure Statement [D.I. 793] (the "**Liquidation Analysis**").  The Liquidation Analysis was completed and developed under my direct supervision with the involvement of members of the Debtors' management, the Debtors' employees, and the Debtors' professionals.  I am familiar

13

with the methods and assumptions used and the conclusions reached in the preparation of the Liquidation Analysis, and believe they are generally consistent with those used in other chapter 11 cases.   The Liquidation Analysis represents the Debtors' best estimate of recovery values and percentages to stakeholders in a hypothetical chapter 7 liquidation.

33.     The Liquidation Analysis describes a hypothetical distribution of the Debtors' assets to satisfy outstanding claims by means of a chapter 7 liquidation, rather than what is currently contemplated in the Plan.  The Liquidation Analysis was based on a variety of assumptions, which are detailed in the notes to the Liquidation Analysis, including my reliance on a Net Forced Liquidation Value appraisal of certain equipment and machinery prepared by Tiger Valuation Services, LLC, as of June 24, 2016 (the "**Tiger Appraisal**").   Based on my experience, I believe the assumptions used are reasonable under the circumstances.

34.     As described above, the Liquidation Analysis involved extensive use of estimates and assumptions that, while considered reasonable by me and the Debtors' management and advisors, are inherently subject to significant business, economic and competitive uncertainties beyond the control of the Debtors.

35.     As set forth in the Liquidation Analysis, recoveries to impaired creditors under the Plan greatly exceed the amounts such parties would receive in a liquidation.  Specifically, based on the assumptions and information in the Liquidation Analysis and the accompanying notes: (a) a chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by Holders of Claims in the Chapter 11 Cases; (b) the recoveries to impaired classes (other than Equity Interests) under the Plan will be significantly better under the Plan than they would under a chapter 7 liquidation; (c) in a hypothetical chapter 7 liquidation, Holders of Claims other than the Mechanics' Lien Claims and the Prepetition Lender Claims would

14

receive no recoveries (other than potential litigation recoveries); and, (d) the recoveries to the Mechanics' Lien Claims in a liquidation would be approximately 52% of the full of their claims and the Holders of the Prepetition Lender Claims would recover a mere 4% of the value of their claims.  The Liquidation Analysis indicates that the net proceeds available from liquidation of the Debtors' assets after accounting for liquidation costs would total approximately $83.5 million.  The consideration to be distributed under the Plan far exceeds that amount because of the incremental "going-concern" value created through reorganization.  In a liquidation, the mineral leases, environmental permits and building permits that the Debtor needs to reorganize would be terminated and that value would be lost.  Accordingly, it is my opinion that a liquidation under chapter 7 as set forth in the Liquidation Analysis would profoundly and adversely affect the ultimate proceeds available for distribution to all Holders of Allowed Claims in the Chapter 11 Cases.

36.     The Plan distributes the highest and best value available to creditors.  The values under the Plan were subject to a market test at the Auction and represents the best offer for the Debtors' assets from a potential plan sponsor or purchaser of the assets.

37.     Accordingly, I believe the "best interests" test of section 1129(a)(7) is satisfied as to all impaired classes of Claims and Equity Interests.

## VIII.   The Plan Complies With Section 1129(a)(8) of the Bankruptcy Code

38.     I understand that Class 1 – Priority Claims are not impaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

39.     I further understand that all of the impaired classes of Claims that are entitled to vote have accepted the Plan.  Specifically, the following classes have all voted to accept the Plan:

Americas 92706730

Class 2 – Prepetition Lender Secured Claims, Class 3 – Mechanic's Lien Claims and all subclasses within Class 3 (i.e., Classes 3A-3LL), Class 4 – Other Secured Claims, and all subclasses within Class 4 (i.e., Classes 4A-4C), Class 5 – Project Unsecured Claims, Class 6 – General Unsecured Claims, and Class 7 – Convenience Claims, as described in the *Revised Declaration of Jane Sullivan on Behalf of Epiq Bankruptcy Solutions, LLC, Regarding Voting and Tabulation of Ballots Cast on the First Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc., as Amended* (the "**Voting Certification**") [D.I. ___]. Class 8 – Equity Interests is deemed to have rejected the Plan. With respect to such rejecting class, section 1129(a)(8) has not been satisfied. I believe the Plan is still confirmable, however, because it satisfies the nonconsensual confirmation provisions of section 1129(b) as set forth below.

## IX.    The Plan Satisfies Section 1129(a)(9) of the Bankruptcy Code

40.    Article V of the Plan treats the administrative priority claims and unsecured priority claims identified above in a manner consistent with the Bankruptcy Code. Among other things, on the Plan Distribution Date, each Holder of an Allowed Administrative Claim shall receive (i) the amount of such Holder's Allowed Administrative Claim in one Cash payment or (ii) such other treatment as may be agreed upon in writing by the Debtors and such Holder; *provided*, that such treatment shall not provide a return to such Holder having a present value as of the Effective Date in excess of such Holder's Allowed Administrative Claim. Section 4.1 of the Plan provides that Priority Claims are unimpaired and will be paid in full and in Cash on the Plan Distribution Date as required by section 1129(a)(9)(B) of the Bankruptcy Code, except for Allowed Tax Claims.

41.    With respect to Allowed Tax Claims, the Plan provides that each Holder of an

Allowed Tax Claim will receive, in full satisfaction of such Allowed Tax Claim: (i) payments in Cash, in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) a lesser amount in one Cash payment may be agreed upon in writing by such Holder and the Debtors; or (iii) such other treatment agreed upon in writing by such Holder; *provided*, that such agreed upon treatment may not provide such Holder with a return having a present value as of the Effective Date that is greater than the amount of such Holder's Allowed Tax Claim.  I believe this treatment is consistent with the requirements of section 1129(a)(9)(C), and that therefore section 1129(a)(9) of the Bankruptcy Code is satisfied.

**X.      At Least One Impaired, Non-Insider Class of Claims Accepted the Plan in Compliance With Section 1129(a)(10) of the Bankruptcy Code**

42.      As evidenced in the Voting Certification, Holders of Claims in Class 2, Classes 3A-3LL, Class 4A-4C, Class 5, Class 6, and Class 7, which are impaired classes under the Plan, voted to accept the Plan independent of any insiders' votes.  Based on the advice and guidance provided to me by the Debtors' advisors, I believe the Plan satisfies section 1129(a)(10) of the Bankruptcy Code because at least one of the impaired class of Claims has voted to accept the Plan, without including any acceptance of the Plan by insiders.

**XI.      The Feasibility Requirement of Section 1129(a)(11) of the Bankruptcy Code**

43.      I understand that to satisfy the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization, of a debtor or any successor to such debtor.

44.      A discussion regarding the satisfaction of the feasibility requirement will be provided by the testimony in support of confirmation of the Plan by (i) Adam M. Rosen of B.

17

Riley & Co, LLC, Financial Advisor to ERP Iron Ore, Inc. and Chippewa Capital Partners, LLC, (ii) Robb J. Bigelow, Managing Director of ERP Iron Ore, Inc., and (iii) Thomas M. Clarke of Chippewa Capital Partners, LLC.

45.     In order for the Plan to become effective, the Debtors and the Plan Sponsor must conclude arrangements to finance the Project.  The testimonies of Adam Rosen, Robb J. Bigelow, and Thomas M. Clarke will provide in more detail the efforts underway to conclude the debt financing prior to confirmation and the confidence of the Plan Sponsor's financial advisor in the success of those efforts.  The Plan Sponsor has raised $250 million of equity financing for the Reorganized Debtor.  The Plan Sponsor has previously closed on the purchase of iron ore production facilities nearby those of the Debtors.  The Plan Sponsor has already committed $10 million to finance the Debtors through their reorganization and, following entry of the Confirmation Order, will commit an additional $5 million to provide assurance to mineral lessors and additional funds to finance the Debtors through the Effective Date.  The Plan Sponsor has identified the source of its $250 million of equity financing.  For all of these reasons, I believe that the Debtors and the Plan Sponsor will successfully close the exit financing required to consummate the Plan.  Moreover, the closing of such financing will constitute a market test of new lenders' confidence in Debtors' and Plan Sponsor's projections and assumptions.  For these reasons, I believe the Plan is feasible and, once consummated, is not likely to be followed by a liquidation.

XII.    **All Statutory Fees Have Been Paid or Will Be Paid in Compliance With Section 1129(a)(12) of the Bankruptcy Code**

46.     Section 14.1 of the Plan provides (i) for the payment of all Statutory Fees by the Debtors on or before the Effective Date and (ii) post-Effective Date payment of all Statutory Fees by the Reorganized Debtors.  To the best of my knowledge, all such fees have been paid or

18

will be paid when due.

## XIII.    The Plan Complies With Section 1129(b) of the Bankruptcy Code

### A.    The Plan Is Fair and Equitable and Does Not Unfairly Discriminate With Respect to the Dissenting Classes

47.    I understand that to "cram down" the Plan on the non-accepting, impaired classes, the Plan must not discriminate unfairly and must be "fair and equitable" with respect to such classes.

48.    Holders of interests in Class 8 –Equity Interests are not entitled to any recovery under the Plan and are thus deemed to reject the Plan.  Although Class 8 is deemed to reject the Plan, I believe the Plan does not discriminate unfairly, and is fair and equitable with respect to all classes of Claims and Equity Interests.

49.    With respect to Class 8 – Equity Interests, no Holder of any interest junior to Holders of Class 8 – Equity Interests is entitled to any recovery under the Plan, and multiple classes of Claims senior to Class 8 are not receiving a full recovery with respect to their Claims under the Plan.

50.    I believe, based on my knowledge and the advice and guidance provided to me by the Debtors' advisors, the Plan meets the requirements of section 1129(b) to confirm the Plan over the rejection by Class 8.

51.    Based on the treatment described above, on my knowledge, and on the advice and guidance provided to me by the Debtors' advisors, I believe the Plan is confirmable pursuant to the terms of section 1129(b) of the Bankruptcy Code.

## XIV.    The Plan Complies With Section 1129(c) of the Bankruptcy Code

52.    The Plan is the only chapter 11 plan for which the Debtors are seeking confirmation in these Chapter 11 Cases.  Accordingly, based on my knowledge and the advice

Americas 92706730

and guidance provided to me by the Debtors' advisors, I believe that the Plan satisfies section 1129(c) of the Bankruptcy Code.

## XV.   The Plan Complies With Section 1129(d) of the Bankruptcy Code

53.   The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933, but rather, as discussed above, the purpose of the Plan is to, among other things, enable the Debtors to effectuate a value maximizing restructuring and perform successfully in their highly competitive iron-ore industry.  Accordingly, I believe, based on my knowledge and the advice and guidance provided to me by the Debtors' advisors, that the Plan satisfies section 1129(d) of the Bankruptcy Code.

## XVI.   Post-Confirmation Arrangements

54.   Following Plan confirmation, the Debtors and Plan Sponsor will be working in partnership to effect the transactions contemplated in the Plan as quickly as possible.  The Debtors and Plan Sponsor have facilities and employees close to each other on the Mesabi Iron Ore Range and those operations and employees will ultimately work together as affiliates for their mutual benefit.  Following confirmation, each enterprise will have an interest in furthering the success of the other.  During that period there will be opportunities to enter into arrangements or transactions between the Debtors and Plan Sponsor to their mutual benefit, in support of the transition and in furtherance of the implementation of the Plan.  This could include job sharing or other arrangements.  To that end, I anticipate entering into at least some such arrangements between confirmation and consummation of the Plan, the purpose of which will be to save or share certain costs, capture synergies among the businesses and the like.  Any such arrangements will be in the interest of the Estates, will not add to the cost of administration, will require reimbursement to the Estates of any expenditure that is primarily for the benefit of the Plan

20

Sponsor, and will not place the Estates at risk with respect to actions that might need to be taken in the unlikely event that the Plan could not be consummated. Accordingly, the proposed Confirmation Order includes the authorization to enter into such arrangements.

## XVII. Conclusion

55. Based on the foregoing, I believe that the Plan, as developed by the Debtors, maximizes value for all stakeholders and complies with all of the requirements of sections 1122, 1123 and 1129 of the Bankruptcy Code. As a result, I believe that the Plan is in the best interests of creditors and should be confirmed by the Bankruptcy Court.

Dated: June 9, 2017

By: _____
David Pauker, CRO
Mesabi Metallics Company LLC and
ESML Holdings, Inc.,
*Debtors and Debtors in Possession*