## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ESSAR STEEL MINNESOTA LLC and | ) | Case No. 16-11626 (BLS) |
| ESML HOLDINGS INC., [1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| SC MESABI LITIGATION TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| CENTRAL BANK OF INDIA, AND | ) | |
| EXPORT IMPORT BANK OF INDIA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## COMPLAINT TO AVOID FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548 AND 550; OBJECT TO CLAIM NOS. 144 AND 154; AND AVOID ALL LIENS RELATED TO SUCH TRANSFERS AND CLAIMS

Bradley E. Scher, in his capacity as Litigation Trustee of the SC Mesabi

Litigation Trust (the "Plaintiff"), as successor in interest to Essar Steel Minnesota LLC d/b/a

Mesabi Metallics Company LLC and ESML Holdings Inc. ("ESML," or the "Debtors"), debtors

and debtors in possession in the above-captioned jointly administered chapter 11 cases, hereby

brings this complaint (the "Complaint"), including for fraudulent transfer, avoidance of liens,

objection to claims, equitable subordination, and declaratory relief, against Central Bank of India

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

and Export Import Bank of India (the "SC Lenders" or the "Defendants"), and alleges, on

personal knowledge as to his own actions and on information and belief as to the actions of

others, as follows:

## NATURE OF THE ACTION

1.     The Debtors are wholly owned subsidiaries of Essar Global Fund Limited

("Essar Global"), a large, multinational enterprise that controls many businesses in an array of

industries.  Essar Global acquired ESML to build and own a large-capacity, state-of-the-art iron

ore mine and pellet plant to be constructed in Nashwauk, Minnesota (the "Project").  Essar

Global and its affiliates, including Essar Projects (India) Limited ("EPIL"), orchestrated and

directed every material aspect of ESML's business.

2.      From 2008 to 2016, ESML paid Essar Global and its various affiliates

over $1.1 billion to complete the Project – everything it was obligated to spend under the

governing contracts related to construction of the Project (the "Project Contracts").  But, as of

the Petition Date, ESML was left with a half-completed iron ore pellet plant that will cost

hundreds of millions of dollars more to finish; and ESML is burdened with over a billion dollars

in claims asserted against it that are directly attributable to the failures of Essar Global and its

numerous affiliates (the "Essar Affiliates") to fulfill their obligations with respect to the Project.

These circumstances resulted from a course of conduct in which ESML was treated as if it

existed solely for the benefit of the Essar Global enterprise, without regard for ESML's interests

or its creditors.

3.     Obtaining sufficient financing was critical to the Project's success.  EPIL,

was to provide a key piece of that financing, and EPIL independently arranged for financing with

the SC Lenders.  The Project was a massive failure due, in large part, to EPIL's failure to

perform its promises.  EPIL committed numerous serious and substantial breaches of its contract

with ESML, failing to provide ESML with anything close to reasonably equivalent value in

exchange for payments it received from ESML.  Specifically, EPIL (i) failed to provide

equipment, (ii) provided valueless defective equipment, (iii) failed to complete required

engineering services, (iv) provided deficient engineering services, and (v) failed to secure the

requisite supplier credit financing by, among other things, accepting inadequate financing in

rupees.  As a result of EPIL's serial and material breaches, EPIL is left with no valid contract

rights to enforce against the Debtors.

        4.       The liens and claims of the SC Lenders at issue here are wholly derivative

of the liens and claims of EPIL.  The SC Lenders never advanced funds or a loan to either

Debtor.  Rather, ESML contracted with EPIL to provide engineering and offshore procurement

services.  In return, ESML agreed to pay $215 million to EPIL and EPIL assigned its claims

based on these obligations to the SC Lenders.  The SC Lenders' Claims against the Debtors are

asserted as assignee of EPIL.  As an assignee, the SC Lenders' Claims are subject to all of the

defenses the Debtors could assert against the assignor, and the assignment does not "cleanse" the

claims; nor does the assignment provide the SC Lenders with any additional defenses or rights of

action against the Debtors that EPIL did not have.  In view of the fact that the rights of the SC

Lenders are derivative of, and limited to, EPIL's rights against the Debtors, the SC Lenders'

liens are subject to avoidance and the SC Lenders' claims are without merit.

        5.       Further, in light of EPIL's failure to perform its obligations in respect of

the Project, any transfers made or purported obligations incurred by the Debtors to EPIL and/or

the SC Lenders in any form (i.e. mortgages, liens and/or security interests) are avoidable

fraudulent transfers—made when the Debtors were insolvent and for less than reasonably

equivalent value.  This is an independent reason to disallow the SC Lenders' Claims and avoid all liens related to such claims.  Through their asserted claims and liens, the SC Lenders have contended that they entered into various agreements with EPIL and the Debtors through which they purportedly received certain security interests in, among other things, the Debtors' assets.  However, the Debtors received little or no value from EPIL or the SC Lenders for any such transfers; the products and services received by ESML from EPIL were worth significantly less than any transfers to the SC Lenders.

6.    Finally, even if the SC Lenders' Claims are not disallowed in full, such claims are grossly overstated.  The SC Lenders' Claims seek over $150 million.  Even if the SC Lenders had provided their entire funding commitment to EPIL (i.e., Rs. 900 crore), which they did not, such funding commitment had a value (to EPIL) of only ~$133 million as of the Petition Date.  Accordingly, the SC Lenders' Claims should be disallowed or, in the alternative, significantly reduced.

<u>**JURISDICTION AND VENUE**</u>

7.    This is a civil proceeding arising in a case under the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, within the meaning of 28 U.S.C. § 1334.  It is properly brought as an adversary proceeding pursuant to Bankruptcy Rule 7001.

8.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 and § 1334(b).

9.    This is a core proceeding under 28 U.S.C. § 157(b).

10.    Venue is proper in this district under 28 U.S.C. § 1409.

## THE PARTIES

11.     Bradley E. Scher is the Litigation Trustee of the SC Mesabi Litigation Trust, the successor in interest to the Debtors.

12.     ESML is a limited liability company organized and licensed under the laws of the State of Minnesota, with its principal place of business at 555 West 27th Street, Hibbing, Minnesota 55746.  ESML is the wholly owned subsidiary of ESML Holdings, Inc. ("Holdings"), a holding company, organized and licensed under the laws of the State of Delaware.

13.     ESML and Holdings (together, the "Debtors") are both indirect wholly owned subsidiaries ultimately of Essar Global.

14.     EPIL is a company organized under the laws of India, and is a wholly owned subsidiary of Essar Projects Limited (Dubai) ("Essar Projects").

15.     Defendant Central Bank of India is a company organized under the laws of India.

16.     Defendant Export Import Bank of India is a company organized under the laws of India.

## FACTUAL ALLEGATIONS

17.     From its inception, ESML was completely reliant upon its affiliates, all of which are wholly owned subsidiaries of Essar Global, for virtually all of the key aspects of its business plan and operations.  ESML's interactions with its affiliates for construction of the Project were never handled on an arm's-length basis. Instead, the contracts governing its engineering, procurement, and construction (collectively, the "Project Contracts") were structured and re-structured by senior management across multiple Essar Affiliates for the

benefit of the Essar Global enterprise as a whole and were designed to manipulate responsibilities and provide the most profit to entities not subject to U.S. taxation. Moreover, the Essar Affiliates often ignored the structure and responsibilities set forth in the Project Contracts altogether.

## A.     The Project Contracts

18.     ESML entered into the first set of Project Contracts with its affiliates in late 2008 (collectively, the "2008 Project Contracts"). The 2008 Project Contracts were not the result of arm's-length negotiations. They were not prepared by ESML, and ESML, which had very few employees at the time it entered into the 2008 Project Contracts, executed the 2008 Project Contracts presented to it without substantive comment.

19.     The 2008 Project Contracts included ESML's agreement with Essar Engineering Services Limited ("Essar Engineering"), dated August 12, 2008, to perform all engineering functions for the Project, for $23 million ("2008 Essar Engineering/ESML Engineering Contract") and (b) Global Supplies FZE, dated September 9, 2008, to perform almost all procurement work, for $365 million ("2008 Global Supplies/ESML Supply Contract").

20.     In early 2010, senior management at various entities in the Essar enterprise decided that ESML should enter into replacement agreements (collectively, the "2010 Project Contracts") with many of the same Essar affiliates as the 2008 Project Contracts. The decision was not made by ESML. As with the 2008 Project Contracts, the 2010 Project Contracts were not negotiated at arm's length; were largely drafted by Essar Affiliates, not ESML; and Essar Affiliates handled all of the technical specifications, budgets, and construction plan issues.

21.     Among the 2010 Project Contracts, ESML entered into a novation of the 2008 Essar Engineering/ESML Engineering Contract with a different entity, Defendant EPIL. Essar Engineering novated its agreement with ESML to EPIL in the novation agreement, dated May 6, 2010 ("2010 Essar Engineering/EPIL Novation"), transferring all rights and obligations under its 2008 agreement with ESML to EPIL.  ESML also entered into an entirely new contract with EPIL dated May 5, 2010, for procurement of offshore goods and the supply of engineering services, for $215 million (the "Supply and Engineering Contract").  EPIL then subcontracted its engineering obligations under the Supply and Engineering Contract to Essar Engineering, with the intention that Essar Engineering would have that work at least partially performed in Mauritius or Singapore.

22.     The decision to restructure the contracts governing the Project through the 2010 Project Contracts was made largely to minimize U.S. tax liability, as well as to take advantage of the additional lending secured through EPIL (as described immediately below).  To do this, the 2010 Project Contracts reallocated a substantial portion of the procurement obligations in existing Project Contracts to EPIL.

**B.     EPIL Financed Its Project Obligations through the SC Lenders**

23.     To fulfill its obligations under the Supply and Engineering Contract, EPIL agreed to open "supply credit facilities" in an amount of 85% of the contract price (i.e., $182.75 million).  In or around August 2010, the SC Lenders agreed to make certain loans in the amount of Rs. 600 crore to EPIL in connection with EPIL's obligations under the Supply and Engineering Contract. This amount was subsequently increased to Rs. 900 crore pursuant to a facility agreement dated June 1, 2012 (the "Facility Agreement").  Borrowings under the Facility Agreement (including amounts previously drawn under the prior agreements) are purportedly

guaranteed and secured by, inter alia, an assignment by EPIL to the SC Lenders of all contracts, rights, securities and insurances with respect to ESML.

24.     On June 1, 2012, EPIL executed that certain Assignment Deed (the "Assignment Deed") assigning to the SC Lenders "the Assigned Rights as security for the Secured Liabilities." The "Assigned Rights" include, inter alia, "all contracts, rights, securities and insurances of [EPIL] with respect to the [Supply and Engineering Contract]." Therefore, to the extent that the SC Lenders assert claims and security interests based upon EPIL's assignment of its rights as against the Debtors, EPIL could only transfer or assign its own rights, subject to defenses that the Debtors have against EPIL.

25.     Following execution of the Supply and Engineering Contract, ESML and certain of its affiliates entered into various agreements to secure ESML's obligations under the Supply and Engineering Contract. These agreements include:

> (a).     a security agreement dated December 29, 2010, pursuant to which ESML granted a continuing lien on and security interest in its assets for the benefit of secured lenders, including EPIL;

> (b).     a membership interest pledge agreement dated March 13, 2011, pursuant to which Essar Steel Holdings Limited (the then-parent of ESML) pledged certain membership interests in ESML for the benefit of certain secured lenders, including EPIL;

> (c).     a mortgage dated March 3, 2014, in respect of certain of ESML's property, granted in favor of EPIL in the amount of $182.75 million (as amended, the "Minnesota Mortgage");

> (d).     an amended and restated security agreement dated September 30, 2014, pursuant to which ESML granted liens on, and security interests in, substantially all of its assets to secure amounts owed to certain secured creditors of ESML (the "Amended Security Agreement");

> (e).     a capital membership interest pledge agreement dated September 30, 2014, pursuant to which ESML Holdings Inc. pledged 100% of its economic and voting interest in ESML as security for, among other things, the financing provided by the SC Lenders; and

> (f).     an amended and restated collateral agreement dated December 15, 2014, pursuant to which ESML assigned its rights to certain funds and

8

escrow accounts to secure the payment of certain liabilities under the
Supply Contract.

26.     By virtue of EPIL's assignment to the SC Lenders of all rights created in
favor of EPIL under certain security documents including, presumably, those set forth herein, the
SC Lenders assert secured claims against the Debtors for no less than $150,416,096.  However,
the Debtors were insolvent at the time that many, if not all, of these transfers were made, and
neither EPIL nor the SC Lenders provided reasonably equivalent value to the Debtors in
exchange for any transfers made by ESML, including any security interests granted by the
Debtors to EPIL and subsequently assigned to the SC Lenders.

## C.      EPIL Failed to Perform Its Project Obligations

27.     EPIL materially failed to perform at least three of its main functions under
the Supply and Engineering Contract: (1) EPIL failed to provide steel fabricated properly to
construct the Project, (2) EPIL failed to provide all of the equipment it was obligated to procure
for the Project, and (3) EPIL failed to complete all required engineering services.  Indeed, EPIL
failed to deliver, and indeed sometimes even failed to order, a significant amount of goods,
including without limitation, pellet removal cranes, valves, expansion joints, slurry pumps, and
water pumps.

28.     The structural steel was originally fabricated by ESML's affiliate, Essar
Heavy Engineering Services in India.  It was not only delayed in being fabricated and shipped to
Minnesota, but it was delivered with numerous issues that required reworking or entirely new
steel to be procured.  An initial assessment of the first thousand metric tons of steel that arrived
at the Project site showed issues with straightness, weld quality, splice plates, and general
incorrect fabrication.  The engineering was incomplete and flawed in numerous respects. For

example, Essar Engineering failed to account for snow loads in winter in designing roofs for

Project buildings.

**D.**      **The SC Lenders Continued to Benefit Despite EPIL's Failures to Perform**

29.      Under the Supply and Engineering Contract, EPIL was responsible for

providing engineering and offshore procurement services for the Project.  The agreement has a

total contract price of $215 million, with an advance due from ESML to EPIL of 15% of the

entire contract price, i.e., $32.25 million.  Of the $215 million contract price, the Supply and

Engineering Contract allocates $179.67 million to the procurement of offshore equipment (the

"Procurement Obligations") and $35.53 million to engineering services (the "Engineering

Services").

30.      To fulfill its Procurement Obligations under the Supply and Engineering

Contract, EPIL entered into the Facility Agreement with the SC Lenders to purchase offshore

goods in an original total amount of approximately $180 million.  Once EPIL procured

equipment for the Project, it was to issue an invoice to ESML, and show proper documentation

to the SC Lenders that the equipment had been shipped to ESML.  Then, (1) the SC Lenders

would pay to EPIL 85% of an invoiced amount, (2) 15% of an invoiced amount price would be

credited against the advance from ESML, (3) ESML would become responsible for re-payment

of the 85% paid to EPIL for the equipment from the Facility Agreement after the expiration of

the agreed moratorium (except that ESML was entitled to retain 10% of each invoice pending

completion of the contract), and (4) ESML would become responsible to EPIL for the interest

that would become due and owing on the amounts outstanding under the Facility Agreement.

Essar Projects guaranteed EPIL's obligations under the Facility Agreement.  Thus, between 2010

and 2016, ESML made the following transfers to the SC Lenders: (a) delivery of liens and other

types of security to the SC Lenders to secure the repayment of the remaining 85% balance owed

to the SC Lenders from the amounts paid to EPIL for purchase of the equipment for the Project

and (b) direct payment to SC Lenders and/or payments through EPIL of interest and other

obligations due and owing under the Facility Agreement.

31.     To fulfill its Engineering Services objections, EPIL was to submit invoices

to ESML and be paid on a progressive basis.  As with invoices for procurement, ESML was

entitled to retain 10% of each invoiced amount for engineering services, to secure full

performance of the contract.  In practice, however, ESML caused the payment of EPIL's

invoices without withholding the 10% retention amount, instead only reducing each invoice in

accordance with the 15% advance.

32.     In return for the deficient Procurement Obligations and inadequate

Engineering Services delivered by EPIL between 2010 and 2016, ESML granted EPIL the

Minnesota Mortgage and liens pursuant to the Amended Security Agreement to secure EPIL's

obligation to the SC Lenders of 85% of the costs advanced by the SC Lenders.  EPIL later

assigned these liens and obligations directly to the SC Lenders.

33.     There are significant issues with EPIL's performance under this

arrangement.  In addition to the unrealistically high margin and issues with the items procured by

EPIL, particularly the steel infrastructure, EPIL did not secure its supplier credit facilities in U.S.

dollars.  It opened the facilities in Indian rupees thereby exposing the Project to unnecessary risk

related to the significant (negative) shift in the exchange rate of the Indian rupee (Rs.) vis-à-vis

the United States Dollar (USD).  Between August 2010 and July 2016, the exchange rate

skyrocketed from trading at 46.8 Rs./USD to 67.4 Rs./USD.  However, by executing the

Assignment Deed and seeking security interests in the Debtors' property, the SC Lenders

effectively represented that they would provide the $182.75 million of financing that was required to complete the Procurement Obligations under Supply and Engineering Contract.  But the rupee-dollar exchange rate continued to deteriorate as ESML executed the Minnesota Mortgage and, later, the Amended Security Agreement—both of which ultimately accrued to the SC Lenders' benefit.  As of the date of the Amended Security Agreement, the SC Lenders' knew (or certainly should have known) that there was a financing shortfall of $30-40 million. Under these circumstances, it is unclear whether EPIL and/or the SC Lenders intended to provide the full amount of the required financing.

E.      **The Chapter 11 Cases and Proofs of Claim Filed**

34.      On July 8, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing these chapter 11 cases (the "Chapter 11 Cases"), jointly administered at Case No. 16-11626 (BLS). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

35.      On August 9, 2016, the Bankruptcy Court entered an order establishing September 30, 2016 (the "General Bar Date") as the final date and time for filing proofs of claim (with certain exceptions) against the Debtors' estates arising prior to the Petition Date, and approving the form and manner of notice of the General Bar Date [Bankr. Docket No. 202]. Prior to the General Bar Date, the Bankruptcy Court entered an order approving a stipulation (the "Bar Date Stipulation") between the Debtors and Essar Global extending the deadline for the EGFL Affiliates (as defined in the Bar Date Stipulation) to file proofs of claim against the Debtors to October 31, 2016 [Bankr. Docket No. 349].

36.     On August 15, 2016, the Debtors filed their Schedules of Assets and Liabilities [Bankr. Docket Nos. 223, 224] (collectively, the "Schedules"). The Schedules list the Central Bank of India (as agent to the SC Lenders) as a creditor with a claim in the amount of $150,416,096.  Within the Schedules, the Debtors identified the claim as contingent, unliquidated, and disputed.

37.     On September 30, 2016, the SC Lenders filed proof of claim no. 144 in the amount of $150,416,096 as a secured claim against Debtor ESML Holdings Inc. ("Claim No. 144") and proof of claim no. 154 in the amount of $150,416,096 as a secured claim against Debtor ESML ("Claim No. 154" and collectively, with Claim No. 144, the "SC Lenders' Claims").  The alleged basis of the SC Lenders' Claims are obligations "arising out of various credit agreements, security documents, pledges and assignments" summarized by an attachment to each claim.

38.     On October 27, 2016, EPIL filed proof of claim no. 181 in the total amount of $155,421,977, of which amount $129,416,289 is asserted as a general unsecured claim and $26,005,688 is asserted as a priority claim against ESML ("Claim No. 181").  The alleged basis of the Claim No. 181 is "[e]quipment & materials supplied and Engineering services performed under a Contract between Debtor and Creditor."  On October 27, 2016, EPIL filed proof of claim no. 182 in the amount of $249,886,561 as a general unsecured claim against ESML ("Claim No. 182").  The alleged basis of Claim No. 182 is "1) Supplier's Credit provided under the Supply and Engineering Contract between Debtor and Creditor; 2) Corporate Guarantee Invocation of Holding company (Essar Projects Limited, Dubai)."

**F.**    **The Confirmation of the Debtors' Plan and Creation of SC Mesabi Litigation Trust**

39.    On June 13, 2017, the Court entered the *Findings of Fact, Conclusions of Law and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [Docket No. 1025] (the "Confirmation Order"). The Confirmation Order confirmed the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [Docket No.. 990] (the "Plan").[2] The effective date of the Plan was December 22, 2017 (the "Effective Date").

40.    Pursuant to the Plan and the Confirmation Order, on the Effective Date, the Debtors, Mesabi Metallics Company LLC (the "Reorganized Company") and Bradley E. Scher, as trustee, executed the SC Litigation Trust Agreement establishing the SC Mesabi Litigation Trust. The SC Mesabi Litigation Trust was created, in part, to administer and liquidate the assets of the SC Mesabi Litigation Trust (including, but not limited to, cause of actions against the Debtors' affiliates) and resolving claims of the Debtors' prepetition secured lenders and making distributions after liquidation of such claims. According to section 8.2 of the Plan:

> The Litigation Trusts shall be the successors to the Debtors for purposes of (i) (A) prosecuting and/or settling the Transferred Causes of Action and (B) prosecuting, objecting to, and settling all affirmative claims or Causes of Action arising from or relating to the Litigation Trust Assets and Trust Claims; and (i) litigating and allowing (A) Claims held by any Creditor that is adverse to a Litigation Trust with respect to the Transferred Causes of Action, (B) all General Unsecured Claims, and (C) Claims held by a Litigation Trust Beneficiary that will receive a distribution from a Litigation Trust (collectively the "Trust Claims").

Furthermore, according to section 8.3 of the Plan:

---

[2] Capitalized terms not defined herein shall have the meaning as provided in the Plan.

The Litigation Trusts, acting through the Litigation Trustees, shall be authorized to exercise and perform the rights, powers, and duties held by the Estates with respect to the Litigation Trust Assets, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of the bankruptcy or insolvency trustee or examiner, or a receiver for the Committee, to provide for the prosecution, objection, settlement, adjustment, retention, and enforcement of the Transferred Causes of Action and Trust Claims.

**G.    Pending Avoidance Actions and Objections to Claims**

41.    On November 19, 2016, the Debtors filed the *Debtors' First (Non-Substantive) Omnibus Objection to Certain Claims* [Bankr. Docket No. 553] (the "Claim Objection") seeking to disallow Claim Nos. 181 and 182 on the grounds that such claims failed to attach documentation sufficient to support the alleged claims against the Debtors, and because Claim Nos. 181 and 182 do not reconcile with the creditor listing and/or amount indicated by the Debtors' books and records.  The Debtors' Claim Objection is incorporated fully herein by reference.

42.    On January 11, 2017, the Debtor Essar Steel Minnesota LLC d/b/a Mesabi Metallics Company LLC filed the *Complaint and Substantive and Non-Substantive Objections to Claim Nos. 179-186* in the Delaware Bankruptcy Court, commencing the adversary proceeding styled Essar Steel Minnesota LLC v. Essar Global Fund Limited, et al., Adv. Case No. 17-50001 (BLS) (as amended, the "Essar Affiliates Adversary Proceeding") including for breach of contract, fraudulent transfer, breach of fiduciary duties and aiding and abetting breach of fiduciary duties, tortious interference with contract, promissory estoppel, claims disallowance, equitable subordination, declaratory relief regarding alter ego, and alter ego against certain affiliates and fiduciaries of the Debtor.  Specifically, the Essar Affiliates Adversary Proceeding seeks in excess of $1 billion as recompense for the damages inflicted upon ESML by the wrongful conduct of the Debtors' affiliates and fiduciaries, including: (1) the Project was not

completed for the contracted price or on time; (2) ESML did not receive reasonably equivalent

value for the over $1.1 billion it paid the Essar Affiliates; (3) the misconduct rendered the Project

more expensive for ESML; (4) the defendants caused ESML to suffer hundreds of millions of

dollars in additional damages and lost profits resulting from the failure to complete the Project

on time; and (5) the defendants wrongfully caused ESML to make payments and incur expenses

that are not even attributable to the Project and rather simply reflect the siphoning of money out

of ESML to other affiliates that had a need for it at the time  The defendants in the Essar

Affiliates Adversary Proceeding include EPIL, and EPIL is expressly named as a defendant for

many, if not all, of the actions listed above, including the turnover of approximately

$206,136,046 in fraudulent transfers and approximately $3,093,883 in preferential transfers.  On

August 29, 2017, the Debtors filed the *First Amended Complaint and Substantive and Non-*

*Substantive Objections to Claim Nos. 179-186* [Adv. Proc. No. 17-50001 (BLS), Docket No. 32]

(the "First Amended Complaint").  The First Amended Complaint filed in the Essar Affiliates

Adversary Proceeding is incorporated fully herein by reference.[3]

       43.     On December 22, 2017, U.S. Bank National Association ("U.S. Bank"),

solely in its capacity as agent for the prepetition term lenders, filed the *Objection of U.S. Bank*

*National Association to Proof of Claim Nos. 144 and 154 Filed by Central Bank of India and*

*Export Import Bank of India* [Bankr. Docket No. 1397] (the "SC Lenders' Claim Objection")

seeking to disallow the SC Lenders' claims on the grounds that (a) EPIL failed to perform under

the Supply and Engineering Contract and the Debtors are entitled to recovery of all transfers

made through such agreement as detailed in the Essar Affiliates Adversary Proceeding; (b) the

SC Lenders' claims, asserted as an assignee of EPIL, are subject to all of the defenses that the

---

[3] The Plaintiffs hereby consent to the consolidation of this action with the Essar Affiliates Adversary
Proceeding.

Debtors could assert against EPIL; and (c) any transfers made directly from the Debtors to the SC Lenders were made for less than reasonably equivalent value and are recoverable by the Debtors.

## FIRST CAUSE OF ACTION

**(Avoidance and Recovery of Fraudulent Transfers - Constructive)**
**[11 U.S.C. §§ 544 and 550, and applicable state law, including Minn. Stat. § 513.44]**

44.     Plaintiff hereby repeats and realleges each of the above paragraphs as though fully set forth herein.

45.     Under section 544(b) of the Bankruptcy Code, any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

46.     Between July 8, 2010 and July 8, 2016, ESML made transfers to or for the benefit of the Defendants of (a) various liens, collateral and other security pursuant to the Minnesota Mortgage, the Amended Security Agreement and other collateral security agreements related to the Facility Agreement and (b) certain funds to satisfy the obligations incurred by EPIL under the Facility Agreement (the "Six Year Fraudulent Transfers").  Attached hereto as **Exhibit A** is a chart detailing the dates and amounts of all of the Six Year Fraudulent Transfers referenced above.  The total amount of the Six Year Fraudulent Transfers is approximately $176,070,683.[4]

---

[4] Certain of the Six Year Fraudulent Transfers may be duplicative of the fraudulent transfers asserted against EPIL in the First Amended Complaint filed in the Essar Affiliates Adversary Proceeding.  Where

47.     Each of the Six Year Fraudulent Transfers constituted a transfer of an interest in the property of the ESML.

48.     Each of the Six Year Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.

49.     At the times of, and subsequent to, each of the Six Year Fraudulent Transfers, ESML had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

50.     Each of the Six Year Fraudulent Transfers:  (1) was made when ESML was insolvent; (2) rendered ESML insolvent; (3) left ESML with unreasonably small capital in relation to ESML's business at the time; and/or (4) was made when ESML intended to incur, or believed or reasonably should have believed that ESML would incur, debts beyond ESML's ability to pay as they became due.

51.     By virtue of the foregoing, each of the Six Year Fraudulent Transfers was a fraudulent transfer avoidable under applicable state law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code, and Plaintiff is entitled to avoid and recover each of the Six Year Fraudulent Transfers under sections 544 and 550 of the Bankruptcy Code.

52.     Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -- (1) the initial

---

duplicative, these Six Year Fraudulent Transfers are asserted herein to recover a transfer to a subsequent transferee of ESML's assets as permitted by 11 U.S.C. § 550(a)(2).  No duplicative recovery is intended.

transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

53.     Each Defendant is the initial transferee of one or more of the Six Year Fraudulent Transfers, the entity for whose benefit one or more of the Six Year Fraudulent Transfers was made, or an immediate or mediate transferee of the subject transfer.

54.     To the extent that one or more of the Six Year Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each Defendant to this cause of action pursuant to section 550(a) of the Bankruptcy Code.

55.     Plaintiff seeks to recover damages from the Defendants in an amount equal to the dollar value of the property transferred pursuant to each of the Six Year Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

## SECOND CAUSE OF ACTION

**(Avoidance and Recovery of Fraudulent Transfers - Intentional)**
**[11 U.S.C. §§ 544 and 550, and applicable state law, including Minn. Stat. § 513.44]**

56.     Plaintiff hereby repeats and realleges each of the above paragraphs as though fully set forth herein.

57.     Under section 544(b) of the Bankruptcy Code, any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

58.     ESML made the Six Year Fraudulent Transfer of funds to or for benefit of the Defendants from July 8, 2010 through July 8, 2016.

59.     Each of the Six Year Fraudulent Transfers constituted a transfer of an interest in the property of ESML.

60.     Each of the Six Year Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.

61.     At the times of, and subsequent to, each of the Six Year Fraudulent Transfers, ESML had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

62.     Each of the Six Year Fraudulent Transfers:  (1) was made when ESML was insolvent; (2) rendered ESML insolvent; (3) left ESML with unreasonably small capital in relation to ESML's business at the time; and/or (4) was made when ESML intended to incur, or believed or reasonably should have believed that ESML would incur, debts beyond ESML's ability to pay as they became due.

63.     At the time of each of the Six Year Fraudulent Transfers, ESML intended or believed that ESML would incur debts beyond its ability to pay as such debts matured.

64.     Each of the Six Year Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud present or future creditors.

65.     By virtue of the foregoing, each of the Six Year Fraudulent Transfers was a fraudulent transfer avoidable under applicable state law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code, and Plaintiff is entitled to avoid and recover each of the Six Year Fraudulent Transfers under sections 544 and 550 of the Bankruptcy Code.

66.     Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -- (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

67.     Each Defendant is the initial transferee of one or more of the Six Year Fraudulent Transfers, the entity for whose benefit one or more of the Six Year Fraudulent Transfers was made, or an immediate or mediate transferee of the subject transfer.

68.     To the extent that one or more of the Six Year Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each Defendant to this cause of action pursuant to section 550(a) of the Bankruptcy Code.

69.     Plaintiff seeks to recover damages from each defendant to this cause of action in an amount equal to the dollar value of the property transferred pursuant to each of the Six Year Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

## THIRD CAUSE OF ACTION

**(Avoidance and Recovery of Fraudulent Transfers - Constructive)**
**[11 U.S.C. §§ 544, 548 and 550, and applicable state law, including Minn. Stat. § 513.44]**

70.     Plaintiff hereby repeats and realleges each of the above paragraphs as though fully set forth herein.

71.     Under section 544(b) of the Bankruptcy Code, any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is

avoidable under applicable law by a creditor holding an unsecured claim that is allowable under

section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the

Bankruptcy Code.  The phrase "under applicable law" has been interpreted to include the states'

fraudulent transfer laws that would govern potentially fraudulent transactions.

72.     Between July 8, 2014 through July 8, 2016, ESML made transfers to or for

the benefit of the Defendants of (a) various liens, collateral and other security pursuant to the

Minnesota Mortgage, the Amended Security Agreement and other collateral security agreements

related to the Facility Agreement and (b) certain funds to satisfy the obligations incurred by

EPIL under the Facility Agreement (the "Two Year Fraudulent Transfers").  Attached hereto as

**Exhibit B** is a chart detailing the dates and amounts of all of the Two Year Fraudulent Transfers

referenced above.  The total amount of the Two Year Fraudulent Transfers is approximately

$40,413,130.[5]

73.     ESML made transfers of (a) funds to or for benefit of the Defendants in an

amount including, but not limited to, approximately $40,413,130 and (b) various secured

obligations to or for benefit of the Defendants pursuant to the Minnesota Mortgage, the

Amended Security Agreement and other collateral security agreements related to the Facility

Agreement (the "Two Year Fraudulent Transfers").  Attached hereto as **Exhibit B** is a chart

detailing the dates and amounts of all of the Two Year Fraudulent Transfers referenced above.

74.     Each of the Two Year Fraudulent Transfers constituted a transfer of an

interest in the property of ESML.

---

[5]  Certain of the Two Year Fraudulent Transfers may be duplicative of the fraudulent transfers asserted against EPIL in the First Amended Complaint filed in the Essar Affiliates Adversary Proceeding.  Where duplicative, these Six Year Fraudulent Transfers are asserted herein to recover a transfer to a subsequent transferee of ESML's assets as permitted by 11 U.S.C. § 550(a)(2).  No duplicative recovery is intended.

75.     Each of the Two Year Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.

76.     At the times of, and subsequent to, each of the Two Year Fraudulent Transfers, ESML had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

77.     Each of the Two Year Fraudulent Transfers: (1) was made when ESML was insolvent; (2) rendered ESML insolvent; (3) left ESML with unreasonably small capital in relation to ESML's business at the time; and/or (4) was made when ESML intended to incur, or believed or reasonably should have believed that ESML would incur, debts beyond ESML's ability to pay as they became due.

78.     By virtue of the foregoing, each of the Two Year Fraudulent Transfers was a fraudulent transfer avoidable under section 548 of the Bankruptcy Code and applicable state law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code, and Plaintiff is entitled to avoid and recover each of the Two Year Fraudulent Transfers under sections 544 and 550 of the Bankruptcy Code.

79.     Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -- (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

80.     Each Defendant is the initial transferee of one or more of the Two Year Fraudulent Transfers, the entity for whose benefit one or more of the Two Year Fraudulent Transfers was made, or an immediate or mediate transferee of the subject transfer.

81.     To the extent that one or more of the Two Year Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each Defendant to this cause of action pursuant to section 550(a) of the Bankruptcy Code.

82.     Plaintiff seeks to recover damages from the Defendants in an amount equal to the dollar value of the property transferred pursuant to each of the Two Year Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

## FOURTH CAUSE OF ACTION

**(Avoidance and Recovery of Fraudulent Transfers - Intentional)**
**[11 U.S.C. §§ 544, 548 and 550, and applicable state law, including Minn. Stat. § 513.44]**

83.     Plaintiff hereby repeats and realleges each of the above paragraphs as though fully set forth herein.

84.     Under section 544(b) of the Bankruptcy Code, any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

85.     ESML made the Two Year Fraudulent Transfer of funds to or for benefit of the Defendants from July 8, 2014 through July 8, 2016.

86.     Each of the Two Year Fraudulent Transfers constituted a transfer of an interest in the property of ESML.

87.     Each of the Two Year Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.

88.     At the times of, and subsequent to, each of the Two Year Fraudulent Transfers, ESML had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

89.     Each of the Two Year Fraudulent Transfers:  (1) was made when ESML was insolvent; (2) rendered ESML insolvent; (3) left ESML with unreasonably small capital in relation to ESML's business at the time; and/or (4) was made when ESML intended to incur, or believed or reasonably should have believed that ESML would incur, debts beyond ESML's ability to pay as they became due.

90.     At the time of each of the Two Year Fraudulent Transfers, ESML intended or believed that ESML would incur debts beyond its ability to pay as such debts matured.

91.     Each of the Two Year Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud present or future creditors.

92.     By virtue of the foregoing, each of the Two Year Fraudulent Transfers was a fraudulent transfer avoidable under section 502 of the Bankruptcy Code and applicable state law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code, and Plaintiff is entitled to avoid and recover each of the Two Year Fraudulent Transfers under sections 544 and 550 of the Bankruptcy Code.

93.     Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548,

549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -- (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

94.     Each Defendant is the initial transferee of one or more of the Two Year Fraudulent Transfers, the entity for whose benefit one or more of the Two Year Fraudulent Transfers was made, or an immediate or mediate transferee of the subject transfer.

95.     To the extent that one or more of the Two Year Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each Defendant to this cause of action pursuant to section 550(a) of the Bankruptcy Code.

96.     Plaintiff seeks to recover damages from each defendant to this cause of action in an amount equal to the dollar value of the property transferred pursuant to each of the Two Year Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

## FIFTH CAUSE OF ACTION

### (For A Declaratory Judgment That Determines the Nature, Extent, Priority and Validity of Liens)

97.     Plaintiff hereby repeats and realleges each of the above paragraphs as though fully set forth herein.

98.     The Defendants, as the assignee of EPIL and holder of purported mortgages and security interests under various agreements related to the Facility Agreement,

claim an interest in the assets or distribution from the Debtors' estates by reason of its claims or recorded security interests.

99.     Plaintiff asserts that the Defendants' purported mortgage and security interests and all parts thereof are invalid, null, void and of no force or effect because ESML did not receive any consideration for the granting of the mortgages and security interests.

100.     Plaintiff requests judgment that (a) the Defendants' mortgage and security interests are (i) invalid or unperfected and, thus, is null, void and of no force or effect or (ii) of no value, and not enforceable against the Debtors' estates; and (b) the mortgage and security interests are expunged and extinguished of record.

## SIXTH CAUSE OF ACTION

### (Objection Seeking Disallowance or Reduction of Claim No. 144 and Claim No. 154) [11 U.S.C. §§ 502(b) and (d)]

101.     Plaintiff hereby repeats and realleges each of the above paragraphs as though fully set forth herein.

102.     Plaintiff objects to the allowance of Claim No. 144 and Claim No. 154 in their entirety.

103.     SC Lenders are entities from which property is recoverable under section 550 of the Bankruptcy Code.

104.     SC Lenders are transferees of certain Six Year Fraudulent Transfers and Two Year Fraudulent Transfers avoidable under section 544 of the Bankruptcy Code.

105.     SC Lenders have not repaid the amount of the Six Year Fraudulent Transfers or Two Year Fraudulent Transfers, or turned over such property to the Debtors, for which SC Lenders are liable under section 550 of the Bankruptcy Code.

106.    Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of SC Lenders, including those asserted in Claim No. 144 and Claim No. 154, against the Debtors must be disallowed until such time that SC Lenders pays to Plaintiff an amount equal to the aggregate amount of the Fraudulent Transfers received by SC Lenders, plus interest thereon and costs.

107.    Because ESML and the SC Lenders have no direct contractual relationship, the SC Lenders' Claims are derivative of, and dependent on EPIL's rights as against ESML, given that such claims are premised upon an assignment of EPIL's rights to the SC Lenders.

108.    The Supply and Engineering Contract required EPIL to provide engineering and offshore procurement services for the Project.  EPIL materially breached the Supply and Engineering Contract and other supplemental agreements in numerous respects, including by materially failing to perform at least three of its primary functions under those agreements: (i) EPIL failed to provide steel fabricated properly to construct the Project; (ii) EPIL failed to provide all of the equipment it was obligated to procure for the Project; and (iii) EPIL failed to complete all required engineering services.  Specifically, EPIL failed to deliver, and indeed sometimes even failed to order, a significant amount of goods, including without limitation, pellet removal cranes, valves, expansion joints, slurry pumps, and water pumps. These defects, and related contractual breaches, provide ESML with substantial defenses to any claims EPIL or the SC Lenders, as assignees, may assert in relation to the Supply Contract.

109.    As assignees of EPIL, the SC Lenders cannot be in a better position than EPIL.  EPIL has no claim against the Debtors and, therefore, the SC Lenders' Claims must be disallowed in their entirety.

## SEVENTH CAUSE OF ACTION

### (Equitable Subordination)
### [11 U.S.C. §§ 510(c) and 105(a)]

110.    Plaintiff hereby repeats and realleges each of the above paragraphs as though fully set forth herein.

111.    The SC Lenders engaged in inequitable conduct, including conduct described in this Complaint, which has resulted in injury to the creditors or conferring of an unfair advantage on the Defendants.  This inequitable conduct has resulted in harm to the Plaintiff and to its entire creditor body, in that creditors have been misled as to the true financial condition of Plaintiff, have been induced to extend credit and/or provide services without knowledge of the actual facts regarding Plaintiffs' financial condition, and are less likely to recover the full amounts due to them because of the Defendants' conduct.

112.    In calculating their claims, the SC Lenders failed to account for the significant (negative) shift in the exchange rate of the Indian rupee (Rs.) vis-à-vis the United States Dollar (USD).  Between August 2010 and July 2016, the exchange rate skyrocketed from trading at 46.8 Rs./USD to 67.4 Rs./USD. However, by seeking security interests in the Debtors' property, the SC Lenders effectively represented that they would provide the $182.75 million of financing that was required to complete the Procurement Obligations under the Supply and Engineering Contract. But the rupee-dollar exchange rate continued to deteriorate as ESML executed the Minnesota Mortgage and, later, the Amended Security Agreement—both of which ultimately accrued to the SC Lenders' benefit.  As of the date of the Amended Security Agreement, the SC Lenders' should have known that there was a financing shortfall of $30-40 million.  The SC Lenders made no effort to remedy the financing shortfall.

113.    Under principles of equitable subordination, all claims asserted against the Debtors by the SC Lenders, to the extent that such claims are not disallowed under the claim objections detailed above, should be subordinated for purposes of distribution, pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

114.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief and respectfully requests that the Court enter relief and judgment in its favor and against the Defendants as follows:

(a).    Entering judgment in favor of the Plaintiff and against the Defendants in this action on each claim;

(b).    Declaring the Six Year Fraudulent Transfers and Two Year Fraudulent Transfers identified herein are avoided and set aside as both constructively and intentionally fraudulent;

(c).    Directing and ordering that the Defendants turn over to the Plaintiff the full amount or value of the Fraudulent Transfers pursuant to Section 550 of the Bankruptcy Code;

(d).    Entering judgment that: (a) SC Lenders' asserted lien either is (i) invalid or unperfected and, thus, is null, void and of no force or effect or (ii) of no value, and not enforceable against the Debtors' assets; and (b) SC Lenders' Claim of Lien is expunged and extinguished of record;

(e).    Disallowing Claim No. 144 and Claim No. 154 in their entirety; and

(f).    Granting Plaintiff such other and further relief as the Court finds just and proper.

Dated:   June 20, 2018

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld (CA Bar No. 130063)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  ljones@pszjlaw.com
        akornfeld@pszjlaw.com
        tcairns@pszjlaw.com

*Attorneys for Bradley E. Scher, Litigation Trustee
to SC Mesabi Litigation Trust*